Jerry CARLOCK, Gerald Sullivan, Sullock Corporation, Jerrold Crawford, Mary Crawford, John Emry, Marjorie Goldfine, Sander Goldfine, Henry Goldfine, Sacramento Mighty Good Ice Cream, Inc., Dorothy Kranhold, Lester Kranhold, Steven Kranhold, Mark Reiff, Jeffrey Dilson, Jacqueline Dilson, Barry Dumont, Connie Dumont, Caledonia Ice Cream, Inc., Abby Goodman, Robert Goodman, Foothills Ice Cream Works Limited, Edwin Hines, Jennifer Wein, Green Mountain Ice Cream Co., Inc., John Fulton, Sharon Fulton, Frances Fulton, David Fulton, Frances T. Ellsworth, Roy Ellsworth, Howard Belodoff, Idaho Ices, Inc., Janet Drago, Noel Drago, Marsha McCroskey, Christine Curtis, Timothy Curtis, The Inside Scoop, Inc. and I.C.E., Inc., Plaintiffs,

v.

The PILLSBURY COMPANY, The Haagen–Dazs Shoppe Company, Inc., The Haagen–Dazs Co., Inc., HDF Liquidating Corporation, HDI Liquidating Corporation, WSC Liquidating Corporation, and Doris Mattus–Hurley, Defendants.

Thomas DWYER, Tivoli Enterprises, Inc., Vanilla Chip Ice Cream, Co., Aaron Pinkus and Marcia Pinkus, Plaintiffs,

v.

The PILLSBURY COMPANY, The Haagen–Dazs Shoppe Company, Inc., The Haagen–Dazs Co., Inc., HDF Liquidating Corporation, HDI Liquidating Corporation, WSC Liquidating Corporation, and Doris Mattus–Hurley, Defendants.

Civ. Nos. 4–87–517, 4–87–586.

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 9, 1989.

Richard I. Diamond, Jeff Ross and Mitchell Scott Paul, Estes, Parsinen & Levy and Barry G. Reed, Zimmerman & Reed, Minneapolis, Minn., for plaintiffs.

David Forsberg, Jeffrey Keyes, Jeffrey Shaw and Sally Scoggin, Briggs & Morgan, St. Paul, Minn. and Jonathan L. Eisenberg, Minneapolis, Minn., for defendants Pillsbury Co., Haagen–Dazs Shoppe Company, Inc. and Haagen–Dazs Co., Inc.

William Z. Pentelovitch, Rebecca Palmer, Virginia Bell and Wayne S. Moskowitz, Maslon, Edelman, Borman & Brand, Minneapolis, Minn. and Yee Wah Chin, Shea & Gould, of counsel, New York City, for defendants HDF Liquidating Corp., HDI Liquidating Corp., WSC Liquidating Corp. and Doris Mattus–Hurley.

## TABLE OF CONTENTS

INTRODUCTION .................................................... 798
PARTIES .......................................................... 799
 A. The Defendants .............................................. 800
 B. The Plaintiffs .............................................. 800
FACTUAL BACKGROUND .............................................. 802
 A. The Haagen–Dazs Franchise .................................... 802
 B. Plaintiffs' Allegations ........................................ 804
DISCUSSION ....................................................... 806

I. BREACH OF CONTRACT AND THE IMPLIED COVENANTS OF GOOD FAITH AND FAIR DEALING ........... 806
 A. Choice of Law ............................................... 806
 B. Governing Law ............................................... 811
 C. Plaintiffs' Specific Allegations of Breach ...................... 816
 D. Summary of Disposition of the Contract and Implied Covenant Claims ........... 826
II. FRAUD OR MISREPRESENTATION ............................... 826
 A. Claims of Fraudulent Inducement .............................. 827
 B. Claims Concerning Distribution ................................ 832
 C. Claims of Fraud in the Operation of the Franchise System ....... 834
 D. Summary of Disposition of Plaintiffs' Claims for Fraud or Misrepresentation ........... 842
III. MONOPOLIZATION .............................................. 842
IV. PRICE DISCRIMINATION ......................................... 843
 A. Robinson–Patman Act .......................................... 843
 B. Oregon Price Discrimination Act ............................... 847
 C. Colorado Unfair Practices Act ................................. 848
 D. Idaho Unfair Practices Law .................................... 848
 E. California Unfair Practices Act ................................ 848
V. STATE CONSUMER FRAUD STATUTES ........................... 849
 A. Minnesota Consumer Fraud Act ................................ 849
 B. Idaho Consumer Protection Act ................................ 850
 C. Washington Franchise Investment Protection Act ................ 852
VI. STANDING OF PLAINTIFF CORPORATIONS ...................... 853
VII. STANDING OF DAVID FULTON AND FRANCES FULTON ........ 854
VIII. STANDING OF JOHN FULTON AND SHARON FULTON .......... 855
IX. VALIDITY OF RELEASES ........................................ 856
 A. Adequacy of Consideration ..................................... 857
 B. Fraud ......................................................... 858
 C. Coercion ...................................................... 858
 D. Scope of the Releases ......................................... 858
CONCLUSION ....................................................... 859

---

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

### INTRODUCTION

These two actions have been brought by sixteen groups of Haagen–Dazs franchisees against the franchisors, manufacturers and distributors of that well-known ice cream. The plaintiffs in the *Carlock* case are franchisees whose Haagen–Dazs "shoppes" are located in California, Colorado, Idaho, Oregon and Washington. The plaintiffs in the *Dwyer* case are franchisees with shoppes located in Minnesota. One plaintiff in the *Dwyer* case, Thomas Dwyer, was the local distributor for Haagen–Dazs in the Twin Cities area, as well as a franchisee. In both cases, plaintiffs allege fraud, misrepresentation, breach of contract, breach of the implied covenants of good faith and fair dealing, antitrust violations, and various state statutory claims. Two motions are now before the Court.[1] Defendants have moved for sum-

---

1. Defendants have also filed a motion to strike the March 22, 1989 affidavit of Jeff Ross (Ross Aff. I), the March 22, 1989 affidavit of Mitchell Scott Paul, and the April 28, 1989 affidavit of Barry Sacks. Ross and Paul are two of plaintiffs' trial lawyers. As noted in Wright & Miller, "[a]ttorneys' affidavits are governed by the same rules that apply to other affidavits under Rule 56. Thus, an attorney's affidavit is admissible only to prove facts that are within his personal knowledge and as to which he is competent to testify...." 10A C. Wright, A. Miller and & M. Kane, *Federal Practice & Procedure: CIVIL 2d* § 2738 at 495.

 Defendants correctly describe the Ross affidavit as eighteen pages of "argument and hearsay."

 The material contained within the affidavit is not within Ross' personal knowledge. Nevertheless, because plaintiffs' brief contained few cites to the record, the Court had to rely heavily on the cites in the Ross affidavit while doing the factual research for this decision. For that reason, defendants' motion will be denied despite the fact that the Court agrees that the Ross affidavit is improper. In order to sort through the voluminous record in this case, the Court necessarily had to consider the information in the affidavit. With respect to any future motions, plaintiffs are admonished not to make any similar attempts to evade the page limits set by the Court.

mary judgment on all but one of plaintiffs' claims.[2] Plaintiffs have moved for summary judgment on their claim that the royalty and advertising contributions collected by defendants exceeded the amounts provided by the franchise agreement.

## PARTIES

### A. *The Defendants*

There are seven defendants in each case. Three of the defendants are the corporations which originally developed and marketed Haagen–Dazs ice cream, now titled the WSC Liquidating Corporation, the HDF Liquidating Corporation, and the HDI Liquidating Corporation. The operations of those corporations were sold to the Pillsbury Company on July 11, 1983. The Pillsbury Company and the two subsidiaries responsible for its Haagen–Dazs operations are also defendants in these cases. In addition, there is one individual defendant, Doris Mattus–Hurley.

### 1. Doris Mattus–Hurley (Mattus–Hurley)

Mattus–Hurley is the daughter of Reuben Mattus and Rose Mattus, the founders of the Haagen–Dazs ice cream business. Mattus–Hurley opened the first Haagen–Dazs Shoppe in 1976, founded the franchise system in 1978, and served as president of the franchisor corporations from 1978 to 1985.

### 2. WSC Liquidating Corporation (WSC)

Originally named the Woodbridge Sweets Company, WSC was founded by Reuben Mattus and Rose Mattus. WSC manufactured Haagen–Dazs ice cream at its plant in Woodbridge, New Jersey and sold the ice cream to approximately 150 distributors who in turn sold the ice cream to retailers. WSC also sold ice cream to Mattus–Hurley's franchise company, which in turn sold the ice cream to its franchisees. The business and affairs of WSC have been wound up and liquidated.

### 3. HDF Liquidating (HDF)

HDF was founded in 1978 by Mattus–Hurley under the name Haagen–Dazs Franchise, Inc. HDF franchised about 300 Haagen–Dazs Shoppes around the country.

---

The Paul affidavit contains detailed analysis of the figures for annual shoppe sales and square footage in an attempt to prove that certain of defendants' alleged representations were false. The Court does not consider it improper for detailed analysis of documentary evidence to be presented in the form of an affidavit. Defendants have done the same with the affidavit of Jane E. Love, which calculates the maximum adjusted royalties called for under defendants' interpretation of the franchise agreement.

Barry Sacks was a Haagen–Dazs distributor in Pennsylvania and Washington, D.C. Like plaintiff Thomas Dwyer, Sacks opened a Haagen–Dazs shoppe before HDF was created and the franchise system developed. Sachs states in his affidavit that he "was part of several discussions concerning the development of the Haagen–Dazs dip shoppe concept." Affidavit of Barry Sacks at par. 4. On that basis alone, Sacks proceeds to assert facts clearly outside his own personal knowledge and contrary to the requirements of Fed.R.Civ.P. 56(c). Some illustrations include:

> 5. The Mattus family was always far more interested in what the dip shoppes could do to develop new markets ... than in the dip shoppes themselves.
>
> ....
>
> 8. I was aware that Doris Mattus knew next to nothing about franchising....
>
> ....
>
> 12. Neither the well being of franchisees, nor their competitive situation, nor the promises that had been made to franchisees were

ever, to my knowledge, significant issues when it came to a question of making money for Doris Mattus.

Sacks Aff. at 2.

All of these statements are nothing more than conclusory allegations as to what the Mattus family "was interested in," "knew" or did not know, or believed or did not believe. Sacks is not qualified to testify as to what the Mattus family was thinking and his statements to that effect are inadmissible and should be disregarded. *See Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1367 (8th Cir.1983) (affidavit of corporate officer as to reasons why another company began buying from dealers other than his company did not create a fact issue on motion for summary judgment because it comprised "inferences, opinions and surmises" and not facts of which he had knowledge). *Coca Cola Co. v. Overland, Inc.,* 692 F.2d 1250 (9th Cir.1982) (employees of defendant's bar were not qualified to testify as to what their customers were thinking when they used the term "Coke," thus affidavit of employees that customers used "Coke" in the generic sense inadmissible on motion for summary judgment). Therefore, defendants' motion to strike the Sacks affidavit will be granted.

2. The defendants did not move for summary judgment on the Minnesota Franchise Act claims in *Dwyer.*

HDF purchased ice cream from WSC and resold it to franchisees. HDF is now an inactive corporation.

4. HDI Liquidating Corporation (HDI)

HDI, originally known as Haagen–Dazs, Inc., distributed ice cream in metropolitan New York. It purchased ice cream from WSC and resold it to retailers in the New York area. HDI has been liquidated.

5. The Pillsbury Company (Pillsbury)

Pillsbury, a diversified international food and restaurant company, purchased the assets of WSC, HDF, and HDI and related entities on July 11, 1983.

6. The Haagen–Dazs Company, Inc. (HDC)

HDC is a wholly-owned subsidiary of Pillsbury which was created to manufacture Haagen–Dazs ice cream. HDC operates the original Woodbridge, New Jersey plant as well as a newer plant in Tulare, California. Like WSC before it, HDC sells ice cream to distributors for resale to retailers and to the franchise company (the Haagen–Dazs Shoppe Company, Inc., discussed below) for resale to franchisees.

7. The Haagen–Dazs Shoppe Company, Inc. (HDSC)

HDSC, a wholly-owned subsidiary of Pillsbury, operates the franchise shoppe business. It is the assignee of the franchise agreements to which HDF was a party. HDSC purchases ice cream from HDC and resells it to franchisees.

B. *The Plaintiffs*

The claims in the *Carlock* case involve eighteen shoppes; the *Dwyer* claims involve five shoppes. The chart below summarizes, for each plaintiff, the date each franchise agreement was signed, the location of each franchise, and whether the franchise remains open.

SUMMARY OF PLAINTIFFS

| Plaintiffs | Date of Franchise Agreement | City in Which Franchise Located | Status of Franchise |
|---|---|---|---|
| Thomas Dwyer | 6/9/80 [a] | Minneapolis, Minnesota | Closed 12/31/88 |
| | 6/9/80 [b] | Minneapolis, Minnesota | Closed 11/88 |
| | 5/17/82 | Minneapolis, Minnesota | Closed 11/84 |
| | 10/4/84 [c] | Minnetonka, Minnesota | Closed 11/30/87 |
| Robert Goodman, Abby Goodman, Foothills Ice Cream Works Ltd. | 6/1/79 | Denver, Colorado | Open |
| | 6/18/82 | Littleton, Colorado | Closed 7/19/87 |
| Janet Drago, Noel Drago (the Dragos only assert claims based on the Broadway and Tukwila stores) | 9/22/80 | Seattle, Washington (Broadway | Closed 12/88 |
| | 3/1/82 | Seattle, Washington (Pike Street Market) | Open |
| | 5/18/81 | Bellevue, Washington | Open |
| | 12/2/82 | Tukwila, Washington | Closed 5/87 |
| Christine Curtis, Timothy Curtis, Inside | 2/26/81 | Seattle, Washington | Open |

| Plaintiffs | Date of Franchise Agreement | City in Which Franchise Located | Status of Franchise |
|---|---|---|---|
| Scoop, Inc. | 4/2/82 | Seattle, Washington | Open |
| Jerry Carlock, Gerald Sullivan, Sullock Corporation | 10/12/81 | San Francisco, California | Closed (Destroyed by Fire 12/88) |
| John Fulton, Sharon Fulton,[d] Frances Fulton, David Fulton | 3/10/82 | Eugene, Oregon | Open |
| Mark Reiff [e] | 4/19/82 | San Francisco, California | Open |
| Marjorie Goldfine, Sander Goldfine, Henry Goldfine, Mighty Good Ice Cream, Inc. | 6/24/82 | Sacramento, California | Closed 7/87 |
| Jennifer Wein, Green Mountain Ice Cream Co., Inc.[f] | 11/19/82 | Lakewood, Colorado | Closed 2/7/88 |
| Aaron Pinkus, Marcia Pinkus | 12/8/82 | Edina, Minnesota | Open |
| Barry Dumont, Connie Dumont, Jeffrey Dilson, Jaqueline Dilson, Caledonia Ice Cream Co. | 12/20/82 | Vail, Colorado | Open |
| | 8/5/83 | Arvada, Colorado | Closed 9/1/86 |
| Frances T. Ellsworth, Roy Ellsworth, Howard Belodoff, Idaho Ices, Inc. | 12/28/82 | Boise, Idaho | Open |
| Jerry Crawford, Mary Crawford | 10/4/83 | Stockton, California | Open |
| Dorothy Kranhold, Steven Kranhold, Lester Kranhold | 12/7/83 | San Diego, California | Open |
| John Emry [g] | 3/12/84 | San Francisco, California | Open |
| Edwin Hines [g] | 4/29/85 | Englewood, Colorado | Closed 10/88 |

---

Most of this chart is taken from Defendants' Memorandum at 8–9.[3]

3. Footnotes to chart summarizing plaintiffs.

 a. Shoppe opened April 1978, before franchise agreement signed.

 b. Shoppe opened May 1980 before franchise agreement signed.

 c. This is the date Dwyer acquired ownership of a previously established shoppe.

 d. David Fulton and Frances Fulton are the parents of John Fulton. David Fulton and Frances Fulton were not parties to the original franchise agreement; however, they took over the operation of the shoppe in or about October 1985 when John Fulton and his wife Sharon Fulton declared bankruptcy. Although David Fulton and Frances Fulton have signed a franchise agreement, HDSC has not consented to the transfer of the franchise because John Fulton and Sharon Fulton refused to sign a general release in favor of HDSC. Affidavit of Stephen Van Velkinburgh par. 4, 5. The standing of David Fulton and Frances Fulton to pursue their claims is discussed at pages 155–57.

 e. Mark Reiff is the executor of the estate of Melvin Albaum, the named franchisee, who is deceased.

 f. Co-franchisee Julie Strom is not a party.

 g. Emry and Hines purchased their shoppes from prior franchisees who are not parties.

## FACTUAL BACKGROUND

In the late 1950's, Reuben Mattus identified an untapped market for a high-quality ice cream. Mattus developed a "super premium" ice cream and named it "Haagen–Dazs" to give the product a Scandinavian flair. Affidavit of William Z. Pentelovich Exh. C. In 1961, Mattus began selling Haagen–Dazs ice cream in prepackaged pints to small stores and delicatessens in the New York metropolitan area. *Id.*

During the 1970's, sales of the product expanded into grocery store chains, convenience stores and other retail outlets. In 1980, 27,140,960 prepackaged pints of Haagen–Dazs ice cream were distributed to convenience store chains, supermarkets, grocery stores, and other retailers throughout the United States, including the 7–Eleven convenience store chain of Southland Corporation. Pentelovich Aff. Exh. D. In 1981 sales increased to more than 40 million prepackaged pints. *Id.* By 1983, it had grown to 72,531,952 prepackaged pints. *Id.*

### A. *The Haagen–Dazs Franchise*

Doris Mattus–Hurley, the daughter of Reuben Mattus, opened the first Haagen–Dazs shoppe in Brooklyn Heights, New York in 1976. Affidavit of Doris Mattus–Hurley at 37. At the shoppe, customers bought Haagen–Dazs ice cream scooped out of bulk containers and served in a variety of forms such as cones, cups, sundaes, shakes and sodas. Related products such as brownies, cookies and soft drinks were also sold. The first shoppe prospered, and over the next several years, Mattus–Hurley opened additional shoppes herself. Mattus–Hurley also authorized various business associates, including plaintiff Dwyer, to open shoppes.

In July 1978, Mattus–Hurley formed HDF as a first step towards creating a national franchise system. The franchise system would be a second avenue for the distribution of Haagen–Dazs ice cream.

The relationship between HDF and its franchisees is based upon a written contract, the franchise agreement. *See* Pentelovich Aff. Exh. F. In addition, offering circulars provided to persons considering the purchase of a franchise contained disclosures and disclaimers regarding the franchises. *See* Pentelovich Aff. Exh. J.

The same franchise agreement was used from 1978 to the present. Representatives of HDF signed the franchise agreements prior to July 11, 1983, and HDSC signed for the franchisor after that date. HDSC was also the assignee of all the franchise agreements signed by HDF. No other defendant entered into any franchise agreement with any of the plaintiffs.

The franchise agreement begins with two paragraphs of "Recitals," in which the franchisee acknowledges that the franchisor has invested considerable time, effort and money in developing the goodwill and reputation of Haagen–Dazs.[4] In part the recital states, "Franchisee acknowledges that the Franchisor has created unique products of the highest quality, sold in the finest establishments." The franchisee agrees to preserve the reputation and further the goodwill of Haagen–Dazs.

In paragraph 1 of the franchise agreement, the franchisor grants a limited license to the franchisee to operate a single shoppe under the Haagen–Dazs trademark at a specified location for a specified term. The term "Haagen–Dazs Shoppe" is defined at paragraph 20 of the agreement as a retail outlet built to the franchisor's specifications and where only approved products are sold. Paragraphs 2 and 3 establish the term of the license, which may range from five to twelve years, and the franchise fee. In paragraph 4, the franchisor agrees not to license another shoppe within a specified distance of the franchisee's shoppe. Paragraph 4 also contains the following sentence.

> Franchisee acknowledges and agrees that the Franchisor and the Haagen–Dazs trademark owner has the right and may distribute products identified by the Haagen–Dazs trademarks through not

---

4. A sample franchise agreement, as well as a copy of each franchise agreement signed by the plaintiffs is contained in Exhibit F to the affidavit of William Z. Pentelovich.

only Haagen–Dazs shoppes but through any other distribution method which may from time to time be established.

Paragraph 9 requires the franchisee to purchase all of the franchise's ice cream and other frozen desserts from Haagen–Dazs at prices set by Haagen–Dazs. Haagen–Dazs agrees to sell the franchisee its requirements unless it is prevented from doing so by "Act of God, governmental restrictions, labor difficulties, inability to obtain supplies, or similar contingency." Pentelovich Aff. Exh. F. par. 9.

In paragraph 10, the franchisor promises to impart its "know-how" in operating a Haagen–Dazs shoppe and in preparing and selling Haagen–Dazs ice cream and other frozen desserts. The franchisor also promises to provide the franchisee with instruction in operating a Haagen–Dazs shoppe and in the preparation and sale of the products described in the "Shoppe Manual." As compensation for the Haagen–Dazs know-how, the franchisee agrees to pay a royalty of forty cents per gallon of Haagen–Dazs products purchased for use at the shoppe. Each calendar year the royalty is to be adjusted, with one cent added or subtracted from the royalty for each "full 3.0 change during the previous calendar year in the U.S. Bureau of Labor Statistics Consumer Price Index, For All Urban Consumers, U.S. City Average ('1967' equals 100), from a base of 196.7," provided that the royalty shall in no event be less than forty cents per gallon. Pentelovich Aff. Exh. F par. 10. At paragraph 10.1, a minimum annual royalty of $4,000 is established, adjusted according to the same formula and with a $4,000 floor.

Paragraph 11 requires the franchisee to contribute towards the franchisor's cost of advertising and promotions. The contribution amounts to $1,000 per year, with $25 added or subtracted to that amount for each "full 3.0 change" in the price index listed above.

In paragraph 15.1, the franchisee warrants that he or she will exercise complete supervision and control over the day-to-day operation of the franchise, including a minimum of forty hours per week of the fran-

chisee's physical presence at the shoppe. The transfer of any legal, equitable or beneficial right, title or interest in the shoppe or its equipment, other than the grant of a purchase money security interest, is deemed "an irrebuttable presumption" that the agreement has been breached.

Paragraph 15.2 grants the franchisee the right to set the retail price of the products authorized for sale under the terms of the franchise.

Paragraphs 19.0–19.4 provide that the franchise may be cancelled and the business sold only on the following conditions:

(1) that "the purchaser be a financially responsible person, of moral character and reputation satisfactory to the Franchisor;"

(2) that the purchaser enter into a new Haagen–Dazs shoppe franchise, upon the terms and conditions as offered at the time of the purchase, and update the store to franchisor's current specifications, and receive training in the operation of the shoppe as required by Haagen–Dazs;

(3) that the franchisee has complied with the terms and conditions of the franchise and has paid all outstanding obligations in full; and

(4) that $5,000 be paid to the franchisor.

Paragraph 20.2 describes the Haagen–Dazs shoppe manual as containing valuable methods of procedure and specifications. The shoppe manual is deemed "an integral part" of the franchise agreement "with the same force and effects [sic] as if fully set forth herein." The franchisor reserves the power to make changes in the shoppe manual. Changes mailed to the franchisees are considered to be effective unless the franchisee objects within five days of receiving the proposed change.

Paragraph 24 defines "know-how" as,

the techniques, methods, procedures, recipes, trade secrets, inventions, specifications and other information relating to the ice cream and frozen desserts business or the type of business contemplated under this Franchise, which were

either imparted by Franchisor to Franchisee in the Shoppe Manual or as part of Franchisee's training or otherwise, and receipt of which Franchisee hereby specifically acknowledges, or which Franchisee originated or acquired during the term of the Franchise, or in connection with it.

Paragraph 28 provides that the franchise is deemed to have been made in the State of New York, County of Bronx. It also provides that the contract is to be governed and interpreted under New York law.

Paragraph 30 declares that rights and remedies provided in the franchise agreement shall be in addition to all other rights and remedies to which the parties are entitled in law or equity.

The final paragraph of the agreement, paragraph 33, states that no claims of success or failure have been made to the franchisee. The paragraph also contains an integration clause which provides that the franchise agreement

> contains all oral and written agreements, representations and arrangements between the parties hereto ... and no representations or warranties are made or implied, except as specifically set forth herein. This Franchise cannot be changed or terminated orally.

### B. *Plaintiffs' Allegations*

Plaintiffs' factual allegations can be broken down into three categories: misrepresentations about the profitability of the franchises, failure to provide the promised support for franchise operations, and misrepresentations about the franchisor's commitment to the franchises. These allegations will be described generally in the section below. The matching of the plaintiffs, their claims and the evidence provided in support of the claim will be reserved until the discussion of the defendants' motion.

### 1. Misrepresentations About the Profitability of the Franchises

Plaintiffs claim that defendants induced them to enter franchise agreements by overstating the projected revenues and understating the projected costs of operating the shoppes. Generally, plaintiffs claim that they were given figures for the average annual gross sales ranging from $250,000 to $450,000. Plaintiffs claim that defendants informed them that the operating profit of a shoppe was between twenty-five and thirty percent of gross income. Start-up costs were estimated by defendants to be between $80,000 and $125,000. Defendants allegedly stated that the average cost of goods sold was thirty-seven percent. According to the plaintiffs, each of these statements was made either with the knowledge that it was false or in reckless disregard of the truth.

### 2. Failure to Provide Operational Support

Plaintiffs also claim that defendants did not provide the franchisees with the expertise, the quality of goods, exclusive rights to certain flavors, and other type of operational support necessary to make the shoppes profitable. First, plaintiffs claim defendants promised to provide expertise in site selection and lease negotiations. Plaintiffs claim that the assistance which defendants provided was so inadequate as to be a breach of that promise. Plaintiffs also claim that defendants did not impart know-how "capable of helping them improve the profitability of their operations." *Carlock* Amended Complaint par. 28A; *Dwyer* Amended Complaint par. 23A.

Haagen–Dazs ice cream is sold to the franchisees in 2½ gallon containers. Franchisees are trained to monitor their sales and inventory by weight, not volume. Each scoop of ice cream is supposed to weigh between 4 and 4½ ounces, March 22, 1989 Affidavit of Jeff Ross (Ross Aff. II), Exh. 1 at 2.25, and inventory is calculated based on the weight of the ice cream used in each product sold. April 4, 1989 Affidavit of Christine Curtis par. 4, 5 and Exh. A–C. Plaintiffs claim that the ice cream sold to them weighed less than promised, and consequently yielded fewer scoops than defendants claimed it would.

Plaintiffs also claim that the defendants' mass distribution of prepackaged pints of Haagen–Dazs ice cream hurt the profitability of the franchises. Plaintiffs argue that

defendants were obligated to take steps to insulate franchisees from the competition provided by the retail sales of prepackaged pints. Plaintiffs assert several claims regarding an exclusive right to certain ice cream flavors. One plaintiff claims to have been told that only eight flavors would be available for sale in retail outlets. Other plaintiffs claim that defendants told them that special flavors with nuts, chips or cherries would be sold exclusively in shoppes. Another allegation made is that defendants promised that new flavors would be sold exclusively in shoppes for at least six months. None of these alleged promises were kept.

Plaintiffs also allege that defendants fraudulently promised them that the opening of a new plant in Tulare, California would result in a lower wholesale price for shoppes on the West Coast. Plaintiffs further claim that defendants charged them royalties in excess of the amounts provided in the franchise agreement. In addition, plaintiffs claim that defendants have sold "poor quality ice cream" to certain plaintiffs and that defendants have sold bulk ice cream to nonfranchised dip store operations. *Carlock* Amended Complaint par. 28(G); *Dwyer* Amended Complaint par. 23(G).

Finally, plaintiffs claim that they were promised assistance with marketing and advertising which they never received. Plaintiffs also claim that defendants promised to hire regional representatives to advise the franchisees. Plaintiffs claim that each of these promises was fraudulently made. Plaintiffs also claim that from time to time the defendants would require them to purchase "expensive advertising, equipment and other goods" which increased the shoppes' operating costs without generating additional revenues. *Carlock* Amended Complaint par. 28(J); *Dwyer* Amended Complaint par. 23(J).

### 3. Misrepresentations about the Defendants' Commitment to the Franchise System

Plaintiffs assert that, as a result of the competition from prepackaged pints, the lack of operational support, and bad loca-tions, many franchises had financial difficulty. Plaintiffs claim that while defendants were assuring them that their problems would be addressed, defendants had decided instead to concentrate on marketing the prepackaged pints. The franchise system was allegedly regarded by defendants only as a means of boosting the retail sales of the prepackaged pints. Plaintiffs accuse defendants of competing against their own franchises through the distribution of prepackaged pints in nonfranchised retail outlets. Plaintiffs claim that defendants sold products to nonfranchised retail outlets "at substantially lower prices and on substantially more favorable economic terms" than to franchises. *Carlock* Amended Complaint par. 28(F); *Dwyer* Amended Complaint par. 23(F).

Plaintiffs claim that defendants' lack of commitment to the franchise system manifested itself in a number of ways. First, defendants were unwilling to disclose relevant information to the franchisees. Plaintiffs claim that defendants concealed the fact that franchise revenues were on the decline nationally in 1985. Plaintiffs also claim that defendants were unwilling to disclose the amount of ice cream sold in bulk to non-franchisees or the price at which distributors sold the prepackaged pints to other retail outlets.

Second, plaintiffs allege that, by increasing the retail sales of prepackaged pints and discontinuing the practice of reserving certain flavors exclusively for the shoppes, the defendants took steps to terminate or scale down the franchise system. Plaintiffs claim that defendants concealed these plans and instead made representations to the contrary. Plaintiffs claim that defendants assured them Haagen–Dazs was a "family" and that the franchisees' interest and concerns would be given high priority. Plaintiffs claim that defendants promised to expand the franchise system to include hundreds of new stores. Plaintiffs also allege that defendants promised to renew their franchises if they "paid their bills and ran clean shoppes." Plaintiffs also claim defendants promised to buy back the franchise of any unhappy franchisee. *Carlock* Amended Complaint Exh. S.

Third, plaintiffs claim to have been told that Haagen–Dazs would never be sold. After it was sold, plaintiffs claim that Pillsbury promised that it would "turn things around" by focusing on building shoppe revenues. *Carlock* Amended Complaint Exh. X. Plaintiffs also claim that Pillsbury assured them that Doris Mattus–Hurley, the founder of the franchise system, would remain with the new franchisor at least through 1988.

Fourth, defendants are alleged to have attempted to reduce the size of the franchise system by offering to convert some franchisees into licensees. Defendants are also alleged to have implemented policies which prevent franchisees from renewing their franchises or from expanding their operations. Furthermore, defendants are claimed to have reduced the size of the HDSC staff.

Fifth, defendants are alleged to have "condoned" the publication of magazine and newspaper articles during 1986 which created the impression that Pillsbury was in the process of ending the Haagen–Dazs franchise system. These articles are alleged to have destroyed the plaintiffs' ability to sell their franchises.

On the strength of the allegations listed above, the plaintiffs in both cases assert claims for breach of contract, breach of an implied covenant of good faith and fair dealing, fraud and misrepresentation, price discrimination and monopolization.[5] The *Dwyer* plaintiffs also assert claims under Minnesota's Prevention of Consumer Fraud Act and its Franchise Act. The *Carlock* plaintiffs have brought claims under the California Unfair Practices Law, the Idaho Unfair Practices Law, the Idaho Consumer Protection Act, the Colorado Unfair Practices Act, the Oregon Price Discrimination Act, and the Washington Franchise Relations Act. Defendants move for summary judgment on each of these claims. Plaintiffs have moved for summary judgment on their claim that defendants breached the franchise agreement by overcharging plaintiffs for royalties and advertising.

## DISCUSSION

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing,* 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## I. BREACH OF CONTRACT AND IMPLIED COVENANTS OF GOOD FAITH AND FAIR DEALING

### A. *Choice of Law*

The conflict of law rules of the forum state control which substantive law will

---

5. Claims for tortious interference with economic relations, breach of fiduciary duties and various state statutory claims were dismissed by this Court's Order of October 13, 1988.

apply. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). There are, however, constitutional concerns that bear on choice of law. The due process clause and the full faith and credit clause are satisfied only if the state whose law is selected has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 312–13, 101 S.Ct. 633, 640, 66 L.Ed.2d 521 (1981). *See also, Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818–19, 105 S.Ct. 2965, 2977–78, 86 L.Ed.2d 628 (1985). Although not identical to the "minimum contacts" analysis relevant to personal jurisdiction, the constitutional test for choice of law is similar. *See, Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 2187, 85 L.Ed.2d 528 (1985) and *Allstate*, 449 U.S. at 320–21 n. 3, 101 S.Ct. at 644 n. 3 (Stevens, J., concurring).

■ Minnesota's approach to choice of law is based on the five "choice-influencing considerations" described by Professor Robert Leflar: predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law. *Hime v. State Farm Fire & Casualty Co.*, 284 N.W.2d 829, 833–34 (Minn. 1979), *cert. denied*, 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980); *Milkovich v. Saari*, 295 Minn. 155, 203 N.W.2d 408, 412 (1973). Generally, Minnesota enforces contractual choice of law provisions, so long as application of the chosen law is consistent with constitutional requirements. *See, e.g., Milliken & Co. v. Eagle Packaging Co.*, 295 N.W.2d 377, 380 n. 1 (Minn.1980); *Combined Insurance Co. v. Bode*, 247 Minn. 458, 464, 77 N.W.2d 533, 536 (1956) (Minnesota is "committed to the rule that the parties, acting in good faith and without an intent to evade the law, may agree that the law of [another state] shall govern"), *rev'd on other grounds by Milkovich v. Saari*, 295 Minn. 155, 203 N.W.2d 408 (1973); *Standal v. Armstrong Cork Co.*, 356 N.W.2d 380, 382 (Minn.Ct.App.

1984). Contractual choice of law provisions apply to claims for breach of the implied covenants of good faith and fair dealing. *See Economu v. Borg–Warner Corp.*, 652 F.Supp. 1242, 1248 (D.Conn.), *aff'd*, 829 F.2d 311 (2d Cir.1987); *C. Pappas Co. v. E & J Gallo Winery*, 610 F.Supp. 662, 665 (E.D.Cal.1985), *aff'd*, 801 F.2d 399 (9th Cir. 1986); *Gilchrist Machinery Co., Inc. v. Komatsu Am. Corp.*, 601 F.Supp. 1192, 1200–01 (S.D.Miss.1984); *Comerio v. Beatrice Foods Co.*, 595 F.Supp. 918, 921 (E.D. Mo.1984); *Bryan v. Massachusetts Mutual Life Insurance Co.*, 364 S.E.2d 786 (W.Va. 1987).

Paragraph 28 of the franchise agreements signed by the plaintiffs states that the franchise shall be deemed to have been made in the State of New York and that all questions of performance or breach shall be governed by New York law. It also states that the parties consent to suit in New York for any cause of action arising under the franchise agreement. In that paragraph, the franchisee appoints an agent in New York for the service of process.

Plaintiffs argue that, despite paragraph 28's choice of law provision, New York law should not apply in this action because there are insufficient contacts with New York to make application of its law constitutional. Plaintiffs also argue that New York law should not govern the contract because it would be contrary to a fundamental policy of Minnesota, namely the Minnesota Franchise Act.

1. Whether Application of New York Law is Constitutional

■ Seventeen of the twenty-three franchise agreements at issue were signed by HDF. Those agreements were assigned to HDSC on July 11, 1983. The remaining six franchise agreements were signed by HDSC. While HDF was incorporated in New York, HDSC is incorporated and has its principal place of business in New Jersey. A party's incorporation in a state is a contact sufficient to allow the parties to choose that state's law to govern their contract. *Hale v. Co–Mar Offshore Corp.*,

588 F.Supp. 1212, 1215 (W.D.La.1984); *In re Falk*, 2 B.R. 609, 614 n. 17 (Bankr.D.N.J. 1980); *Restatement (Second) Conflicts of Laws,* § 187 comment f (1971) (domicile of party satisfies "reasonable relation" test). *But see, Staten Island Rustproofing Inc. v. Ziebart Rustproofing Co.,* 70 Bus. Franchise Guide (CCH) par. 8492 (E.D.N.Y.1985) (state of incorporation is not sufficient contact). Plaintiffs argue, however, that the contacts necessary to support application of New York law ceased in 1983 when HDF was purchased by Pillsbury and HDSC became party to the franchise agreement. In support of their argument, plaintiffs cite *Northern States Power Co. v. International Telephone and Telegraph Corp.,* 550 F.Supp. 108 (D.Minn.1982). In *Northern States Power,* the plaintiff, a Minnesota corporation, contracted with the defendant, also a Minnesota corporation, for the manufacture of screw anchors and extensions used to install and erect power line towers. The contract was negotiated and executed in Minnesota, and the screw anchors were to be assembled in Wisconsin. The screw anchors failed, resulting in the collapse of four towers. Plaintiff sued on tort and contract theories.

The contract contained a clause specifying that New York law was to govern its interpretation. The only contact with New York was that the parent corporation of the defendant had its principal place of business there. Applying Minn.Stat. § 336.1–105, which declares contractual choice of law provisions effective if the transaction bears "a reasonable relation" to the state whose law is selected, the court held that Minnesota law should govern the contract because New York had no reasonable relation to the parties' transaction.

■ *Northern States Power* is distinguishable on two grounds. First, the Minnesota Uniform Commercial Code's choice of law provision, applied in *Northern States Power,* is not applicable in the present case. Rather than the Code's "reasonable relationship" test, the appropriate standard here is whether application of the chosen state's law would be "arbitrary or fundamentally unfair." Second, a party to

this case, HDF, was incorporated in the chosen state. Furthermore, HDF's assignor, HDSC, has a substantial interest in the application of one state's contract laws to all of its franchise agreements, as application of different bodies of law to various contracts would likely render the franchise system unmanageable. The need for uniform enforcement of franchise agreements has been a consideration in decisions to enforce a contractual choice of law provision. *See, e.g., Capital National Bank v. McDonald's Corp.,* 625 F.Supp. 874, 880 (S.D.N.Y.1986) ("Because McDonald's enters into a substantial number of franchise agreements in various states, it has an interest in having those agreements governed by one body of law."); *Sullivan v. Savin Business Machines Corp.,* 560 F.Supp. 938, 940 (N.D.Ind.1983) (enforcing franchise agreement's choice of New York law because "the desire for a uniform facilitation of the conduct of trade" was valid reason for use of form contract). Furthermore, the largest concentration of franchises was in New York. In 1983, 73 out of approximately 300 shoppes were in New York. October 19, 1987 Affidavit of Thomas Dwyer Exh. A.

The Court will enforce the parties' contractual choice of law provision and apply New York law in the *Carlock* case. By entering into contracts which expressly provide that New York laws govern franchise disputes, the franchisees purposefully availed themselves of the benefits and protections of New York's laws. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 2187, 85 L.Ed.2d 528 (1985). Not only did franchisees agree that New York law should govern the contract, they also consented to suit in New York and appointed an agent there for service of process. Pentelovich Aff., Exh. F, par. 28. The contacts with New York go beyond those created by the agreement, however, since the franchise system was created by a New York corporation. The relevant test is whether New York has "a significant contact or significant aggregation of contacts," giving rise to state interests, such that application of New York's law is neither arbitrary nor fundamentally unfair.

*Allstate Insurance Co. v. Hague,* 449 U.S. 302, 313, 101 S.Ct. 633, 640, 66 L.Ed.2d 521 (1980). Given that (1) the franchise system was developed by a New York corporation, (2) the parties agreed to have New York law govern the contract and (3) the franchisees have consented to personal jurisdiction in New York, the application of New York law cannot be considered either arbitrary or fundamentally unfair.[6]

### 2. Whether Application of New York Law Would Violate a Fundamental Policy of Minnesota

■ Plaintiffs argue that enforcement of the contractual choice of law provision would violate Minnesota's public policy by circumventing application of the Minnesota Franchise Act. This argument can apply only to the *Dwyer* plaintiffs, and it involves a single factor in the Minnesota conflicts analysis, the advancement of the forum's governmental interests.[7] *See Schwartz v. Consolidated Freightways Corp.,* 300 Minn. 487, 221 N.W.2d 665 (1974) (analysis of governmental interests determinative), *cert. denied,* 425 U.S. 959, 96 S.Ct. 1740, 48 L.Ed.2d 204 (1976). Under this factor, Minnesota courts consider whether the state has a strong interest, reflected in its public policy, which favors application of a particular law. *SCM Corp. v. Deltak Corp.,* 702 F.Supp. 1428, 1431 (D.Minn. 1988); *Milkovich v. Saari,* 295 Minn. 155, 203 N.W.2d 408, 414 (1980). *See also,* R. Leflar, L. McDougal, R. Felix, *American Conflicts Law* (4th ed. 1986) § 106.

Plaintiffs argue that the Minnesota Franchise Act constitutes a fundamental policy of the state. That Act, codified at Minn. Stat. § 80C.01 *et seq.,* was adopted in 1973 to protect franchisees within Minnesota from unfair contracts and other previously unregulated abuses in the then-burgeoning franchise industry. *Clapp v. Peterson,* 327 N.W.2d 585, 586 (Minn.1982).

The act covers all "franchises" within the state if (1) the franchisee has a right to use the franchisor's trade name or commercial symbol, (2) the franchisee shares a "community of interest" with the franchisor in the marketing of goods or services, and (3) the franchisee has paid a franchise fee. Minn.Stat. § 80C.01, subd. 4. The statute provides three forms of protection. First, it requires that, before any franchise can lawfully be offered or sold within the state, the franchise be registered and have filed a public offering statement with certain disclosures about the franchisor and the proposed franchise relationship. Minn.Stat. §§ 80C.02, 80C.04 and 80C.06. Second, the statute requires that a franchise be terminated for "good cause" and, in most cases, only after franchisees are given advance written notice and an opportunity to correct any deficiencies. Minn.Stat. § 80C.14,

---

**6.** Plaintiffs claim that application of the contractual choice of law provision will result in the application of Washington law for the Washington plaintiffs, Janet Drago and Neal Drago and Christine Curtis and Timothy Curtis. Plaintiffs base their claim on a letter dated August 9, 1983, from an attorney for HDSC to the Washington State Department of Licensing and an attached copy of a blank franchise agreement providing that Washington law applies. Affidavit of Jeffrey I. Ross Exh. 58. The six franchise agreements signed by the Dragos and the Curtises were, however, all signed prior to 1983 and all provided that New York law should apply. Nothing suggests that the blank form cited by plaintiffs constituted an amendment to those franchise agreements. Therefore, the Court rejects plaintiffs' argument and will apply New York law to the claims of the Washington plaintiffs.

**7.** Plaintiffs base their argument on section 187(2)(b) of the *Restatement (Second) of Conflict of Laws* which states:

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied ... unless either

....

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which [as the state with the most significant relationship to the transaction], would be the state of the applicable law in the absence of an effective choice of law by the parties.

As noted, Minnesota's choice of law test is based on Professor Leflar's five choice-influencing considerations not the Restatement. Nevertheless, the same issue is raised under both tests— would application of the chosen law violate one of the forum state's significant governmental interests. *See* R. Leflar, L. McDougal, R. Felix, *American Conflicts Law* (4th ed. 1986) § 106.

subd. 3. Third, the statute makes injunctive relief available to remedy "unfair or inequitable practices." Minn.Stat. § 80C.14, subd. 1.

The statute also contains an anti-waiver provision which makes void any "condition, stipulation or provision" purporting to bind the franchisee to a waiver of the statute's provisions. Minn.Stat. § 80C.21.

Application of New York law would allow the defendants to avoid the provisions of Minnesota's Franchise Act. Although New York has an analogous statute, the New York Franchise Sales Act, N.Y.Gen. Bus.L. § 680, that statute would not cover the plaintiffs. Like most of the state laws enacted to protect franchisees, the New York statute applies only where an offer to sell or buy the franchise is made in New York, the franchise is actually sold in New York, the franchise operates in New York, or the franchisee resides in New York. *See Mon–Shore Management, Inc. v. Family Media, Inc.*, 584 F.Supp. 186, 191 (S.D. N.Y.1984).

■ The issue that must be addressed is whether the Minnesota Franchise Act is, in this case, a sufficiently strong governmental interest to preclude enforcement of the parties' contractual choice of law provision. The United States Court of Appeals for the Eighth Circuit considered a similar question in *Modern Computer Systems, Inc. v. Modern Banking Systems, Inc.*, 871 F.2d 734 (8th Cir.1989). *Modern Computer* involved an appeal by a plaintiff franchisee from the denial of its motion for a preliminary injunction, based on the Minnesota Franchise Act, to prevent the defendant franchisor from terminating its franchise. One basis for the trial court's denial of the motion was its determination that, as a result of the choice of law clause in the parties' contract, Nebraska, not Minnesota, law governed the dispute. Nebraska also has a franchise act, but that act did not cover the plaintiff franchisee. The district court's finding was reversed by the panel which originally heard the appeal, *Modern Computer Systems v. Modern Banking Systems*, 858 F.2d 1339 (8th Cir.1988), however on rehearing the court vacated the panel's decision and affirmed the district court. 871 F.2d 734 (8th Cir.1989) (en banc).

The question addressed in *Modern Computer* is whether the Minnesota Franchise Act constitutes a fundamental state policy which may not be overridden by the parties' contractual choice of law. To answer that question, the Eighth Circuit borrowed the factors applied by the United States Court of Appeals for the Sixth Circuit in *Tele–Save Merchandising v. Consumers Distributing*, 814 F.2d 1120, 1123 (6th Cir. 1987). These factors are (a) whether the parties had agreed in advance to the law to be applied in future disputes; (b) the relative strength of the contacts between the state selected and the plaintiff's home state; (c) whether the parties were of unequal bargaining strength; and (d) whether application of the law chosen in the contract would be repugnant to the public policy of the plaintiff's state. 871 F.2d at 738.

Applying these factors, the court of appeals noted that the parties had agreed to have their contract governed by Nebraska law and that the contacts were "fairly evenly divided" between Minnesota and Nebraska. 871 F.2d at 739. The court found " 'no evidence of a great disparity in bargaining power between the parties.' " *Id.*, *quoting* a memorandum opinion of the Dakota County District Court. More significantly, the court declared that:

> Some evidence of oppressive, unreasonable or unfair use of superior bargaining position, as in a contract of adhesion, is required before a court can justifiably disregard a mutually agreed upon choice of law clause.

*Id.* Finally, the court found that application of the choice of law clause was not repugnant to the public policy of Minnesota. The franchisee protections embodied in the Franchise Act were offset by the "powerful countervailing policy" of enforcing the parties' choice of law. 871 F.2d at 740. Thus, the court held that, despite its anti-waiver provision, the Minnesota Franchise Act would not override the contractual choice of law clause.

Application of *Modern Computer*'s four-factor analysis yields the same result in this case. First, the parties have agreed to have their contract governed by New York law. Pentelovich Aff. Exh. F at par. 28. Second, this transaction has contacts with both New York and Minnesota.[8] Third, the disparity between the parties' bargaining strength is not sufficient to justify disregarding their choice of law. The standard agreements signed by the plaintiffs are customary in franchising given the need for system-wide uniformity and the requirements of various state statutes.[9] This does not mean that plaintiffs had no choice. Plaintiffs could have invested in a Haagen–Dazs franchise under the terms of the franchise agreement, invested in one of the many other franchise systems, or chosen some other form of investment. Plaintiffs allege that HDF used its superior bargaining position to fraudulently induce them to purchase a franchise. However, the Court has carefully reviewed the extensive record presented on this motion for summary judgment and nothing in that record suggests the "oppressive, unreasonable or unfair use" of bargaining power to which the *Modern Computer* court referred. Finally, as the *Modern Computer* court held, a choice of law clause which precludes application of the Minnesota Franchise Act is not repugnant to Minnesota's public policy.

Therefore, the Court concludes that New York law must be applied in both the *Dwyer* and *Carlock* cases. This analysis leads, of course, to the conclusion that the claims under the Minnesota Franchise Act

in *Dwyer* should be dismissed. However, defendants did not move for summary judgment on those claims and the law in the Eighth Circuit prohibits a court from granting summary judgment sua sponte. *Williams v. City of St. Louis*, 783 F.2d 114 (8th Cir.1986).

**B.** *Governing Law*

Defendants attack plaintiffs' claims for breach with three alternative arguments, depending upon the particular allegation, either: (A) that the evidence demonstrates no breach, (B) that plaintiffs' claims are barred by the contract's integration clause, the parol evidence rule or the statute of frauds, or (C) that claims based on alleged oral modifications of the contract are unenforceable unless supported by new or additional consideration. Defendants also argue that (1) plaintiffs cannot assert their breach of contract and implied covenant claims against any defendants other than HDF and HDSC, and (2) that neither Pillsbury nor HDSC are liable as a successor to HDF.

1. General Contract Principles

In New York, as in every state, the law of contracts provides a remedy only for the nonperformance of agreed terms because "[e]very man is presumed to be capable of managing his own affairs, and whether his bargains are wise or unwise, is not ordinarily a legitimate subject of inquiry in a court of either legal or equitable jurisdiction." *Parmelee v. Cameron*, 41 N.Y. 392, 395 (1869). An unjustified failure to perform as required by the contract's express terms constitutes a breach. *Restatement*

8. HDF is a New York corporation. The plaintiffs, Dwyer and the Pinkuses, purchased their franchises from HDF with one exception. The exception is Dwyer's 1984 purchase of an already existing franchise. The Pinkuses were Minnesota residents at the commencement of this litigation. *Dwyer* Amended Complaint par. 5. Dwyer's corporations, which are also named as plaintiffs, are Minnesota corporations. *Id.* Dwyer himself was a Wyoming resident. July 17, 1989 Affidavit of Thomas Dwyer par. 2. The negotiations between HDF and the plaintiffs and the execution of the franchise agreements took place in Minnesota and New Jersey. *See* July 6, 1989 Letter of Sally Scoggin at 1–4 and Exh. B.

9. *See, e.g.,* Minn.Stat. §§ 80C.02–80C.04; Cal. Corp.Code §§ 31110, 31111(h), 31125; Wash. Rev.Code §§ 19.100.020, 19.100.040(8). The California Commissioner of Corporations, for example, has stated that the California Franchise Investment Law "precludes franchisors and franchisees from negotiating a franchise which differs from the terms registered pursuant to Section 31111 of the [Franchise Investment Law]." *See* March 29, 1989 Affidavit of Jonathan L. Eisenberg par. 4 and Exh. C. In addition, see Wash.Rev.Code § 19.100.180(2)(c) and Minn.Rules § 2860.4400(b) prohibiting discrimination between franchisees.

*(Second) of Contracts* § 260(2). In addition, a covenant of good faith and fair dealing is implied in contracts which do not involve the sales of goods or employment at will. *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972).

The implied covenant of good faith and fair dealing serves "in aid and furtherance of other terms of the agreement of the parties." *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y. S.2d 232, 237, 448 N.E.2d 86 (1983). That covenant is breached only when a party to the contract seeks to prevent its performance by, or to withhold its benefits from, the other party. *Broad v. Rockwell International Corp.*, 642 F.2d 929, 957 (5th Cir.1981) (applying New York law), *cert. denied*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). The covenants do not create independent substantive contractual rights. *See, Van Valkenburgh*, 330 N.Y. S.2d at 333, 281 N.E.2d at 144. Nor do they create rights inconsistent with those explicitly set out in the contract. *Pharmacists' Ass'n. of Western New York, Inc. v. Blue Cross of Western New York, Inc.*, 112 A.D.2d 728, 492 N.Y.S.2d 221 (App.Div. 1985). A party's exercise of its contractual rights cannot, by itself, constitute a breach of the implied covenant of good faith and fair dealing. *See Mutual Life Insurance Co. v. Tailored Woman, Inc.*, 309 N.Y. 248, 128 N.E.2d 401, 403 (1955).

Thus, plaintiffs' claims for breach of the implied covenants of good faith and fair dealing must, like the breach of contract claims, be evaluated in light of the defendants' specific contractual obligations. This is illustrated by *Patel v. Dunkin' Donuts of America, Inc.*, 146 Ill.App.3d 233, 100 Ill.Dec. 94, 496 N.E.2d 1159 (1986) and *Super Valu Stores, Inc. v. D–Mart Food Stores, Inc.*, 146 Wis.2d 568, 431 N.W.2d 721 (Ct.App.1988). After the franchisor in *Patel* established a new franchise within one mile of plaintiff's franchise store, plaintiff sued for breach of the franchise agreement and the implied covenant of good faith and fair dealing. The franchise agreement, however, granted the franchisee no territorial exclusivity and explicitly reserved to the franchisor the right to operate or franchise other stores at its discretion. The court rejected both of the plaintiff's claims, saying:

> [T]he parties did address the competition issue in the Franchise Agreement by giving defendants the right to establish a new business at its own discretion and on its own terms. Thus, there is no way the implied covenants of good faith and fair dealing can be expanded to bar defendants from opening a new franchise within one mile of plaintiff's business.

100 Ill.Dec. at 96, 496 N.E.2d at 1161. In *Super Valu*, the franchisor opened a competing business four blocks from an existing franchisee's location; ultimately, the franchisee was forced out of business because of the competition. The Franchise Agreement provided that the franchisor retained the right to enter into other franchise agreements at its "sole choice and discretion." 431 N.W.2d at 723. Rejecting the franchisee's claim for breach of the implied covenants of good faith and fair dealing, the court said:

> where, as here, a contracting party complains of acts of the other party which are specifically authorized in their agreement, we do not see how there can be any breach of the covenant of good faith. Indeed, it would be a contradiction in terms to characterize an act contemplated by the plain language of the parties' contract as a "bad faith" breach of that contract.

*Id.* at 726.

### 2. The Reach of Plaintiffs' Contract Claims

Only HDF and HDSC are parties to the franchise agreements. Contract or implied covenant claims cannot be asserted unless there is privity of contract between the parties. *Buckley v. 112 Central Park So.*, 285 App.Div. 331, 136 N.Y.S.2d 233 (1954); *Greyhound Corp. v. Commercial Casualty Inc.*, 259 App.Div. 317, 19 N.Y.S.2d 239 (1940). *See also, McGowan v. The Pillsbury Co.*, 723 F.Supp. 530, 537 (D.Wash.

1989) [included as Exh. 66 to Ross Aff. II] (in a parallel Haagen–Dazs franchise action, court dismissed contract claims against all defendants other than HDF and HDSC). On this basis, defendants argue that plaintiffs' breach of contract claims reach only HDF and HDSC.

Plaintiffs limit their response to the contention that Pillsbury and HDSC are successors of HDF and have therefore assumed any liability that may be imposed on HDF for breach of the franchise agreements. In New York, a purchasing corporation is not liable for the debts or liabilities of its predecessor except (1) where the purchaser expressly or impliedly agreed to assume such debts, (2) where the transaction amounted to a consolidation or merger of the corporations, (3) where the purchasing corporation is a "mere continuation" of the selling corporation, or (4) where the transaction is fraudulently done to escape liability for such debts. *Hartford Accident and Indemnity Co. v. Canron, Inc.*, 43 N.Y.2d 823, 825, 402 N.Y.S.2d 565, 373 N.E.2d 364 (1977). *See also, Niccum v. Hydra Tool Corp.*, 438 N.W.2d 96, 98 (Minn.1989) (Minnesota follows same approach); 15 *Fletcher Cyc. Corp.* § 7122. Plaintiffs claim that questions of fact exist as to both whether HDSC assumed the liabilities of HDF or whether HDSC is a "mere continuation" of HDF.

Plaintiffs argue that two documents containing summary descriptions of Pillsbury's acquisition of Haagen–Dazs create a fact question as to what liabilities were assumed. The language relied on by plaintiffs are two separate single sentence descriptions of the multi-million dollar transaction. The sentence is contained in two documents. The first document is a cover letter dated August 9, 1983 to the Washington State Department of Licensing accompanying papers for the purpose of amending the Haagen–Dazs franchise registration as necessitated by the sale to Pillsbury. Ross Aff. II Exh. 58. The letter states that the amendment "is being filed only to indicate that on July 11, 1983

the business, assets and liabilities of Haagen–Dazs Franchise, Inc. were acquired by The Haagen–Dazs Shoppe Company, Inc." *Id.* The second document is a thirty-three page compilation of information for prospective franchisees dated January 1, 1985. Ross. Aff. II Exh. 29. The sentence at issue is part of a two-sentence paragraph describing HDSC's predecessor. It states "[o]n July 11, 1983 The Haagen–Dazs Shoppe Company, Inc. acquired the business, assets and liabilities of Haagen–Dazs Franchise, Inc." *Id.*

Defendants counter by citing the specific language of the purchase agreement. In its Haagen–Dazs acquisition, Pillsbury agreed to assume only certain specified liabilities of the purchased corporations and the Mattus family. Section 1(a)(ii)(B) of the purchase agreement states that Pillsbury agreed to assume "all liabilities and obligations" of the purchased corporations

except the following which are not assumed by the Purchaser:

. . . .

(II) *liabilities or obligations arising out of any breach by [the acquired companies] at any time before or after such Balance Sheet Date and prior to the Closing of any lease, agreement, contract, arrangement, understanding, plan or commitment* unless and to the extent that such liabilities or obligations are reflected or reserved against in such balance sheet.

Affidavit of Jerry W. Levin Exh. C (emphasis added). The balance sheet at issue does not reserve to Pillsbury liability for breach of any scheduled agreement, including the franchise agreements, prior to closing. Levin Aff. par. 5. Thus, the agreement expressly provides that Pillsbury is not assuming liability for breach of those agreements prior to "the Closing." In light of the specific language of the agreement, the evidence presented by plaintiffs is not sufficient to create a genuine issue of fact about whether Pillsbury assumed liability for any prior breaches of the franchise agreements by HDF.[10]

10. Plaintiffs point out that in a parallel case to this one, *McGowan v. The Pillsbury Co.*, 723

F.Supp. 530 (D.Wash.1989), the court refused to grant summary judgment dismissing the claims

Plaintiffs also argue that successor liability should be imposed on the basis that HDSC is a "mere continuation" of HDF. The "mere continuation" theory refers principally to a reorganization of the original corporation as, for example, may be accomplished through bankruptcy. 15 *Fletcher Cyc. Corp.* §§ 7122, 7200. It requires a showing that only one corporation survived the transaction and that the successor shares "a common identity" of officers, directors and stockholders with the predecessor. *Parra v. Production Machine Co.*, 611 F.Supp. 221, 223–24 (E.D.N.Y.1985) (applying New York law). *See also Tucker v. Paxson Machine Co.*, 645 F.2d 620, 625–26 (8th Cir.1981) (applying Missouri law).

There is no evidence of the requisite identity between HDF and HDSC. Pillsbury, not the Mattuses, owned all HDSC stock after July 11, 1983.[11] The directors and officers of the new Pillsbury subsidiaries were significantly different than those of the corporations owned by the Mattus family. Affidavit of Jonathan L. Eisenberg dated March 29, 1989 par. 2 and Exh. A. The fact that certain members of the Mattus family continued as employees of the Pillsbury subsidiaries is not sufficient to establish that HDSC is merely a reincarnation of HDF. *See Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1458–59 (11th Cir.1985) (applying Georgia law).

3. The Effect of the Integration Clause

The franchise agreements contain the following integration clause:

This Franchise contains all oral and written agreements, representations and arrangements between the parties hereto, and any rights which the respective parties hereto may have had under any oth-

er previous contracts are hereby cancelled and terminated, and no representation or warranties are made or implied, except as specifically set forth herein. This Franchise cannot be changed or terminated orally.

Pentelovich Aff. Exh. F par. 33. The clause provides both that the agreement contains "all oral and written agreements, representations and arrangements between the parties" and that the agreement "cannot be changed or terminated orally." It has two effects. First, because this language indicates that the parties intended the writing to be final and complete, it invokes the parol evidence rule to bar claims based on prior oral agreements. Second, the language prohibits subsequent oral modification of the contract. Each of these effects will be discussed in turn.

Where a writing is a complete and final expression of the parties' agreement, the parol evidence rule bars evidence of prior or contemporaneous representations from being introduced for the purpose of varying or contradicting the writing. 6 *Corbin on Contracts*, § 573 at 357 (1960). As noted above, the franchise agreements at issue purport to be a final and complete expression of the parties' agreement. Plaintiffs argue that the integration clause covers only those issues explicitly addressed within the franchise agreement. This argument ignores the plain language of the integration clause, which states that the franchise agreement "contains *all* oral and written agreements, representations and arrangements between the parties . . . and no representations or warranties are made or implied, except as specifically set forth herein." Pentelovich Aff. Exh. F par. 33. In addition, the topics that plain-

---

against HDSC for breach prior to Pillsbury's acquisition of the Mattus' companies. Ross. Aff. II Exh. 66 at 15. However, it does not appear that the court in that case considered the language of the purchase agreement. As explanation for its decision, the Washington court stated only that, "HDSC does not explain why this acquisition should not include liability for breaches of contracts by HDF prior to the date of acquisition." *Id.* See, however, another parallel case where no successor liability was found. *Rosenberg v.*

*The Pillsbury Co.*, 718 F.Supp. 1146, 1150–51 (S.D.N.Y.1989).

11. See this Court's Orders dated January 4, 1988 (discussing ownership of the business by the Mattus family and their corporations, HDI, HDF and WSC until the Pillsbury acquisition on July 11, 1983) and October 13, 1988 (discussing in detail the ownership of the companies before and after the Pillsbury acquisition).

tiffs describe as outside the scope of the franchise agreement are addressed by the writing. For example, plaintiffs claim that the franchisee's right to exclusive flavors is not addressed by the franchise agreement. Plaintiffs' Memorandum at 67. The franchise agreement, however, does not establish any right to exclusive flavors. Instead, it reserves to the franchisor and the Haagen–Dazs trademark owner the right to distribute Haagen–Dazs products "through ... any ... distribution method which may from time to time be established." Pentelovich Aff. Exh. F par. 4. Plaintiffs also allege that issues of income and anticipated failure rate are not addressed by the agreement. However, the agreement provides that "Franchisee agrees that no claims of success or failure have been made to him prior to signing this Franchise." *Id.* at par. 33.

■ The integration clause at issue in this case serves to invoke the parol evidence rule under New York law. *See Leumi–Financial Corp. v. Richter,* 17 N.Y.2d 166, 216 N.E.2d 579, 269 N.Y.S.2d 409, 413 (1966). However, the parol evidence rule is applicable only when the issue to be determined can be decided through an interpretation of the writing. *See* 3 *Corbin on Contracts,* § 573 at 358–60 (1960). The parol evidence rule does not operate to exclude evidence of fraudulent oral representations by one party to induce another to enter a written contract. *Millerton Agway Cooperative, Inc. v. Briarcliff Farms, Inc.,* 17 N.Y.2d 57, 215 N.E.2d 341, 268 N.Y.S.2d 18 (1966). Parol evidence is also admissible to shed light on ambiguous terms in the contract. *Morris v. Morris,* 234 A.D. 187, 254 N.Y.S. 429 (App.Div. 1931).

In New York, a provision prohibiting oral modifications of the written agreement is enforceable by virtue of N.Y.Gen. Oblig.Law § 15–301, subd. 1, which provides:

A written agreement ... which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

Thus, New York law bars claims based upon an alleged oral modification of a contract containing a clause prohibiting oral modifications. *Schlansky v. United Merchants & Manufacturers, Inc.,* 443 F.Supp. 1054, 1058–59 (S.D.N.Y.1977) (applying N.Y.Gen.Oblig.Law § 15–301); *Klein v. Jamor Purveyors, Inc.,* 108 A.D.2d 344, 489 N.Y.S.2d 556 (App.Div.1985) (contract clause barring oral modification requires dismissal of contract claims based on oral representations); *Cliffs Management Corp. v. Great Eastern Management Corp.,* 85 A.D.2d 584, 445 N.Y.S.2d 460 (1981).

### 4. Statute of Frauds

A contract within the statute of frauds is not enforceable unless it complies with the requirements of the statute. Under New York law, contracts which cannot be performed within a year come within the statute of frauds codified at N.Y.Gen. Oblig.Law § 5–701(a)(1). The franchise agreements at issue are for terms ranging from five to twelve years. Hence, they are within section 5–701(a)(1) which requires a writing signed by the party charged which contains all the essential terms of the agreement. *General Overseas Corp. v. Republic Int'l Corp.,* 74 F.Supp. 698, 702 (S.D.N.Y.1947). In New York, franchise agreements are governed by the Uniform Commercial Code. *Division of Triple T Service, Inc. v. Mobil Oil Corp.,* 60 Misc.2d 720, 304 N.Y.S.2d 191 (1969), *aff'd,* 34 A.D.2d 618, 311 N.Y.S.2d 961 (1970). Thus, franchise agreements are also within another statute of frauds, section 1–206 of the Uniform Commercial Code. As adopted by New York, section 1–206 requires a writing which reasonably identifies both the subject of the sale and the consideration, and which is signed by the party against whom enforcement is sought. *FDIC v. Herald Square Fabrics Corp.,* 81 A.D.2d 168, 179, 439 N.Y.S.2d 944 (App. Div.1981).

### 5. Consideration Necessary for Oral Modification

Finally, under New York law, oral modifications of contracts are not enforceable unless supported by new or additional consideration. *Beacon Terminal Corp. v. Chemprene, Inc.*, 75 A.D.2d 350, 429 N.Y. S.2d 715, 718 (App.Div.1980); *State Bank of Albany v. Arbit Furniture Co.*, 41 A.D.2d 866, 342 N.Y.S.2d 662, 664 (3d Dept. 1973), *aff'd without opinion*, 34 N.Y.2d 875, 359 N.Y.S.2d 277, 316 N.E.2d 713 (1974). Where the term alleged to have been added to the contract cannot be performed within a year, the term is not enforceable unless it satisfies the statute of frauds. *Schlansky v. United Merchants & Manufacturers, Inc.*, 443 F.Supp. 1054, 1058 (S.D.N.Y.1977) (applying New York law to dismiss contract claim based on oral representations that could not be performed within one year); *Carvel Corp. v. Nicolini*, 144 A.D.2d 611, 535 N.Y.S.2d 379 (App.Div.1988) (statute of frauds bars oral modification of written agreement).

### C. Plaintiffs' Specific Allegations of Breach

#### 1. Claims Concerning Distribution

Plaintiffs claim that defendants breached the franchise agreement and the implied covenants by (a) distributing Haagen–Dazs ice cream through establishments that were not "up-scale," (b) by violating the franchisees' exclusive rights to certain flavors, and (c) by a mass distribution of pre-packaged pints which competed with shoppe sales. The major hurdle for all of these claims is the language in the franchise agreement which grants the franchisor and the Haagen–Dazs trademark owner the right to distribute Haagen–Dazs products "through not only Haagen–Dazs Shoppes but through any other distribution method which may from time to time be established." Pentelovich Aff. Exh. F at par. 4. Each allegation, and the evidence in support of the allegation, will be considered in turn.

#### a. Distribution through establishments that were not "up-scale"

Plaintiffs claim that the franchise agreement restricts the defendants to distribution of Haagen–Dazs only through "up-scale" establishments. Plaintiffs claim that this part of the agreement was of value because, if honored, it would enhance the product image while avoiding the market saturation that hurt their business.

Plaintiffs find a toehold for this claim in the "Recitals" section of the franchise agreement. In a paragraph written to acknowledge the franchisor's investment in its product and to impress upon the franchisee the importance of preserving the reputation and goodwill of the name "Haagen–Dazs," the agreement states, "Franchisee acknowledges that the Franchisor has created unique products of the highest quality, sold in the finest establishments." Pentelovich Aff. Exh. F at 1.

Plaintiffs claim that this language obligates the franchisor to distribute Haagen–Dazs only through up-scale outlets. That claim must be rejected for two reasons. First, the sentence does not purport to impose any future obligation on the franchisor. It is only precatory language which serves to recognize the franchisor's past efforts to create goodwill. Second, if the language were interpreted as suggested by plaintiffs, it would conflict with the provision which specifically reserves the franchisor the right to distribute Haagen–Dazs products "through not only Haagen–Dazs Shoppes, but through *any other distribution method*, which may from time to time be established." Pentelovich Aff. Exh. F at par. 4 (emphasis added). The franchise agreement does not bind the franchisors to any particular marketing strategy. Plaintiffs' claim that the franchisors breached the agreement by distributing Haagen–Dazs through outlets that were not "up-scale" will therefore be dismissed.

#### b. Franchisee's Exclusive Right to Certain Flavors

Plaintiffs assert three different claims concerning an exclusive right to certain ice cream flavors. First, plaintiff Thomas Dwyer claims to have been told that at any one time only eight flavors would be available for retail sale by non-

franchisees. Second, all plaintiffs claim that the company announced, but did not honor, a policy to reserve new flavors exclusively for the franchisees during at least the first six months after the flavor is introduced. Third, several plaintiffs [12] claim that they had been promised that special flavors, such as those containing nuts, chips or cherries, would be sold only in the shoppes.

Only the last of these claims has any roots in the language of the franchise agreement. The plaintiffs making the claim that the special flavors would be reserved for shoppes cite a page in the shoppe manual which lists "Regular Flavors" and "Special Flavors." Ross. Aff. II Exh. 1 at 2.5; March 29, 1989 Eisenberg Aff. Exh. G at 2.5. Paragraph 20.2 of the franchise agreement incorporates the shoppe manual as part of the contract. Plaintiffs argue that the shoppe manual's enumeration of certain flavors as "special" reflects an agreement to reserve the special flavors for the shoppes.

Plaintiffs' argument fails. The lists of "regular" and "special" flavors are in the part of the shoppe manual entitled "Employee Manual." The lists are alone on a page preceded by a section describing what makes Haagen-Dazs's ice cream special and followed by a set of policies and rules regarding such things as sanitation, smoking and the use of phones. Absolutely nothing in the shoppe manual suggests that the special flavors listed are to be distributed exclusively through the shoppes.

The other two claims—that at any one time only eight flavors would be available for retail sale by non-franchisees and that the company failed to reserve new flavors to the franchises for at least six months— do not find any support in the language of the franchise agreement. Plaintiffs' argument that these alleged representations constitute an oral modification of the contract must fail given the language in the contract prohibiting oral modifications and

New York's policy, discussed above, to enforce such clauses. Because the terms of the contract do not provide plaintiffs with any exclusive right to certain flavors, plaintiffs' claims that the franchisors breached the agreement by failing to honor those exclusive rights will be dismissed.

### c. *Mass Distribution of Prepackaged Pints*

■ Perhaps the central issue in this case is whether the mass distribution of Haagen-Dazs ice cream products may constitute either a breach of the contract or a breach of the implied covenant of good faith and fair dealing.

The Haagen-Dazs trade name was established during the 1960's and 1970's by the sale of prepackaged pints. Originally, the pints had been sold only in small grocery stores, convenience stores and other retail outlets. That year, more than 27 million prepackaged pints of Haagen-Dazs ice cream were sold; more than 40 million were sold in 1981. Pentelovich Aff. Exh. D, E.

Mattus-Hurley had opened the first Haagen-Dazs shoppe during 1976. In 1978 she formed the franchise company, HDF. Only two of the plaintiffs opened their shoppes before 1980. Thomas Dwyer, who was also the distributor for the Twin Cities area, opened his first shoppe in 1977. Robert Goodman and Abby Goodman acquired a franchise in June of 1979. All of the other plaintiffs' franchises were acquired in 1980 or later.

At the time those franchise agreements were executed, Haagen-Dazs' system of dual distribution was in place and not merely a future possibility. The franchise agreement reserved to the franchisor the right to exploit all possible means of distribution. In paragraph 4 it stated:

Franchisee acknowledges and agrees that the Franchisor and the Haagen-Dazs trademark owner has the right and may distribute products identified by the Haagen-Dazs trademarks through *not only Haagen-Dazs shoppes but through*

---

**12.** The plaintiffs who have made this allegation are Carlock, the Crawfords, the Goldfines, the Goodmans, the Pinkuses and Dwyer.

*any other distribution method which may from time to time be established.* Pentelovich Aff. Exh. F par. 4.

In light of this language, the mass distribution of prepackaged pints could not constitute a breach of the contract. Plaintiffs argue, however, that it constituted a breach of the implied covenant of good faith and fair dealing. Plaintiffs argue that the mass distribution of prepackaged pints hurt shoppe sales and, although the franchisors were aware of that fact, they failed to take any steps to protect the franchises.

There is evidence that HDF was aware that, as non-franchise distribution increased and the shoppes' exclusive claim to special flavors was eroded, it was difficult for the franchises to remain competitive. One franchisee described his situation to HDF after sales of prepackaged pints began at an area grocery store.

> Our pint and quart sales have decreased sharply in the last four weeks, and we now have many old customers coming to the store less frequently and only for a single cone....
>
> The recipients of prepackaged pints are using the product as a leader or selling it at a loss initially to draw people away from the franchise store. Then, after they have established regular customers, they increase the price of their prepackaged pint to a profit level, while still underselling the franchise store by at least 50 [cents]. It is virtually impossible for a franchisee to buy bulk ice cream from the manufacturer; pay the expense of purchasing pint or quart containers for the bulk ice cream to be transferred to; pay for the laborer to pack the pints and quarts, and after all of that, still compete with a prepackaged pint.

Affidavit of Joseph A. Lovallo Exh. A at 1–2. *See also* Affidavit of Roy W. Sloane par. 5–6; Ross Aff. II Exh. 26.

In December 1983, the HDSC board of directors discussed the condition of the franchise system and agreed that it faced critical problems demanding immediate attention. Ross Aff. II Exh. 32, Minutes of December 8, 1983 HDSC board of directors meeting. Mattus–Hurley, the president of HDSC at the time,[13] informed franchisees in March that "a number of programs [are] currently being developed with the express purpose of building *your* sales volume and *your* store profitability." Ross Aff. II Exh. 33, March 2, 1984 letter from Mattus–Hurley to franchisees. These programs ostensibly included a $1 million "National Marketing Campaign Fund."[14] *Id.* Mattus–Hurley promised that the fund *"will be spent* before the fiscal year ends on May 31, 1985." *Id.* (emphasis in original). A separate local marketing and promotion program was also promised. *Id.*

In May 1984, HDSC informed HDC management that it was being hurt by prepackaged pint sales. Ross Aff. II Exh. 25, Minutes of May 17, 1984 joint companies management committee meeting. It is unclear whether any action was taken in response.

Documents dated March 1985 which appear to be handouts for an HDC marketing meeting state:

> THE WAR FOR THE LUXURY ICE CREAM CONSUMER WILL BE WAGED IN THE SUPERMARKET, NOT IN THE SHOPPE.
>
> SHOPPES ARE A TACTICAL MARKETING TOOL AND SHOULD BE USED AS SUCH (BEACONS ON THE STREET).

Ross Aff. II Exh. 37. In addition, the national marketing manager for HDC, Jeff Scholl, is described as having a "damn the shoppes, full speed ahead [with non-franchise retail sales]" attitude. Deposition of Jay Tenenbaum at 81.

Looked at in the light most favorable to the plaintiffs, the evidence suggests that HDC may have focused on increasing the sales of prepackaged pints at the expense of franchise sales. It also suggests that

---

**13.** In January 1985, Charles Kanan replaced Mattus–Hurley as president of HDSC.

**14.** The national marketing campaign fund promise is discussed further at pages 67–68, 109–10.

HDSC was at best ineffective at, or at worst unconcerned about, taking measures to counter the effects of prepackaged pint sales on the franchises. This does not, however, amount to a breach of the implied covenant of good faith and fair dealing. That covenant serves "in aid and furtherance of other terms of the agreement of the parties." *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y. S.2d 232, 237, 448 N.E.2d 86 (1983). It does not create independent substantive rights or create rights inconsistent with those explicitly set out in the contract. *Pharmacists' Ass'n of Western New York, Inc. v. Blue Cross of Western New York, Inc.*, 112 A.D.2d 728, 492 N.Y.S.2d 221 (App.Div.1985). In this case, the franchisor and its parent companies explicitly reserved the right to distribute Haagen–Dazs ice cream by any method. That language gives Haagen–Dazs the right to aggressively distribute prepackaged pints, even though that distribution adversely affects retail sales by franchisees.

For example, in *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142, *cert. denied*, 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972), the publisher of a series of electronics books agreed to use its "best efforts" to sell the books. The books sold well and, in fact, became the publisher's best sellers. When it came time for a new edition, the publisher hired a new writer at a lower royalty to produce a set of books very similar to the original series. The publisher then marketed the new set to the same customers who had been placing large orders for the plaintiff's books. 330 N.Y.S.2d at 331.

The New York Court of Appeals refused to read into the contract an implied term which closed off the publisher's right to publish books which compete with earlier works and "to promote them fully according to the publisher's economic interests, even though those later publications adversely affect the contracting author's sales." 330 N.Y.S.2d at 333, 281 N.E.2d at

144. Thus, a distributor that does not breach the implied covenant of good faith and fair dealing by shifting the emphasis of its marketing efforts to a more profitable product.

*Patel v. Dunkin' Donuts of America, Inc.*, 146 Ill.App.3d 233, 100 Ill.Dec. 94, 496 N.E.2d 1159 (1986), discussed previously, is also on point. In that case, the plaintiff franchisee claimed that the defendant franchisor breached the implied covenant of good faith and fair dealing by opening another franchise store within one mile of the plaintiff's business. The court granted defendant's motion for judgment on the pleadings because the franchise agreement provided that the franchisor, "in its sole discretion," had the right to establish and operate other stores. 100 Ill.Dec. at 94, 496 N.E.2d at 1159. The plaintiff argued that competition from the new store would deprive him of the benefit of the franchise agreement. The court held:

> the parties did address the competition issue in the franchise agreement by giving defendants the right to establish a new business at its own discretion and on its own terms. Thus, there is no way the implied covenant of good faith can be expanded to bar defendants from opening a new franchise within one mile of plaintiffs' business.

100 Ill.Dec. at 96, 496 N.E.2d at 1161. *See also Little Oil Co. v. Atlantic Richfield Co.*, 852 F.2d 441 (9th Cir.1988) (directed verdict proper on implied covenant claims of franchisee who alleged that changes in franchisor's marketing approach constituted constructive termination of the franchise agreement; franchisee's remedies limited to breach of contract).

The Court therefore finds that the language in the franchise agreement which reserves to the franchisor and the trademark owner the right to distribute Haagen–Dazs products by any method bars plaintiffs' claim that the mass distribution of prepackaged pints constituted a breach of the implied covenant of good faith and fair dealing.[15] Plaintiffs' claim is contrary

---

**15.** This holding is in accord with *Rosenberg v. The Pillsbury Co.*, 718 F.Supp. at 1156–57 (S.D.N.

Y.1989), a parallel case in which it held that paragraph 4 of the Haagen–Daz franchise

to the express language of the franchise agreement and must therefore be dismissed.

### 2. Quality of the Ice Cream

■ The distinguishing features which make Haagen–Dazs ice cream a super premium ice cream are its high butter fat content and its low air content or "overrun." Ross Aff. II Exh. 1 at 2.3. Air is whipped into ice cream to give it volume. *Id.* Haagen–Dazs ice cream contains so little air that it outweighs most other ice creams by 30 to 40 percent. *Id.*

Haagen–Dazs franchisees are trained to measure the amount of ice cream served to customers and to monitor their inventory by weight, not volume. *Id.* at 2.4, 2.25 and "Weekly Inventory Worksheet." Plaintiffs claim that defendants breached the franchise agreement by increasing the air content of the ice cream sold in bulk containers.

Plaintiffs claim that defendants increased the overrun in the bulk ice cream sold to franchisees in approximately 1982. Curtis Aff. at par. 6–7; *see also* Deposition of Thomas Dwyer at 326–27. Plaintiffs support this claim by comparing the "ice cream usage factors" before and after the 1982 franchisee convention. *Id.* Exh. A, B. The "ice cream usage factor" converts the amount of ice cream used in shoppe products such as cones or cakes into a fractional amount of a 2½ gallon tub. *Id.* at par. 4. Plaintiffs contend that the usage factors were increased after the 1982 franchisee convention because the weight of the ice cream in the tubs was decreased. *Id.* at 7–9. Given that the ice cream sales were measured by weight, this had a direct bearing on the franchisee's product and dollar yields.

Because only the air content of the bulk ice cream was increased and not that of the prepackaged pints, *see,* Ross Aff. II Exh. 21 and Defendants' Answers to Interroga-

tories at 5, franchisees were provided with a lower quality ice cream than that sold to other retail outlets.

Defendants claim that there was no change in overrun or in the weight of the 2½ gallon tubs after 1978, prior to the time that any plaintiff (except possibly Thomas Dwyer) became a franchisee. This claim is supported by the testimony of Milton Hurwitz, who was in charge of manufacturing at WSC and HDC from 1973 to 1986. Deposition of Milton Hurwitz at 8, 14, 19–20, 59.

The ice cream usage factors were contained on a weekly inventory work sheet included in the shoppe manual. Ross Aff. II Exh. 1. The franchise agreement incorporates the shoppe manual "with the same force and effects [sic] as if fully set forth herein." Pentelovich Aff. Exh. F at par. 20.2. Therefore, the "ice cream usage factors" may constitute a binding contractual term. Because this issue turns upon an ambiguity in the contract, parol evidence would be admissible. Plaintiffs have presented sufficient evidence to survive summary judgment on their claim that the franchise agreement was breached by dilution of the bulk ice cream.[16]

### 3. Providing Operational Support

Plaintiffs make four claims that the defendants breached the franchise agreement by failing to provide operational support to the franchisees. These claims are that defendants (1) failed to supply the franchisee's requirements, (2) failed to provide know-how, (3) failed to provide marketing assistance, and (4) failed to develop a winter product.

#### a. *Failure to Supply Requirements*

■ The franchise agreement obligates the franchisor to sell to franchisee its requirements of ice cream, ice milk, sherbet, water ices and other frozen desserts offered for consumption to the retail purchas-

agreement precluded the claim that the mass distribution of prepackaged pints constituted a breach of the implied covenant of good faith and fair dealing.

**16.** The franchisor did, of course, have the power to amend the shoppe manual. If HDF or HDSC

did properly amend the shoppe manual by distributing the pages containing the new usage factors to franchisees prior to changing the amount of overrun, then there would be no breach.

er as described in the Shoppe Manual "unless prevented therefrom by Act of God, governmental restrictions, labor difficulties, inability to obtain supplies, or similar contingency." Pentelovich Aff. Exh. F at par. 9. In their complaints, plaintiffs claim that defendants "have *created* massive ice cream shortages to Plaintiffs' franchised shoppes" while continuing to supply other retail outlets. *Carlock* Complaint par. 29E and *Dwyer* Complaint par. 24E (emphasis added). Plaintiffs, however, have failed to provide any evidence that defendants subjected the franchisees to artificial shortages.

The only shortage of ice cream of which there is evidence in the record was experienced during the spring of 1987. This shortage was due to a sudden and unanticipated industry-wide bacterial problem. Deposition of Benton Silloway at 70–73. The shortage affected sales to distributors as well as to the franchise system. *Id.* The evidence cited by the plaintiffs concerns this single occurrence. *See* Ross Aff. II Exh. 51, 56A. Nothing suggests that the shortage was due to anything other than a problem with bacteria. Plaintiffs have failed to present any evidence that defendants breached the franchise agreement by failing to supply plaintiffs with their requirements and their claims to the contrary will therefore be dismissed.

b. *Failing to Provide Know-how*

Plaintiffs allege that defendants have "not sufficiently imparted valuable trade secrets or know-how ... capable of helping [franchisees] improve profitability." *Carlock* Amended Complaint par. 28A; *Dwyer* Amended Complaint par. 23A.

Plaintiffs' claim is based on paragraph 10 of the franchise agreement which provides:

Franchisor shall impart to the Franchisee its know-how, as hereinafter defined, in operating a Haagen–Dazs Shoppe and in preparing and selling Haagen–Dazs Ice Cream and other frozen desserts, and Franchisor shall also cause the Franchisee to be instructed and trained in the operation of a Haagen–Dazs Shoppe and in the preparation and sale of Haagen–Dazs products in the various recipes and forms specified in the Shoppe Manual.

Pentelovich Aff. Exh. F at par. 10.

In paragraph 24, "know-how" is defined as information relating to Haagen–Dazs' products and its franchise business which either (1) was imparted by the franchisor to the franchisee through the shoppe manual, the franchisee's training or otherwise, or (2) was acquired by the franchisee during the term of the franchise. The franchisee specifically acknowledges receipt of the know-how imparted by the franchisor.

By "Haagen–Dazs know-how" or "know-how" the parties mean the techniques, methods, procedures, recipe, trade secrets, inventions, specifications and other information relating to the ice cream and frozen desserts business or the type of business contemplated under this Franchise which were either imparted by Franchiser to Franchisee in the Shoppe Manual, or as part of the Franchisee's training or otherwise, and receipt of which Franchisee hereby specifically acknowledges, or which Franchisee originated or acquired during the term of the Franchise, or in connection with it.

Pentelovich Aff. Exh. F at par. 24.

Plaintiffs attempt to avoid the effect of paragraph 24 with the contention that "Paragraph 24 defines 'know-how' for the purposes of Paragraph 24 *only.*" Plaintiffs' Memorandum at 89 n. 10 (emphasis in original). Plaintiffs' argument has no merit. Paragraph 10 refers to know-how "as hereinafter defined" and paragraph 24 is the only place in the franchise agreement where know-how is defined. Taken together, the two paragraphs obligate the franchisor to provide the franchisees with a copy of the shoppe manual and training in the operation of the shoppe and in the preparation and sale of Haagen–Dazs products. The franchisors do not, as plaintiffs appear to claim, have a general obligation to provide franchisees with sufficient knowledge to maintain a profitable shoppe.

No plaintiff (except Dwyer who opened his first shoppe before the franchise system was developed) claims not to have received the shoppe manual or the Haagen–

Dazs training.[17] Thus, the plaintiffs have failed to establish a genuine issue of fact concerning a breach of HDF's or HDSC's obligation to impart know-how. The claims based on such a breach will be dismissed.

### c. *Failing to Provide Marketing Assistance*

■ Plaintiffs claim that HDF and HDSC breached the franchise agreement by failing to provide franchisees with adequate marketing support. The franchise agreement does not contain any provision obligating the franchisor to provide any specific form of marketing assistance. The implied covenant of good faith and fair dealing does not provide a basis for plaintiffs' claims because it does not create independent substantive contractual rights. Therefore, these claims will be dismissed.

### d. *Failure to Provide Expertise in Site Selection and Lease Negotiations*

Plaintiffs claim that defendants breached the franchise agreement by failing to provide adequate expertise with site selection and lease negotiations. The franchise agreement does not include a provision on site selection and lease negotiations. To the contrary, the offering circular specifically stated that,

> franchisor *may* offer supervision or assistance in: site selection; lease negotiations ... and other requests as develop in connection with individual Shoppe peculiarities. Franchisor *is not bound by contract* to provide these voluntary and discretionary supervisions and assistances.

Pentelovich Aff. Exh. J at par. 11 (emphasis added). A franchise agreement was not executed until after the prospective franchisee had selected a site and secured a lease. *Id.* Until that point, the prospective franchisee was free to cancel the franchise application. *Id.* Plaintiffs do not offer any argument as to why an obligation to provide expertise in site selection and lease negotiation should be considered part of the franchise agreement. *See* Plaintiffs'

Memorandum at 91–92. Accordingly, plaintiffs' claims for breach based on a failure to provide such expertise will be dismissed.

### e. *Failure to Provide a Product for the Winter Months*

■ Two plaintiffs claim that defendants represented that a product would be developed to boost sales during the winter months, when business was slow. These plaintiffs argue that a jury could find these representations to constitute an oral contract which was breached by the defendants.

The two franchisees advancing this claim are the Curtises in the *Carlock* case and the Pinkuses in the *Dwyer* case. Christine Curtis alleges only that she was told that "Haagen–Dazs was busy developing a product that would help [the franchises] through winter months" in 1983, after the Curtises had executed their franchise agreements. Deposition of Christine Curtis at 515. This does not constitute a promise to develop a winter product. Even assuming that it could be interpreted as a promise, under the applicable New York law, consideration is required to support an oral modification of a contract. Plaintiffs have not put forward any evidence that Curtis gave consideration in exchange for the alleged promise.

Although plaintiffs claim in their complaint that "many times" defendants represented to Aaron Pinkus, Vicki Pinkus, Michael Pinkus and Marcia Pinkus that a winter product would be developed, plaintiffs offer only the deposition testimony and answers to interrogatories of Marcia Pinkus in support of their claim. In her deposition, Marcia Pinkus states,

> I spent almost three years talking to [Mattus–Hurley] on the phone requesting something to get us through the nine months, ten months of the winter. And my only answer was we're working on something.

of the franchise agreement. *See* Affidavit of Joseph A. Geraci par. 13.

---

**17.** Defendants have also offered evidence that they have offered franchisees products and services which go beyond the minimum obligations

Deposition of Marcia Pinkus at 233. Marcia Pinkus' answers to interrogatories also describe nothing more than unanswered requests.

Many times plaintiff asked Carl Paley and [Mattus–Hurley] for additional products to sell during the winter months when business was low. Doris failed to find products which she [Mattus–Hurley] felt were suitable. Plaintiff requested that they [sic] be allowed to defer payment during the "low business" winter months. Plaintiff requested advertising assistance. She received little, if no, results from her requests.

Marcia Pinkus' Answers to Interrogatories at 20 (attached to the Affidavit of Karen M. Bohaty). The evidence presented from Marcia Pinkus does not suggest, even indirectly, that the defendants agreed to provide franchisees with a winter product. It cannot provide a basis for finding defendants bound by contract to develop such a product.

### f. *Promise to Buy Back Franchises*

Plaintiffs also assert claims of breach as a result of an alleged promise on the part of HDSC to buy back the franchises of any unhappy franchisees. The alleged promise was made by Mattus–Hurley at the HDSC board of governors meeting held on March 26–28, 1984. Mattus–Hurley said:

[I]f we have people here, for whatever reason, who are dissatisfied with their investment, don't feel that they want to be team players—I think those people should come up to me and talk to me about it, and maybe there's a way we can get them out of this. If they don't feel that they want to be part of this group, then they shouldn't be, and there has to be a way to equitably get them out of it and keep our programs going....

....

.... Anyone who, for whatever reason, would like to have us look at their shoppes and make them an offer on buying them back, we are prepared to do so. So I would appreciate it if you would go back to your regions and communicate this. One of the things that has occurred to me during the last two days is,

there are people out there who are unhappy and they have not communicated that. It is *imperative* that they do this. In some cases, we may be able to offer them some alternative. The attitude here is flexibility. We know that we have some problems and we are going to do what we have to do to correct the problems. We are not putting our heads in the sand. We're not saying there's nothing we can do. We're going to look at them and we're going to evaluate each individual situation....

Pentelovich Aff. Exh. R at 30, 59 (emphasis in original).

As the quote makes clear, Mattus–Hurley did not promise to buy back the shoppe of any unhappy franchisee. She stated that HDSC was prepared to evaluate the shoppe of each unhappy franchisee and make an offer to buy it back. Mattus–Hurley has testified that every franchisee who, within "several months" of the board of governors meeting, indicated interest in being bought out received an evaluation and that HDSC did purchase several shoppes. Deposition of Doris Mattus–Hurley at 271–73.

The terms of Mattus–Hurley's offer, to the extent that it bound HDSC at all, only bound HDSC to evaluate the shoppes of unhappy franchisees for a possible buy out. Plaintiff presents no evidence that HDSC failed to do this. Plaintiffs' claims of breach based on the promise to buy back the shoppes of unhappy franchisees will be dismissed.

### g. *Excessive Charges for Royalties and Advertising Contributions (Cross–Motions for Partial Summary Judgment)*

Plaintiffs' final claim of breach concerns alleged overcharges of royalties and advertising fund contributions. Plaintiffs have responded to defendants' motion for summary judgment on this issue with a cross motion for summary judgment.

The franchise agreement requires the franchisee to pay the franchisor a royalty of forty cents per gallon of ice cream, with

adjustments made according to the following formula

> $.01 shall be added to or subtracted from such royalty for each full 3.0 change during the previous calendar year in the U.S. Bureau of Labor Statistics Consumer Price Index, For All Urban Consumers, U.S. City Average ("1967" equals 100), from a base of 196.7 provided, however, that in no event shall the said royalty be less than $.40 per gallon.

Pentelovich Aff. Exh. F at par. 10.[18] The contract also requires franchisees to pay an annual advertising contribution of $1,000, adjusted in $25 increments according to the same formula. *Id.* at par. 11.

Resolution of the cross-motions turns on the meaning of the phrase "each full 3.0 change during the previous calendar year in the [CPI–U] from a base of 196.7." Plaintiffs argue that the formula accounts only for the change in the CPI–U "during the previous calendar year." Thus, plaintiffs argue that to correctly apply the formula one must, first, determine the change in the CPI–U during the previous calendar year. This is done by subtracting from the index's value on December 31 of the previous year the value on December 31 two years previous. This number should then be divided by three, any fraction is dropped, and the resulting number represents the number "full 3.0 change[s]" in the CPI–U during the previous calendar year. The maximum adjusted royalty that may be charged is calculated by adding one cent for each "full 3.0 change" during that year to maximum adjusted royalty for the previous year.

Defendants contest plaintiffs' interpretation of the adjustment clause by arguing that it ignores language providing that the changes be calculated "from a base of 196.-7." The figure of 196.7 is presumably the value of the CPI–U in July 1978, when the franchise system was begun. Defendants argue that the formula works as follows: the change in the CPI–U is calculated by subtracting 196.7 from the CPI–U for December 31 of the previous year. This figure is divided by three, any fraction is dropped, and the resulting number represents the number of "full 3.0 change[s]" since July 1978. The maximum adjusted royalty that may be charged during any particular year is calculated by adding one cent for each "full 3.0 change" between July 1978 and the end of the previous year to the base royalty figure of 40 cents per gallon.

The following tables illustrate the difference between the two formulas.

TABLE I

Comparison of adjusted royalty as calculated by the parties.

| Year | CPI–U [19] | Adjusted Royalty (per gallon) as Calculated by: | |
|------|-----------|-----------|-----------|
| | | Defendants | Plaintiffs |
| 1979 | 202.9 | .42 | --- |
| 1980 | 229.9 | .51 | .49 |
| 1981 | 258.4 | .60 | .58 |
| 1982 | 281.5 | .68 | .65 |
| 1983 | 292.4 | .71 | .68 |
| 1984 | 303.5 | .75 | .71 |
| 1985 | 315.5 | .79 | .75 |
| 1986 | 327.4 | .83 | .78 |
| 1987 | 331.1 | .84 | .79 |
| 1988 | 345.7 | .89 | .83 |

18. Although paragraph 10.1 provides for a minimum annual royalty of $4,000, adjusted in $100 increments according to the same formula quoted above, the franchisor has always collected royalties based upon the actual gallons sold by the franchisee. Geraci Aff. at par. 3. This is despite the fact that, during the years 1985–88, the purchases of each of the plaintiffs (with the exception of one shoppe in one year) were such that the per gallon royalty was less than the minimum annual royalty. *Id.* at par. 4.

19. In December of the immediately preceding year.

TABLE II
Comparison of adjusted royalty as calculated
by the parties and the actual royalty charged

| Time Period | Actual Royalty Charged | Using Defendants' Formula | | Using Plaintiff's Formula | |
|---|---|---|---|---|---|
| | | Adjusted Royalty | Differences Between Adjusted & Actual | Adjusted Royalty | Differences Between Adjusted & Actual |
| 1/1/79 to 2/31/79 | .40 | .42 | − .02 | .40 | –0– |
| 1/1/80 to 5/6/80 | .40 | .51 | − .11 | .49 | − .09 |
| 5/6/80 to 12/31/80 | .50 | .51 | − .01 | .49 | + .01 |
| 1/1/81 to 3/29/81 | .50 | .60 | − .10 | .58 | − .08 |
| 3/30/81 to 12/31/81 | .60 | .60 | –0– | .58 | + .02 |
| 1/1/82 to 3/30/82 | .60 | .68 | − .08 | .65 | − .05 |
| 4/1/82 to 12/31/82 | .68 | .68 | –0– | .65 | + .03 |
| 1/1/83 to 3/30/83 | .68 | .71 | − .03 | .68 | –0– |
| 4/1/82 to 12/31/83 | .72 | .71 | + .01 | .68 | + .04 |
| 1/1/84 to 4/30/84 | .72 | .75 | − .03 | .71 | + .01 |
| 5/1/84 to 12/30/84 | .75 | .75 | –0– | .71 | + .04 |
| 1/1/85 to 4/30/85 | .75 | .79 | − .04 | .75 | –0– |
| 5/1/85 to 12/31/85 | .79 | .79 | –0– | .75 | + .04 |
| 1/1/86 to 4/30/86 | .79 | .83 | − .04 | .78 | + .01 |
| 5/1/86 to 12/31/86 | .83 | .83 | –0– | .78 | + .05 |
| 1/1/87 to 8/16/87 | .83 | .84 | − .01 | .79 | + .04 |
| 8/17/87 to 12/31/87 | .84 | .84 | –0– | .79 | + .05 |
| 1/1/88 to 5/31/88 | .84 | .89 | − .05 | .83 | + .01 |
| 6/1/88 to 12/31/88 | .89 | .89 | –0– | .83 | + .05 |

The franchisor's right to collect an advertising contribution was not exercised until 1984. The plaintiffs dispute the amount of the adjusted contribution on the same basis upon which they contest the adjustments to the royalties. Plaintiffs claim that each franchisee was overcharged $100 in 1984, $100 in 1985, $125 in 1987 and $150 in 1988 for advertising contributions.

Each of the interpretations of the adjustment clause advanced by the parties is in some way inconsistent with the contract. Under defendants' interpretation, the clause permits an adjustment equal to "each full 3.0 change" in the CPI–U from the constant base of July 1978. This seems to ignore language in the clause which ties the adjustment to "each full 3.0 change *during the previous calendar year.*"

Plaintiffs' interpretation, on the other hand, would make the phrase "from a base of 196.7" meaningless. If, as plaintiffs contend, the maximum adjustment permitted in each year depends only on the change in the CPI–U during the previous calendar year, then no purpose is served by designating a "base" unless the base applies only to the first time an adjustment was made (January 1979). The base for calculating the change in the CPI–U would always be the index value for the previous year.

As noted earlier, parol evidence is admissible to aid in the interpretation of an ambiguous clause. The adjustment clause at issue is susceptible to more than one interpretation. Plaintiffs offer two letters written by Carl Paley, vice president of HDF, to the franchisees to support their interpretation of the adjustment clause.[20] In a May 7, 1980 letter addressed to franchisees, Paley states:

20. Defendants argue that these letters should not be considered by the Court for two reasons. First, defendants argue that the May 7, 1980 letter was not produced by any of the plaintiffs in response to document production requests served upon them. *See* Affidavit of Linda Olson par. 4. The only copy of the letter available is an unsigned one which defendants had produc-

There has been a 30.2 increase in the U.S. Bureau of Labor Statistics Consumer Price Index *during the year 1979.* Our royalty schedule is directly affected by this barometer. For each 3 point increase our royalty increases one penny.

March 20, 1989 Affidavit of Jeff Ross Exh. C at 4 (emphasis added). In a January 27, 1982 letter to franchisees, Paley states:

Royalty increases are computed on the basis of one penny per gallon for each three point increase in the CPI. The published government figure for 1981 is 281.5, representing *an increase of 24 points over 1980.* This represents an eight cent per gallon increase in royalty.

March 20, 1989 Ross Aff. Exh. C at 6 (emphasis added). Plaintiffs assert that the letters are evidence that HDF was calculating the royalty adjustment based upon the change in the CPI–U during the course of the previous year, rather than from the base figure for July 1978. However, the calculations underlying the figures in the letters suggest the opposite. From December 31, 1978 to December 31, 1979, the CPI–U increased 20 points, which is far less than the 30.2 points described by Paley. If the increase is calculated from the "base" figure for July 1978, however, the increase is exactly 30.2. During 1981, the CPI–U increased 23.1 points, not the 24 points stated by Paley. Calculated from the July 1978 base, however, the 1981 adjustment covers a 24-point shift in the value of the CPI–U.

Both motions for summary judgment will be denied. The proper construction of the adjustment clause is a question to be resolved at trial. *See Cut Price Super Markets v. Kingpin Foods, Inc.*, 256 Minn. 339, 98 N.W.2d 257, 267 (1959).

### D. *Summary of Disposition of the Contract and Implied Covenant Claims*

Two of plaintiffs' claims against HDF and HDSC for breach survive the motion for summary judgment. These are: (1) plaintiffs' claim that HDF and HDSC breached the franchise agreement by increasing the air content of the bulk ice cream sold to franchisees and (2) that HDF and HDSC breached the franchise agreement by improperly calculating the adjustments to royalties and advertising contributions.

All of plaintiffs' remaining claims against HDF and HDSC for breach will be dismissed on the grounds specified in the discussion above. All of plaintiffs' claims for breach against the other defendants will be dismissed for lack of privity.

Finally, plaintiffs' motion for partial summary judgment on their claim that HDF and HDSC charged plaintiffs excessive royalties and advertising contributions will be denied.

## II. FRAUD OR MISREPRESENTATION

The bulk of plaintiffs' claims concern harm allegedly resulting from defendants' fraud or negligent misrepresentations. *Carlock* Amended Complaint, Count II; *Dwyer* Amended Complaint, Count I.

The choice of law provision in the franchise agreement does not apply to claims of fraud and misrepresentation. *See Klock v. Lehman Bros. Kuhn Loeb, Inc.*, 584 F.Supp. 210, 215 (S.D.N.Y.1984). The Court need not determine, at this stage of the litigation, which state's laws apply to plaintiffs' claims for fraud and misrepre-

ed to plaintiffs. *Id.* The January 27, 1982 letter is signed and it was produced only by one plaintiff, Janet Drago. *Id.* at par. 5.

Second, defendants argue that the letters should not be considered for the purposes of these motions because the letters were submitted to the Court through an affidavit from plaintiffs' trial counsel stating that the letters were sent by Paley to the franchisees. *See* March 20, 1989 Ross Aff. at par. 5. As defendants note, whether the letters were sent to franchisees is not within counsel's personal

knowledge. Moreover, some question exists about whether the May 7, 1980 letter offered was ever sent to the franchisees because not one of the plaintiffs produced it.

The Court will allow the letters to be considered for the purposes of this motion. Even assuming that the May 7, 1980 letter was not sent to the franchisees, it is relevant evidence of how the defendants calculated the royalty adjustment. Defendants remain free to raise these and other objections to the admissibility of this evidence at trial.

sentation because a conflict of laws analysis is only necessary where there is an "outcome determinative" conflict. *Surgidev Corp. v. Eye Technology, Inc.,* 648 F.Supp. 661, 679–80 (D.Minn.), *aff'd,* 828 F.2d 452 (8th Cir.1987). No such conflict exists for the purposes of this motion, because the laws of the various states are essentially the same on the issues being raised here. *Compare, O'Neal v. Burger Chef Systems, Inc.,* 860 F.2d 1341 (6th Cir. 1988) (suit by franchisee for fraud under Tennessee law) and *Vaughn v. General Foods Corp.,* 797 F.2d 1403 (7th Cir.1986), *cert. denied,* 479 U.S. 1087, 107 S.Ct. 1293, 94 L.Ed.2d 149 (1987) (same under Indiana law).

The elements required to establish a case of fraud or misrepresentation are:

(1) A false representation,

(2) knowledge or belief on the part of the person making it that the representation is false; or that there is an insufficient basis for making the statement,

(3) intention to induce plaintiff to act or rely upon the statement,

(4) justifiable reliance,

(5) damage.

*First Financial Federal Savings & Loan Assoc. v. E.F. Hutton Mortgage Corp.,* 834 F.2d 685, 686 (8th Cir.1987) (applying New York law). *See also, Charles Woods Television Corp. v. Capital Cities/ABC, Inc.,* 869 F.2d 1155 (8th Cir.1989) (applying Missouri law); *Hurley v. TCF Banking and Savings, F.A.,* 414 N.W.2d 584, 586 (Minn. Ct.App.1987); W. Prosser, *Law of Torts,* 685–86 (4th ed. 1971).

Plaintiffs' many allegations can be grouped into three categories: claims of fraudulent inducement to enter the franchise agreement, claims concerning distribution of the ice cream and claims of fraud in the operation of the franchise system.

### A. Claims of Fraudulent Inducement

Plaintiffs claim that the defendants fraudulently induced them to enter into the franchise agreement by: (1) overstating the income and operating profit of the shoppes, (2) understating the start-up and operating costs of the shoppes, (3) falsely claiming that no shoppe (except for perhaps one) had failed, and (4) falsely representing that the franchisor would provide expertise and support in lease negotiations and site selection.

#### 1. Overstating Shoppe Income and Operating Profit

Plaintiffs allege fraudulent inducement through (A) false representations about the gross income and operating profit of "average" shoppes, *Carlock* Amended Complaint par. 19(A); *Dwyer* Amended Complaint par. 14(A), and (B) exaggerated projections of the income that could be expected from their prospective shoppes. *Carlock* Amended Complaint par. 19(B). The particulars of the various plaintiffs' claims are as follows.

Plaintiff Frances Ellsworth claims that in 1981, during the time she was considering the purchase of a franchise, Carl Paley, vice president of HDF, informed her that the lowest amount a Haagen–Dazs franchise was grossing was $175,000 a year and the highest amount was $550,000 a year. Deposition of Frances Ellsworth at 114–15.

Plaintiff Abby Goodman claims that, at the time the Goodmans were considering a purchase of a franchise, John Suglia of HDF stated that "marginal" Haagen–Dazs shoppes were doing $190,000 in business and the best shoppes were doing more than $300,000 in business. Deposition of Abby Goodman at 114–16. Suglia told Robert Goodman that the Goodmans could expect their shoppe to do $300,000 to $350,000 per year in business. Deposition of Robert Goodman at 116. The Goodmans decided to purchase a franchise after making a conservative financial projection based on sales of $140,000 the first year, $50,000 less than the amount of business a "marginal" store was represented as doing.

Plaintiff Christine Curtis received a letter from Paley dated September 8, 1980 which stated that, based on a compilation of data from existing Haagen–Dazs shoppes, the total initial investment of these shoppes was $105,000 to $120,000, the net pretax profit was 20 to 30 percent,

and the average annual gross volume of the shoppes which had been open for more than one year was between $200,000 and $250,000. Pentelovich Aff. Exh. K. The letter states that the information "is not to be construed as a suggestion or representation of anticipated volume or profits." *Id.* Defendants question whether the Curtises can show that they have been damaged by the alleged misrepresentations. Their University District shoppe had a gross volume exceeding $250,000 during every year of operation. Pentelovich Aff. Exh. L. The gross volume of their Green Lake shoppe exceeded $250,000 during the first full year of operation; thereafter the gross volume fell within the $200,000 to $250,000 per year range stated in the Paley letter. Pentelovich Aff. Exh. M, N.

Plaintiff Jerry Carlock received a letter from Paley dated August 14, 1981 stating that after the first year of operation shoppes averaged $220,000 to $260,000 in business and had a pretax profit of 29 to 35 percent. Pentelovich Aff. Exh. O. The letter stated, however, that,

> The above information is not to be construed as [a] representation or suggestion of anticipated gross volume or net profit. It is a compilation of data based upon existing Haagen–Dazs Shoppes and is submitted for the purpose of making an intelligent evaluation as to the viability of the Haagen–Dazs retail shoppes.

*Id.* Carlock's first year sales volume was more than $300,000. Deposition of Jerry Carlock at 208.

Plaintiff Marcia Pinkus claims that Paley told her and Michael Pinkus that they could expect to gross at least $250,000 to $300,000 the first year and about $350,000 the second year. Marcia Pinkus Dep. at 165. She also claims that Paley told them that they would net a 25 to 30 percent profit. *Id.* at 166. Marcia Pinkus understood these figures to be a projection, and not a guarantee, of future sales and profits. *Id.* at 167, 169.

The Kranhold plaintiffs allege that defendants exaggerated the income their shoppes would realize. Dorothy Kranhold claims that Paley told her that the lowest revenue of any shoppe was $150,000 and that some stores had revenues as high as $350,000. Deposition of Dorothy Kranhold at 15.

Plaintiffs Jeffrey Dilson and Barry Dumont claim that a realtor told them that Haagen–Dazs shoppes grossed more than $300 per square foot. Dilson and Dumont claim that Paley confirmed that the figure was true. Deposition of Jeffrey Dilson at 60; Deposition of Barry Dumont at 50. Dumont also claims that Paley told them that they could expect a net profit of 22 to 30 percent. Dumont Dep. at 50. However, when Dumont asked Paley to supply information on the profitability of the shoppes, Paley had initially told Dumont that the information did not exist. Dumont Dep. at 48. When asked if Paley had given him a guarantee of a $300 per square foot gross and a net profit of 22 to 30 percent, Dumont said:

> I don't think it was in the form of a guarantee. I think the implication was a lot of that depended on how you were [—] whether you were a good manager, whether you worked in the shop, paid somebody to manage for you [—] there were a lot of variables involved in any retail establishment. You know in hindsight it was a rather sweeping statement.

Dumont Dep. at 51–52.

Two other groups of plaintiffs, the Crawfords and the Goldfines, also claimed that the defendants overstated the income of the shoppes as a means of inducing them to enter into franchise agreements. Neither side discusses these claims in their briefs, however.

Defendants argue that plaintiffs could not reasonably rely on these alleged representations in light of disclaimers contained in the franchise agreement and the offering circular. The franchise agreement provides:

> Franchisee agrees that no claims of success or failure have been made to him prior to signing this Franchise.... This Franchise contains all oral and written agreements, *representations* and ar-

rangements between the parties hereto ... *and no representations or warranties are made or implied, except as specifically set forth herein.*

Pentelovich Aff. Exh. F at par. 33 (emphasis added). The offering circular which was provided to each plaintiff contained a much more specific disclaimer.

*No representations or statements of actual, or average, or projected, or forecasted sales, profits or earnings ... are made to franchisees with respect to Haagen–Dazs Shoppes.* Neither franchisor's sales personnel nor any employee or officer of the franchisor is authorized to make any claims or statements as to the earnings, sales, or profits or prospects or chances of success that any franchisee can expect or that present or past franchisees have had. The franchisor specifically instructs its sales personnel, agents, employees and officers that they are not permitted to make such claims or statements as to the earnings, sales or profits or the prospects or chances of success, nor are they authorized to represent or estimate dollar figures as to given Haagen–Dazs Shoppe operations. The franchisor recommends that applicants for Haagen–Dazs Franchises make their own investigation and determine whether or not the Shoppes are profitable. *The franchisor will not be bound by allegations of any unauthorized representations as to earnings, sales, profits or prospects or chances of success.* The franchisor recommends that each applicant for a Haagen–Dazs Franchise should consult with an attorney of their choosing and further be represented by legal counsel at the time of their contract closing.

Pentelovich Aff. Exh. J at item 19.

██ A party cannot reasonably rely upon allegedly fraudulent promises which are directly contradicted by the terms of an applicable offering statement, *Jackvony v. Riht Financial Corp.,* 873 F.2d 411, 416 (1st Cir.1989); *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 805 (1st Cir.1987); *Zobrist v. Coal–X, Inc.,* 708 F.2d 1511, 1518 (10th Cir.1983), or a subsequently executed contract, *One–O–One Enterprises, Inc. v. Caruso,* 668 F.Supp. 693, 699 (D.D.C.1987), aff'd, 848 F.2d 1283 (D.C.Cir.1988); *Bank of Am. Nat'l Trust & Sav. Ass'n v. Lamb Fin. Co.,* 179 Cal.App.2d 498, 3 Cal.Rptr. 877, 880 (1960). In the absence of some factor which would justify plaintiffs' reliance on oral representations which are expressly contradicted in the writings, *see Zobrist,* 708 F.2d at 1518, plaintiffs could not justifiably rely on the alleged misrepresentations without further inquiry. Therefore, plaintiffs' claims for fraudulent inducement based on overstatements of shoppe income and operating profit will be dismissed.

### 2. Understatements of Start-up and Operating Costs

██ Three plaintiffs claim that defendants misrepresented the start-up costs of the shoppes, Carlock, *see* Carlock Dep. at 114; the Dragos, *see* Deposition of Janet Drago at 297, 415–16; and the Pinkuses, *see* Deposition of Aaron Pinkus at 353 and Marcia Pinkus Dep. at 204–06, 208–10. Defendants argue that these alleged misrepresentations are not actionable because they were predictions as to the future, not statements of past or present fact. Defendants also argue that plaintiffs were made aware of defendants' inability to predict start-up costs by a specific disclaimer in the offering circular. On the strength of this argument, defendants contend that plaintiffs could not reasonably rely on any representations as to start-up costs.

Item 7 in the offering circular is titled "Franchisees' Initial Investment." It states:

A Haagen–Dazs franchisee is required to establish at franchisee's expense a retail Haagen–Dazs Shoppe which includes.... The entire cost of such items and services is borne by the franchisee and varies for each Haagen–Dazs Shoppe according to the amount of equipment, construction or alteration costs, and services involved.

The expenditure for real property to be acquired by franchisee for purposes of the Haagen–Dazs Shoppe premises will

vary beyond useful estimate or meaningfully describable low-high range, as it will be determined by market conditions including but not limited to: geographical area, location, desirability, improvements included, size, utilities included, term of lease, negotiating ability of franchisee and all other competitive forces involved in the acquisition of the use of real property....

....

.... The expenditure for equipment, fixtures, trade fixtures, utensil[s] and other fixed assets will vary for each Shoppe as noted above according to the number, style and price of such items required by each franchisee within the specifications promulgated by the franchisor. An estimated low-high range for franchisee's initial investment in equipment, fixtures, trade fixtures, utensils and other assets is $10,000.00 to $30,000.00.

....

The franchisee's initial investment in inventory is estimated at a low-high range of $8,000.00 to $20,000.00....

Security deposits and other prepaid expense[s] will vary according to the particular circumstances of a franchisee and the particular circumstances of a given Shoppe.... The business of a Haagen-Dazs Shoppe will require the franchisee to make provisions for working capital. An estimated provision for working capital low-high range is $10,000.00 to $20,000.00.

....

... [T]he expenditure for [use or acquisition of real estate, security deposits, other prepaid expenses and permits or licenses] will vary beyond useful estimate or meaningfully describable low-high range. Prospective franchisees should contact qualified professionals such as real estate brokers, bankers, accountants, attorneys, insurance brokers and business consultants so as to make an independent survey of these expenditures.

Pentelovich Aff. Exh. J at Item 7. Applying the law as described with regard to the plaintiffs' claims concerning false statements of earnings, the disclaimer in the offering statement precludes a finding that plaintiffs justifiably relied upon defendants' representations concerning start-up costs. Therefore, the claims based on these allegations will be dismissed.

All plaintiffs allege that defendants falsely induced them to enter the contract by misrepresenting the average cost of goods sold as 37 percent. *Carlock* Amended Complaint Ex. D; *Dwyer* Amended Complaint Exh. A. Plaintiffs are, however, unable to establish a genuine issue of fact on whether this representation was false. In order to establish falsity, plaintiffs argue that (a) defendants did not have financial records of all the shoppes, and (b) Mattus–Hurley was not able to keep the cost of goods below 37 percent at her Montague Street and 59th Street Stores. Mattus–Hurley Dep. at 70–71. Mattus–Hurley states in her deposition that the cost of goods at those stores was high because they were testing stores and that she had the records from other stores necessary to get an approximation of the actual cost of goods in shoppes. *Id.* Plaintiffs do not introduce their own records to establish the falsity of defendants' representation. On the contrary, two plaintiffs, Hines and Carlock, testified that defendants' figure was accurate. Deposition of Edwin Hines at 141–42; Carlock Dep. at 209. Plaintiffs have simply failed to establish a genuine issue of fact concerning whether defendants' alleged representation was a false statement at the time the representation was made.

### 3. False Claims that No Shoppe or Only One Shoppe Had Failed

Two sets of franchisees, Dumont/Dilson and Pinkus, claim that the defendants misled them by stating that no shoppe (or only one shoppe) had ever failed. *See* Aaron Pinkus Dep. at 154 (only one shoppe had failed); Dilson Dep. at 126 (no shoppe had failed). Plaintiffs have not, however, demonstrated that this alleged misrepresentation was false. The only evidence plaintiffs cite to establish that the statement was false is the "acute situation" experi-

enced by franchisee Joseph Lovallo and the "widescale fallout that was becoming apparent by 1983." Ross Aff. I at par. 19. Lovallo's franchise was open until 1983. Lovallo Aff. at par. 1. Both Pinkus and Dumont allege that the misrepresentation was made sometime during 1982; there is no evidence in the record that any shoppe had failed before that time.

4. False Representations that Franchisor Would Provide Expertise and Support in Site Selection and Lease Negotiations

 Five groups of franchisees claim that they were fraudulently induced into entering franchise agreements by a false offer from the defendants of expertise and support in site selection and lease negotiations. The Haagen–Dazs offering circular provides:

> [F]ranchisor *may offer* supervision or assistance in: *site selection; lease negotiations* ... and other requests as develop in connection with individual Shoppe peculiarities. *Franchisor is not bound by contract to provide these voluntary and discretionary supervisions and assistances.*
>
> . . . .
>
> The *location* for the franchisee's business *is selected by the franchisee in combination with the franchisor's consent.* The skills, experience and knowledge of a particular franchisee may be greater with respect to a given potential Shoppe location than those of the franchisor, but the franchisor will nevertheless apply generally accepted location and survey procedures conducted under the supervision of experienced personnel before granting that consent. The generally accepted location and survey procedures include, but are not limited to: demographic data, shopping patterns, accessibility, visibility, traffic information, population density, competition, zoning, parking and complimenting other businesses.

Pentelovich Aff. Exh. J at Item 11 (emphasis added). According to the offering statement, the franchisor may offer assistance in site selection and lease negotiation, but franchisor is not required by contract to offer such assistance. The franchisor does, however, promise to evaluate the site selected by the franchisee before deciding whether to approve the location. The evaluation is to be conducted by experienced personnel using "generally accepted location and survey procedures." *Id.*

Both HDF and HDSC required a prospective franchisee to have leased a site approved by the franchisor before entering into the franchise agreement. *Id.* Accordingly, any activity concerning site selection and/or lease negotiation would have already taken place by the time plaintiffs signed the franchise agreements. Plaintiffs point out, however, that the quality of the site selection evaluation/assistance provided by the franchisor would be apparent only after the store opened.

The five groups of franchisees who claim to have been fraudulently induced into entering the franchise agreement through false representations that the franchisor would provide expertise and support in site selection and lease negotiations are the Crawfords, the Kranholds, the Pinkuses, the Carlock/Sullivan group and the Goldfines. *Carlock* Amended Complaint Exh. O; *Dwyer* Amended Complaint Exh. A.

Plaintiff Jerrold Crawford claims to have been told by Paley that he would receive assistance from Haagen–Dazs in negotiating his lease. Deposition of Jerrold Crawford at 22. Crawford consulted with Joseph Kennedy from HDSC a number of times during the lease negotiations, *id.* at 22, and never asked for any further assistance from HDSC in the negotiation process. *Id.* at 52. HDSC approved Crawford's lease. *Id.* at 49. Although Crawford claims that the lease was "very poor," *id.* at 48, there is nothing in the record to suggest that the evaluation of Crawford's location was done other than through generally accepted survey and location procedures.

Plaintiff Dorothy Kranhold testified that she and her family did not have the knowledge necessary to judge whether a site was good or not. Dorothy Kranhold Dep. at 26. Paley and Kennedy of HDSC directed the

Kranholds' efforts to find a site and eventually selected a site for them. *Id.* at 20–29. Paley had never visited the site, and Kennedy had visited it only once for a short time. *Id.* at 27–28. Kennedy started handling the negotiations on the lease, but apparently left the company before the negotiations were completed. *Id.* at 77. When one of the Kranhold group called Paley to ask what was happening with the negotiations, Paley requested that the lease be sent to him. *Id.* Paley then approved the lease without conducting any further negotiations. *Id.* Kranhold claims that, as a result, the rent is much higher than it should have been. *Id.*

Plaintiff Marcia Pinkus testified that HDF informed the Pinkuses that they should locate their shoppe at a particular intersection in Minneapolis. Marcia Pinkus Dep. 182–83. No one from HDF visited the intersection before approving the particular site and lease chosen by the Pinkuses, however. *Id.* 189–90, 284. Apparently, Paley and Mattus–Hurley reviewed some pictures of site which the Pinkuses had brought to New Jersey and approved the site on that basis alone. *Id.* at 182–83. Kennedy, who was HDF's expert on site selection, had no involvement in the selection process. *Id.* at 182–83, 189–90. Apparently the location was poor. After the shoppe began operation, Mattus–Hurley visited the shoppe and said that it should have been elsewhere. *Id.* at 283–84. When Paley visited he asked Marcia Pinkus, "How in the hell did you get stuck in that hole?" *Id.* at 283.

Plaintiffs have provided no evidence to support the claim of either the Carlock/Sullivan or the Goldfine franchisees. Thus the Carlock/Sullivan and the Goldfine claims will be dismissed. The Crawfords' claims will also be dismissed. Based on his deposition testimony, Crawford cannot claim that HDSC misrepresented the amount of assistance it would provide during his lease negotiations. Nor has Crawford presented any evidence suggesting that HDSC employed less than generally accepted survey and location procedures in approving Crawford's location.

The claims of the Kranholds and the Pinkuses will survive defendants' motion. Both of these parties have presented enough evidence to allow a reasonable jury to find that they suffered damage from justifiable reliance on allegedly fraudulent misrepresentations by HDSC.

### B. *Claims Concerning Distribution*

A second group of fraud claims is based upon alleged misrepresentations concerning how Haagen–Dazs ice cream would be distributed. Defendants argue that these claims should be dismissed for two reasons. First, the alleged misrepresentations are predictions, not statements of fact, and therefore cannot be the basis for a claim of fraud. Second, plaintiffs could not have justifiably relied upon any alleged misrepresentations concerning distribution since the franchise agreement clearly reserves to the franchisor the right to distribute Haagen–Dazs ice cream in any manner or method it chose.

Defendants correctly state the law. An action for misrepresentation must be based upon a statement of a past or existing fact. *Cady v. Bush,* 283 Minn. 105, 166 N.W.2d 358, 361 (1969). Statements about future profitability or performance do not provide a basis for an action in fraud. *Zar v. Omni Industries, Inc.,* 813 F.2d 689, 692–93 (5th Cir.1987); *Schwartz v. Newsweek, Inc.,* 653 F.Supp. 384, 389 (S.D.N.Y.1986), *aff'd,* 827 F.2d 879 (2d Cir.1987); *Cady;* 166 N.W.2d at 361. There cannot be reasonable reliance where allegedly fraudulent promises directly contradict the terms of a contract. *Kennedy v. Josephthal & Co.,* 814 F.2d 798, 805 (1st Cir.1987); *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 735–36 (2d Cir.1984); *Symes v. Bahama Joe's, Inc.,* No. 87–0963–2 (D.Mass. Aug. 12, 1988) [1988 WL 92462]; *Beer Wholesalers, Inc. v. Miller Brewing Co.,* 426 N.W.2d 438, 442 (Minn.Ct.App.1988). *cert. denied,* —— U.S. ——, 109 S.Ct. 1173, 103 L.Ed.2d 235 (1989).

Each of the five alleged misrepresentations and the evidence provided in support of plaintiffs' claims is summarized below.

1. Haagen–Dazs Ice Cream Would Be Available Only in Shoppes, Fine Restaurants and Supermarkets

Plaintiffs allege that the defendants informed them that Haagen–Dazs ice cream would only be distributed through up-scale retail outlets, Deposition of Howard Belodoff at 78–89; Crawford Dep. at 23; Christine Curtis Dep. at 39–40; Janet Drago Dep. at 93, 112–13; Deposition of Mark Reiff at 59–60, and that the shoppes would be the primary outlet for retail sales. Robert Goodman Dep. at 118–120; Janet Drago Dep. at 112–13. This statement is at most a prediction of how the business would develop, and is not actionable as fraud given Haagen–Dazs' contractual right to use any method of distribution it chose. These claims will therefore be dismissed.

2. Grocery Store Sales Would Benefit, Not Harm, Shoppes Sales

Plaintiffs claim that defendants persisted in telling franchisees that grocery stores sales of prepackaged pints helped the shoppes when defendants knew that the opposite was true. By 1980, HDF had reason to know that sales of prepackaged pints hurt shoppe sales. Lovallo Aff. Exh A, B. *See also* Ross Aff. II Exh. 25, 26. Nevertheless, HDF and later HDSC told plaintiffs who raised the issue that sales of prepackaged pints benefited the shoppes. Mattus–Hurley Dep. at 111–12; Tenenbaum Dep. at 70–71; Deposition of Carl Paley at 142–44; Belodoff Dep. at 78; Crawford Dep. at 23; Dilson Dep. at 64–65; Dwyer Dep. at 65; Deposition of Jennifer Wein at 50. Plaintiffs claim that this was a misrepresentation of fact. Plaintiffs argue that, had defendants not "covered up" the truth, they could have dealt directly with the problem by, for example, revising the distribution policy or helping franchisees adopt appropriate marketing strategies.

Plaintiffs must show that they were damaged by their own reasonable reliance on defendants' misrepresentations. Plaintiffs claim damages because of the "effect" of the misrepresentations on the defendants, that is, plaintiffs claim that the misrepresentations enabled defendants not to address the problems the franchisees suffered due to the distribution of the prepackaged pints.

It has been established that the distribution of prepackaged pints did not constitute a breach of a franchise agreement or the implied covenants of good faith and fair dealing. Plaintiffs cannot advance the very same claim on a theory of fraud. Because plaintiffs have failed to show damages proximately caused by their own reasonable reliance on defendants' representations that grocery store sales of prepackaged pints would benefit shoppe sales, these claims will be dismissed.

3. New Flavors Were to Remain Exclusive to the Shoppes for at Least Six Months

Plaintiffs contend that HDSC announced a policy of reserving new flavors exclusively for the shoppes during at least the first six months after development, citing the Haagen–Dazs national marketing plan for the fiscal year 1987 (6/1/86–5/31/87). Several franchisees recall this policy being introduced at either the 1986 or 1987 franchisee convention. Abby Goodman Dep. at 284; Janet Drago Dep. at 445; Reiff Dep. at 159. Plaintiffs claim that defendants did not intend to honor this policy. Beyond the general assertion that defendants "pattern of broken promises" creates an issue of fact on this question, however, plaintiffs present no evidence to support this contention. Moreover, this alleged misrepresentation is in direct contradiction with the franchise agreement. The agreement reserves to the franchisor the power to distribute Haagen–Dazs products "through not only Haagen–Dazs Shoppes but through any other distribution method which may from time to time be established." Pentelovich Aff. Exh. F at par. 4. As has been stated, plaintiffs cannot reasonably rely on promises which directly contradict the terms of the contract. These claims will therefore be dismissed.

4. Special Flavors Would Be Distributed Only Through the Shoppes

HDF originally distributed only a limited number of flavors through grocery stores. Curtis Christine Dep. at 76–77; Abby Good-

man Dep. at 17–18; Carlock Dep. at 59–61. Plaintiffs claim that defendants told them that special flavors, such as those with nuts, chips or cherries, would always be reserved for sale in the shoppes. *See, e.g.,* Carlock Dep. at 59–61; Crawford Dep. at 75; Christine Curtis Dep. at 39–40, 76–77, 88. To the extent that shoppes served as the exclusive source for special flavors, they were insulated from competition with non-franchised retailers. Crawford Dep. at 23; Affidavit of Sharon Fulton at 159; Janet Drago Dep. at 129–132; Paley Dep. at 143–44; Ross Aff. II Exh. 9. As with the claim discussed above, this alleged misrepresentation is directly contrary to the express terms of the franchise agreement. Thus, plaintiffs could not have justifiably relied upon it and these claims will also be dismissed.

### 5. Only Eight Flavors Would Be Available for Sale at Any One Time in Non–Franchise Retail Outlets

Plaintiff Thomas Dwyer claims that, in the early 1980's, defendants informed him that only eight flavors would be available at any one time for sale in non-franchise retail outlets. *Dwyer* Amended Complaint Exh. A. Dwyer's first two shoppes were opened before he signed the franchise agreement; nevertheless, in June 1980, Dwyer executed franchise agreements for both of those shoppes. Given the language in the agreement reserving to the franchisor the right to distribute Haagen–Dazs ice cream in any method it chose, the representation Dwyer alleges to have been made was excluded from the agreement and explicitly superseded by the integration clause. *See One–O–One Enterprises, Inc. v. Caruso,* 668 F.Supp. 693, 698–99 (D.D.C. 1987). Dwyer's claim will therefore be dismissed.

### C. *Claims of Fraud in the Operation of the Franchise System*

Plaintiffs assert claims of fraud or misrepresentation based upon a number of alleged misrepresentations concerning the operation of the franchise system. Each alleged misrepresentation will be discussed in turn.

### 1. Products to Assist Franchisees Through The Slow Winter Months Will Be Developed

Plaintiffs claim defendants fraudulently represented that they were trying to develop a product to boost the winter sales of the franchise stores. The evidence in support of this claim was discussed at pages 69–70.

In order for this alleged misrepresentation to be actionable, plaintiffs must show both that the statement was false when made and that plaintiffs incurred damages in reliance upon the misrepresentation. Plaintiffs have done neither. Discovery is closed in this case and, nevertheless, the only evidence that plaintiffs offer to prove that the representation was false is a copy of HDF's "Schedule of Operations and Administrative Expenses" for the year ending April 30, 1983. Ross Aff. II Exh. 30. Claiming that this schedule does not reflect any expenditures for research and development, plaintiffs assert that they have raised a genuine issue of fact concerning whether the alleged representation was false.

Plaintiffs place more weight on the expense schedule than it will bear. By itself, the expense schedule does not establish that HDF did not attempt, between May 1, 1982 and April 30, 1983, to develop a winter product. The fact that the schedule does not include a category titled, "Research and Development," does not mean that no money was spent on new product development. Those expenses may have been included in one or more of the categories listed on the schedule. Even assuming that plaintiffs are correct in the conclusion that they draw from the expense schedule, *i.e.,* that HDF did not make any effort to develop a winter product between May 1, 1982 and April 30, 1983, that still does not establish that the alleged representations were false. The Curtis franchisees claim that the representation was made June 1983, after the period covered by the expense schedule. *Carlock* Amended Complaint Exh. G. The Pinkus franchisees claim that it was made repeatedly over a three-year period beginning in 1982.

*Dwyer* Amended Complaint Exh. A; Marcia Pinkus Dep. at 233. Thus, the expense schedule offered by the plaintiffs does not cover the time when the representations were allegedly made. Therefore, the Court finds the single expense schedule offered by plaintiffs insufficient to create a genuine issue of fact on the falsity of the alleged misrepresentation.

The only damage plaintiffs allege is that this misrepresentation, along with the many others, caused them to remain in the franchise system. Plaintiffs Memorandum at 45. Plaintiffs were contractually obligated to operate their shoppes, purchase ice cream and certain other products and pay royalties. Plaintiffs have cited no specific action that they took in reliance on the alleged representation that defendants were developing a winter product. Without any such action, plaintiffs cannot establish that the alleged misrepresentation proximately caused them damage.

### 2. Cakes Were a Large Part of Shoppe Revenue

The Crawfords claim that Leo Cagata of HDSC told them that cakes were "a large part" of shoppe revenue. *Carlock* Amended Complaint Exh. H. Nothing in the record produced for this motion supports that claim. Plaintiffs' counsel states that this alleged misrepresentation caused franchisees to devote "energies to futile avenues of making a profit." Ross Aff. I at 6. No evidence is produced in support of this claim.

■ The statement that cakes are a large part of shoppe revenue cannot be construed as a guarantee that Crawford would profit if he tried to market more cakes. A vague statement such as this one must be characterized as an expression of opinion or as sales talk or "puffing." It will not support a claim for fraud. *See O'Neal,* 860 F.2d at 1348–49; *George Backer Mgt. Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978); *Holland v. Lentz,* 239 Or. 332, 397 P.2d 787 (1964).

### 3. Weight of Tubs of Ice Cream Is 320 Ounces

■ Plaintiffs Curtis, Goodman, Pinkus and Dwyer alleged that defendants falsely represented the weight of the ice cream in the bulk containers sold to franchisees as 320 ounces. *Carlock* Amended Complaint Exh. L; *Dwyer* Amended Complaint Exh. A. Each of these four groups of plaintiffs presents evidence in support of their claims. Christine Curtis Dep. 58–59, 164; Dwyer Dep. 326–28; Abby Goodman Dep. 38; Aaron Pinkus Dep. 161–62; Affidavit of Michael Pinkus Exh. A. In addition, these claims that defendants affirmatively misrepresented the weight of the bulk ice cream overlaps with the claim discussed at pages 838–39, that defendants fraudulently concealed an increase in the air content of the bulk ice cream. Therefore, these plaintiffs have established a genuine issue of material fact on each element of this claim.

### 4. Promise of $70.00 Per Tub Yields

The Drago and Goodman plaintiffs allege that defendants fraudulently promised them yields of $70.00 per tub. Defendants argue that this alleged representation is not actionable because it is a prediction, rather than a statement of existing fact. Plaintiffs do not answer this argument. Tub yields are dependent on a number of factors, such as the price charged by the franchisee and the training and supervision of the counter staff, which are beyond the control of the franchisor. For that reason, defendants could not have promised franchisees a particular yield. The franchisor may have declared that $70.00 tub yields were a realizable goal, but this would be actionable as fraud only if such yields were impossible to achieve. Because plaintiffs have presented no evidence on this point, the claims will be dismissed.

### 5. Shoppes Should Be Able to Maintain 92 to 96 Percent Scooping Efficiency From Each Tub of Ice Cream

The Curtis and Emry plaintiffs, as well as other plaintiff franchisees attending national franchise convention in 1983, allege that defendants fraudulently represented

that all shoppes "should be able" to maintain a 92 to 96 percent scooping efficiency. *Carlock* Amended Complaint Exh. M. This alleged representation, like the one discussed above, is not actionable because it is a prediction as to what scooping efficiency shoppes should be able to maintain and not a statement of existing fact. Again, plaintiffs offer no proof that this rate of scooping efficiency is impossible to maintain. Therefore, these claims will be dismissed as well.

### 6. Franchisees Would Have Regional Representatives Who Would Provide Them Assistance

All plaintiffs allege that the defendant franchisors fraudulently represented that regional representatives would be hired to assist the franchises. *Carlock* Amended Complaint Exh. P; *Dwyer* Amended Complaint Exh. A. Defendants challenge this claim by contending that the representation was true. HDSC did establish a system of regional representatives. Deposition of Joseph Geraci at 9–14. The system began with three representatives and was later expanded to six or seven representatives. *Id.* at 10–12. Plaintiffs do not dispute this. Nevertheless, plaintiffs claim that at the time the representation was made defendants intended not to follow through. Plaintiffs do not offer any direct evidence to support this assertion. Instead, plaintiffs merely allege that the promise to provide field representation was made and broken so often as to evince an intention not to act on that promise. However, in the evidence provided only two plaintiffs state that defendants made a promise to provide regional representatives. The Inside Scoop, Inc. Answer to Interrogatory 4 attached to the Bohaty Aff. (promise alleged to have been made, no specifics given) and Deposition of Sharon Fulton at 96 (promise alleged to have been made, no date given). Plaintiffs have not provided sufficient evidence to create a question of fact concerning whether HDF or HDSC made the alleged representation without any intent to follow through. This claim will be dismissed.

### 7. The Franchise System Would Be Expanded To Include Hundreds of New Stores

The Goodman, Curtis, Crawford and Ellsworth plaintiffs claim that defendants misrepresented an intention to expand the franchise system to include hundreds of new stores. *Carlock* Amended Complaint Exh. Q. Plaintiffs claim that this misrepresentation was made to convince the plaintiffs that the franchisor stood behind the franchise system. Plaintiffs offer no evidence to establish that the alleged misrepresentation was untrue at the time that it was made. In addition, the alleged misrepresentation is not actionable because it is a prediction as to the future, not a statement of existing fact. Therefore, these claims will be dismissed.

### 8. Franchises Would Be Renewed If Franchisees Paid Their Bills and Ran Clean Shoppes

Six specified plaintiffs and unspecified others allege that defendants represented an intention to renew any franchise which paid its bills and "ran a clean shoppe." *Carlock* Amended Complaint Exh. S; *Dwyer* Amended Complaint Exh. A. Plaintiffs claim that HDSC subsequently adopted an onerous renewal policy, which makes the prior representations false. However, none of the plaintiffs' franchises has approached its date of expiration and thus none have attempted to renew their franchises. Because plaintiffs cannot show that they have been harmed by reliance on this alleged misrepresentation unless and until HDSC decides not to renew their franchises, these claims will be dismissed.

### 9. HDSC Would Buy Back the Shoppe(s) of Any Unhappy Franchisee

The Goldfine, Drago, Ellsworth/Belodoff plaintiffs and unspecified others allege that in the spring of 1984 Mattus–Hurley misrepresented that HDSC would "buy back" the shoppes of any unhappy franchisees. *Carlock* Amended Complaint Exh. T; *Dwyer* Amended Complaint Exh. A. The evidence offered by plaintiffs in support of

this claim is discussed at pages 70–72. In essence, Mattus–Hurley stated that HDSC was willing to evaluate any franchise for a possible buy out if the franchisee no longer wanted to be a part of the Haagen–Dazs franchise system. *See* Pentelovich Aff. Exh. R. HDSC did respond to all timely requests from franchisees interested in the offer. Mattus–Hurley Dep. at 271–73. Several franchises were purchased. Ross Aff. II Exh. 59. Plaintiffs have failed to create any issue of fact concerning the truth of Mattus–Hurley's representation, and therefore these claims will be dismissed.

### 10. Haagen–Dazs Is a "Family"

All plaintiffs claim that defendants made fraudulent misrepresentations that they regarded Haagen–Dazs as "a family," a representation which indicated to the plaintiffs that the franchisor would give high priority to the franchisees' interests and concerns. *Carlock* Amended Complaint Exh. U; *Dwyer* Amended Complaint Exh. A. Plaintiffs contend that they have created a fact question concerning whether the defendants intended to follow through on those statements through testimony that Mattus–Hurley referred to the franchisees as "animals," Deposition of Arnie Runestad at 145–47, and said "it is us versus them." Tenenbaum Dep. at 79. Plaintiffs also cite testimony describing the attitude of Jeff Scholl, the marketing manager for HDC, as "damn the shoppes, full speed ahead with [sales through non-franchise outlets]," Tenenbaum Dep. at 81, and a document prepared for an HDC marketing meeting referring to the shoppes as "tactical marketing tools." Ross Aff. II Exh. 37.

 The statement that Haagen–Dazs is a "family" is too vague a statement to support an action for misrepresentation. *See, e.g., Vaughn v. General Foods Corp.,* 797 F.2d 1403, 1411–13 (7th Cir.1986), *cert. denied,* 479 U.S. 1087, 107 S.Ct. 1293, 94 L.Ed.2d 149 (1987). This claim will therefore be dismissed.

### 11. Mattus–Hurley Would Remain in the Franchise System Through 1988

Plaintiffs have withdrawn this allegation.

### 12. Haagen–Dazs Would Never Be Sold

All plaintiffs who attended the March 1983 meeting at The Pointe in Arizona allege that the Mattuses fraudulently assured them that Haagen–Dazs would never be sold. *Carlock* Amended Complaint Exh. W; *Dwyer* Amended Complaint Exh. A. Plaintiffs offer no evidence to show either that the Mattuses were misrepresenting their intentions at the time the statement was allegedly made or that the plaintiffs suffered damages as a result of their reliance on the alleged misrepresentations. *See* Ross Aff. I at 14. Therefore, this claim will be dismissed.

### 13. Pillsbury Would Turn Things Around—Concentrate on Building Revenues for the Shoppes

 Plaintiffs allege that the defendants "misrepresented" that Pillsbury "would turn things around—concentrate on building revenues for the shoppes." *Carlock* Amended Complaint Exh. X. This allegation fails to state a claim for misrepresentation. Pillsbury's actual success in operating Haagen–Dazs depended in large part on factors outside of the defendants' control—the economy and competing producers for example—and was therefore beyond defendants' ability to know with certainty. A statement by any of the defendants as to what Pillsbury would be able to achieve with Haagen–Dazs is by its very nature a prediction as to the future which is not actionable as fraud. Moreover, the alleged statement is so vague and indefinite as to preclude any reasonable reliance. This claim will therefore be dismissed.

### 14. Franchisees Would Receive Assistance With Marketing and Advertising

 All plaintiffs allege that the defendant franchisors misrepresented themselves as committed to providing the franchises with marketing and advertising assistance. HDF solicitation materials claimed that HDF was "supported by national advertising and professional headquarter management team." Ross Aff. II Exh. 11. This claim appears to have been

false. In 1983 Mattus–Hurley asked an advertising agency which had worked on various projects for HDF and HDI to make a presentation to the franchisees about the accomplishments of HDF marketing. The agency refused to do so because it feared that the franchisees would see the advertising that had been done as favoring supermarket sales and detrimental to the shoppes. Sloane Aff. at par. 5 and Exh. D. In 1983, HDF spent less than $50,000 on advertising. Ross Aff. II Exh. 30. As discussed above at 58, HDSC sent a letter dated March 2, 1984 to franchisees committing itself to a $1 million national marketing campaign. Ross Aff. II Exh. 33. The letter promised that the fund would be spent by March 31, 1985. *Id.* An internal memorandum dated April 25, 1984 states, however, that the funds for the national marketing campaign were not to be used until at least late May 1985. Ross Aff. II Exh. 34. This evidence creates a question of fact about whether HDF and HDSC were making representations that advertising support would be provided to franchisees without any intent to follow through on those representations.

Defendants do not challenge whether plaintiffs can show that they justifiably relied on these representations or whether that reliance was the proximate cause of damage to plaintiffs. Defendants do argue that the representations are not actionable because they relate to future, not existing, facts. Defendants are wrong on this point. Representations that HDF was supported by a national advertising team and that HDSC had committed $1 million to a marketing fund that would be spent during a particular fiscal year are representations of existing facts. Therefore, this claim will stand.

### 15. A Marketing Fee Would Probably Never Be Collected

The Kranhold and Pinkus plaintiffs allege that defendants misrepresented that the marketing fee provided for in the franchise agreement would "probably never" be collected. This alleged representation is, on its face, qualified. Dorothy Kranhold testified that Paley told her that the marketing fee "probably never will [be collected], at least, as long as the Mattuses are around." Dorothy Kranhold Dep. at 41. Steven Kranhold testified that Paley said that the marketing fee "never had been collected before, and he didn't see in the near future it being collected." Deposition Steven Kranhold at 128. Plaintiffs present no evidence suggesting that Paley knew of a plan to collect the marketing fee when he made these alleged representations.

Marcia Pinkus, the other alleged recipient of this representation, did not testify that Paley told her this and did not identify this as an alleged misrepresentation in her interrogatory answers.

These claims will be dismissed. Plaintiffs have not created any fact question on whether the representation, as qualified, was false. Moreover, as defendants correctly argue, the alleged misrepresentation is not actionable because it is not a statement of existing fact, but a prediction as to the future.

### 16. Fraudulent Concealment of the Increase in the Air Content of Bulk Ice Cream

All plaintiffs claim that defendants fraudulently concealed a change in the air content (and hence a decrease in the weight) of the bulk ice cream containers. The evidence, discussed at pages 62–64, indicates that air content in the bulk ice cream was increased at some point. There is a question of fact as to when the increase took place. Defendants claim that it took place in 1978, before the franchise system was established, plaintiffs claim that it took place in 1981. The "weekly inventory sheet," which is part of the shoppe manual and contains a conversion factor for calculating the amount of ice cream sold, was not changed to reflect the increase in air content until 1982. Because Haagen–Dazs ice cream sold to shoppe customers is measured by weight, the increased air content would mean the franchisees would get less product and a lower dollar yield from each tub.

Plaintiffs' breach of contract claim for the decrease in the weight of the tubs will

survive the motion for summary judgment. The claims advanced by four plaintiffs that defendants affirmatively misrepresented the weight of the bulk ice cream tubs will also stand.

 The Court will also allow plaintiffs' claims for fraudulent nondisclosure to stand. While fraud based on nondisclosure is generally not actionable unless the parties are in some type of fiduciary or confidential relationship with one another,[21] *Klein v. First Edina Nat'l Bank,* 293 Minn. 418, 196 N.W.2d 619, 622 (1972), a seller who conceals "a material and substantial fact" to induce a sale, may be liable to the buyer for fraud even in the absence of any fiduciary or confidential relationship. *Peterson v. Arellono,* 289 Minn. 541, 185 N.W.2d 282, 284 (1971).

### 17. Fraudulent Concealment of the Fact that Shoppes' Revenues Were on the Decline Nationally

Plaintiff Edwin Hines claims that when he bought his franchise in 1985 defendants failed to disclose that revenues were on the decline nationally. Hines, however, did not buy the franchise from HDSC; he bought it from its prior owner. In connection with that transaction, Hines signed a "Haagen–Dazs Franchise Surrender and Reissue Agreement" in which he acknowledged that:

> [HDSC] has not been party to any negotiations or agreements pertaining to the sale of the Haagen–Dazs Shoppe business to Purchaser, and that said corporation and its directors, officers, agents, servants or employees has not made any representations or warranties regarding such transaction.

Pentelovich Aff. Exh. I. In the offering circular defendants specifically disclaimed any responsibility for making any representations as to sales or profits. Pentelovich Aff. Exh. J at Item 19. The circular specifically recommends that potential franchisees make their "own investigation and determine whether or not the Shoppes are profitable." *Id.* Defendants were under

no duty to provide information on the franchise system's declining revenues to Hines, and therefore this claim will be dismissed.

### 18. Pillsbury Concealed Plans to Scale Down or Eliminate The Shoppe System

All plaintiffs contend that in approximately 1985 defendants fraudulently concealed "Pillsbury's" plans to scale down or eliminate the Haagen–Dazs franchise system. *Carlock* Amended Complaint Exh. GG; *Dwyer* Amended Complaint Exh. A. Defendants challenge this allegation by asserting that plaintiffs have no evidence that Pillsbury secretly planned to scale down or eliminate the franchise system.

Plaintiffs do not offer any direct evidence of the alleged plan. Plaintiffs cite declining sales by the shoppes and HDSC's large operating losses. Plaintiffs also cite a November 1986 article in the Wall Street Journal which describes Pillsbury as planning to end the franchise system. Ross Aff. II Exh. 47. HDSC promptly informed franchisees that this article was inaccurate. Affidavit of Joseph Geraci Exh. F. It attributed the article to rumors about a licensing program that was being developed. Geraci Aff. Exh. G. Subsequent policy statements by HDSC have sought to reaffirm that there are no plans to terminate the franchise system. *See* Geraci Aff. Exh. H (Renewal Policy: no plan or desire to shut down the franchise system), Exh. J (Operating Principles: "We fully intend to remain in this business, including the shoppes . . ."), Exh. K (Successor Franchise Policy offering eligible franchisees opportunity to apply for new ten-year franchises).

The only other evidence cited by plaintiffs are their own unsubstantiated conclusions that Pillsbury has decided to terminate the franchise system. *See* Janet Drago Dep. at 511–12; Harry Dumont's Answer to Interrogatory 6.

 The question which must be resolved is whether plaintiffs have offered evidence which creates a genuine issue of

21. The Court has already held that there was no fiduciary relationship between the plaintiffs and defendants in this case. Order dated October 13, 1988 at 26–28.

fact on whether defendants fraudulently concealed a plan to scale down or eliminate the franchise system. The evidence which plaintiffs offer of such a plan boils down to the hearsay evidence provided in the November 1986 Wall Street Journal article. This does not satisfy the requirement of rule 56(e) that the nonmoving party demonstrate the existence of a genuine issue of fact by setting forth such facts "as would be admissible in evidence." The hearsay offered by plaintiffs is not sufficient to warrant submitting this claim to a jury. *See Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 570 n. 4 (7th Cir.1989); *Miller v. Solem*, 728 F.2d 1020, 1023–24, 1026 (8th Cir.), *cert. denied*, 469 U.S. 841, 105 S.Ct. 145, 83 L.Ed.2d 84 (1984). Defendants' motion for summary judgment will be granted on this claim.

### 19. Misrepresentations Concerning Ridge Square

Plaintiff Thomas Dwyer acquired the Ridge Square shoppe in 1984 after the prior franchisee had defaulted on obligations that Dwyer had guaranteed. Dwyer Dep. at 686, 688. Dwyer alleges that he was required to pay a transfer fee of $5,000 for his acquisition of the franchise that other transferees were not required to pay and that he was not informed of Pillsbury's settlement with the prior owners. Defendants move for summary judgment on these claims.

Dwyer's first claim, concerning the $5,000 fee, plainly fails to state a claim of fraud. The franchise agreement conditions transfer of the franchise upon payment of a $5,000 fee to the franchisor. Pentelovich Aff. Exh. F at par. 19(3). Regardless of whether that fee was paid by other transferees, the fact that Dwyer did not negotiate to have the fee waived or paid by the transferor does not give rise to a claim for fraudulent concealment.

With regard to the second claim, defendants argue that Pillsbury was under no duty to disclose the settlement to Dwyer and that, moreover, Dwyer cannot establish that the settlement was material to him or that he was damaged by Pillsbury's failure to disclose it to him. Defendants are correct. Plaintiffs have failed to present any evidence concerning the nature of the settlement and its effect on Dwyer.[22] Again, plaintiffs have failed to make an evidentiary showing sufficient to create an issue of fact for trial on elements essential to their claim, and therefore the claim must be dismissed.

### 20. Tulare Plant Would Reduce Price of Wholesale Product to Shoppes on the West Coast

The Goodmans, the Kranholds, the Curtises and Emry allege that defendants falsely represented that product from the new Tulare, California plant would be sold to shoppes on the West Coast at a lower price. Plaintiffs neither describe nor document the substance of the alleged misrepresentation. Defendants contend that the alleged misrepresentation is a prediction which actually came true. Defendants also contend that plaintiffs cannot show that the defendants believed the representation not to be true at the time it was made.

From 1978 to 1985, Haagen–Dazs ice cream was manufactured in Woodbridge, New Jersey and shipped throughout the United States. In 1985, a second manufacturing plant was opened in Tulare, California. Since the opening of the second plant, the eastern half of the United States has been serviced by Woodbridge and the western half by Tulare. The *Dwyer* plaintiffs receive their ice cream from Woodbridge; all of the *Carlock* plaintiffs receive ice cream from Tulare.

Prior to the opening of the Tulare plant, the base price of ice cream was the same

---

**22.** Plaintiffs only response to the motion for summary judgment on Dwyer's claims is contained in the March 22, 1989 affidavit of Jeff Ross. All plaintiffs say is:

Defendants do not deny that the statements and concealment were made. The facts and circumstances surrounding this transaction give rise to a claim for fraud. Pillsbury ended up paying a substantial sum of money to the former shoppe owner. There were many promises to act by Pillsbury to mitigate the situation. It is apparent that fact questions abound.

Ross Aff. I at 18.

for all franchises but the total cost varied because of different freight, warehousing and delivery costs. Geraci Aff. Exh. D4, D9, D11, D13. When the Tulare plant opened, different base prices were established because of different manufacturing costs at the two plants. The Tulare customers paid a higher base price. For example, the base price of a tub of "category 1" ice cream from Tulare was $14.10 whereas the base price of the same tub from Woodbridge was $13.45. *Id.* Exh. D8, D9. Despite the higher base price, the actual delivered cost of a tub to West Coast franchisees has decreased because of freight savings in shipping from Tulare. These savings are demonstrated in the following chart, contained in Defendants' Memorandum at 141 and derived from Exhibits D1–D13 of the Geraci affidavit.

Category 1 Base Price Plus Freight, Warehouse, Handling, and Delivery Charges

| | 1985 From Woodbridge | 1986 From Tulare |
| --- | --- | --- |
| San Francisco | 17.78 | 17.03 |
| Seattle | 17.78 | 17.22 |
| Portland | 18.16 | 17.60 |
| Boise | 17.90 | 17.70 |
| Denver | 17.42 | 17.13 |

Thus, the *Carlock* plaintiffs have experienced an overall cost savings as a result of the opening of the Tulare plant.

Plaintiffs have not answered defendants' assertion that it is, in fact, true that the Tulare plant has succeeded in making ice cream less expensive for West Coast franchisees. Plaintiffs do argue that a March 28, 1985 memorandum indicates that the defendants never intended the West Coast franchisees to get a lower price. The memorandum from Charles Kanan of HDSC says:

> [I]nitially it will cost us more to make the product in Tulare for the Western half of the U.S. than it does at Woodbridge. Irrespective of that fact it is the position of Haagen–Dazs that delivered product price to the shoppes will remain equivalent to Woodbridge prices.

Ross Aff. II Exh. 62.

The reduction in shipping costs meant that West Coast franchisees would pay a lower "delivered product price" than they had before the plant was opened. As a result, the delivered product price for those franchisees was closer to the prices paid by East Coast franchisees. Although the March 28, 1985 memorandum is not artfully written, it cannot be construed as evidence of an intent to misrepresent the effect of the opening of the Tulare plant on the cost of ice cream to West Coast franchisees.

The Court does not, however, base the disposition of this claim on any particular interpretation of Kanan's March 28, 1985 memorandum. Plaintiffs have failed to demonstrate the falsity of defendants' alleged representation that the Tulare plant would result in lower ice cream prices to the West Coast franchisees. On that ground, the claim must be dismissed.

21. A Royalty Rebate Program Would Be Implemented to Benefit Franchisees

All plaintiffs allege that HDSC misrepresented that a royalty rebate program would be implemented to benefit franchisees. *Carlock* Amended Complaint Exh. AA; *Dwyer* Amended Complaint Exh. A. Defendants argue that the alleged misrepresentation was true. HDSC did announce a royalty rebate program, by memorandum dated May 7, 1984. Geraci Aff. par. 2 and Exh. A. The program provided for a rebate to each franchisee on any amount of ice cream purchased during the fiscal year 1985 which exceeded the amount purchased in fiscal year 1984. *Id.*

Defendants have also produced a copy of a $653.72 royalty rebate check sent to the Pinkus franchisees on October 18, 1985. Pentelovich Aff. Exh. W.

In response, plaintiffs offer only an assertion by Christine Curtis that the royalty rebate program "was never available to shoppes." Plaintiff Christine Curtis' Answers to Interrogatories at 9 (unnumbered attachment to Bohaty Aff.). That assertion by itself is not sufficient evidence to

create a genuine issue of fact on whether the royalty rebate program was implemented. Therefore, the claim that defendants falsely represented that a royalty rebate program would be implemented will be dismissed.

### 22. The Price of Ice Cream Sold to Other Retail Outlets Was Fraudulently Concealed

█ Plaintiffs allege that defendants concealed the pricing of ice cream to non-franchised retail outlets. *Carlock* Amended Complaint Exh. CC; *Dwyer* Amended Complaint Exh. A. Independent distributors, not defendants, sold ice cream to non-franchised retailers. The independent distributors set their own prices. Affidavit of Frank Sewill par. 3–4; Affidavit of Yvette Edwards par. 5–6; Affidavit of Thomas Rogers par. 3; Affidavit of Roy Bracken par. 4. Plaintiffs could have just as easily inquired as to those prices from the distributor. Where information is not within the special knowledge of the defendant, there can be no concealment. *Wilburn v. Pepsi-Cola Bottling Co.*, 410 F.Supp. 348, 353–54 (E.D.Mo.1976) (applying Missouri law); *Borba v. Thomas*, 70 Cal.App.3d 144, 138 Cal.Rptr. 565, 571 (5th Dist.1977); *Oates v. Taylor*, 31 Wash.2d 898, 199 P.2d 924, 927 (1948); *Prosser and Keeton on The Law of Torts* § 106 at n. 25 (5th ed. 1984). This claim will therefore be dismissed.

### D. *Summary of Disposition of Plaintiffs' Claims for Fraud or Misrepresentation*

All of plaintiffs' claims of fraud or misrepresentation will be dismissed, except the following:

1. the claim by the Pinkuses that they were fraudulently induced to enter the franchise agreement by HDF's representations that it would provide assistance in site selection;

2. the claim by the Kranholds that they were fraudulently induced to enter the franchise agreement by HDSC's representation that it would provide assistance in site selection;

3. the claim by the Curtises, the Goodmans, the Pinkuses and Dwyer that HDF and HDSC falsely represented the weight of the ice cream in the bulk containers as 320 ounces;

4. the claim by all plaintiffs that HDF and HDSC represented that they would provide marketing and advertising assistance without any intent to follow through on that representation;

5. the claim by all plaintiffs that HDF and HDSC concealed an increase in the air content of the bulk ice cream.

## III. MONOPOLIZATION

In Count IV of the *Dwyer* and *Carlock* complaints, plaintiffs assert claims for monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs allege that defendants "are attempting to monopolize, and are monopolizing, the trade of Haagen–Dazs ice cream in the United States." *Carlock* Complaint par. 46; *Dwyer* Complaint par. 41. Defendants move the Court for summary judgment on Count IV of plaintiffs' respective complaints, arguing that defendants' monopolization of their own product does not violate Section 2.

In *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), the Supreme Court set forth the elements which a plaintiff must prove to recover on a claim of monopolization under section 2.

> The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*Grinnell*, 384 U.S. at 570–71, 86 S.Ct. at 1704. Plaintiffs contend that genuine issues of material fact exist as to whether plaintiffs can establish these elements.

█ In order to determine whether a party possesses monopoly power, it is first necessary to define the relevant market in which the party's power over prices or competition is to be tested. The relevant mar-

ket may be a segment or submarket of a larger, more readily apparent market. *See International Boxing Club, Inc. v. United States*, 358 U.S. 242, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959). In this case, plaintiffs contend that the relevant submarket is Haagen–Dazs ice cream. The products making up this market, plaintiffs contend, are bulk ice cream sold in shoppes and prepackaged pints. Plaintiffs assert that defendants maintain a monopolistic share in this submarket through sales of prepackaged pints.

As stated by the Court in *Belfiore v. New York Times Co.*, 654 F.Supp. 842, 846 (D.Conn.1986), *aff'd*, 826 F.2d 177 (2d Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1030, 98 L.Ed.2d 994 (1988), it seems clear that "[t]he natural monopoly every manufacturer has in the production and sale of its own product cannot be the basis for antitrust liability." This principle has been reaffirmed in other cases where courts have refused to define the relevant market as one encompassing only the defendant's product. *See Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.*, 637 F.2d 1376, 1378–80 (9th Cir.), *cert. denied*, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981); *Carlo C. Gelardi Corp. v. Miller Brewing Co.*, 421 F.Supp. 237, 243–44 and n. 11 (D.N.J.1976). The relevant market in which a defendant operates "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956). Plaintiffs cannot reasonably contend that Haagen–Dazs ice cream is so distinctive that no other brand of ice cream or other frozen dairy product is able to serve as a reasonable substitute. On the contrary, it seems clear that there is significant interchangeability among brands of ice cream. The Court finds that, given the apparent competition among brands of ice cream, it would be inappropriate to define the relevant market in this case as consisting only of Haagen–Dazs ice cream.

In light of the Court's determination that the relevant market for purposes of section 2 is not limited to the market for Haagen–Dazs ice cream, summary judgment is appropriate in favor of defendants on Count IV of plaintiffs' respective complaints. Plaintiffs have not submitted market data or other relevant material adequately describing the nature, cost, usage or other comparative features of competing products which would allow a trier of fact to determine the relevant market. Further, plaintiffs have failed to submit evidence of the market share maintained by defendants' product compared to that of other ice cream products. In short, plaintiffs have failed to present any evidence regarding the monopoly power of defendants' in the relevant market. This failure to make a showing sufficient to establish the existence of an element essential to plaintiffs' section 2 claim necessitates an award of summary judgment in favor of defendants on that claim. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

## IV. PRICE DISCRIMINATION

In Count II of the *Dwyer* and *Carlock* complaints, plaintiffs allege that defendants engaged in price discrimination in violation of the Robinson–Patman Act, 15 U.S.C. § 13 et seq. Plaintiffs in *Carlock* assert similar claims under California, Idaho, Colorado and Oregon state statutes in Counts X, XIV, XV and XIX of their complaint. Plaintiffs allege that defendants have sold ice cream products to non-franchised retail outlets on substantially more favorable economic terms than to plaintiffs' franchise shoppes. Defendants now move the Court for summary judgment on plaintiffs' statutory price discrimination claims. Defendants contend that plaintiffs have failed as a matter of law to establish their right to recovery under the specified price discrimination statutes.

### A. *Robinson–Patman Act*

The Robinson–Patman Act makes it unlawful

either directly or indirectly to discriminate in price between different purchasers of commodities of like grade and quality ... where the effect of such dis-

crimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them. . . .

15 U.S.C. § 13.

■ To establish a claim of price discrimination under the Robinson–Patman Act, a plaintiff must prove that (1) one seller (2) sold a given commodity in interstate commerce (3) to two different purchasers at two different prices, (4) that the commodities sold to the purchasers were of like grade and quality, and (5) that the effect of the price differential may be substantially to lessen competition. *See John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 27 (2d Cir. 1978), *cert. denied*, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979); *Rutledge v. Electric Hose & Rubber Co.*, 511 F.2d 668, 677 (9th Cir.1975); *Energex Lighting Industries, Inc. v. North American Philips Lighting Corp.*, 656 F.Supp. 914, 919 (S.D. N.Y.1987), *see also* 1 Von Kalinowski, *Antitrust Laws and Trade Regulation* Desk Ed. § 5.02[1]. Defendants contend that plaintiffs are unable to satisfy all the required elements necessary to demonstrate a Robinson–Patman Act violation. Defendants thus argue that summary judgment should be granted in favor of defendants on Count II of plaintiffs' respective complaints.

### 1. Common Seller

■ In order to make a claim of price discrimination under the Robinson–Patman Act, a plaintiff must allege that a given commodity was sold to two different buyers at two different prices by the same seller. 1 Von Kalinowski, *Antitrust Laws and Trade Regulation* Desk Ed. § 5.02[4]. Therefore, if a manufacturer sells a product to wholesalers and jobbers who in turn sell to retailers at differing prices, the manufacturer will not be held liable under the Robinson–Patman Act as a seller in a price discrimination suit brought by an aggrieved retailer. *See Massachusetts Brewers Association v. P. Ballantine & Sons Co.*, 129 F.Supp. 736, 739 (D.Mass.1955). Sales made by an affiliated company are not attributed to the parent company unless the parent actively controlled, or at least contributed to, the affiliated company's pricing or distribution policies. *Acme Refrigeration of Baton Rouge, Inc. v. Whirlpool Corp.*, 785 F.2d 1240, 1243 (5th Cir.), *cert. denied*, 479 U.S. 848, 107 S.Ct. 171, 93 L.Ed.2d 108 (1986). In this case, plaintiffs allege that defendants are liable for price discrimination because the plaintiff/franchisees were charged higher prices for Haagen–Dazs ice cream than were non-franchise retail outlets. Defendants contend, however, that they cannot be held liable for price discrimination because, although plaintiffs purchased Haagen–Dazs products from HDF or HDSC, non-franchise retailers purchased Haagen–Dazs products from independent distributors at prices set by those distributors. Defendants thus contend that plaintiffs cannot demonstrate that one seller—namely defendants—sold similar products to different retailers at disparate prices.

In support of their argument, defendants have submitted the affidavit testimony of independent distributors who describe the process for distribution of Haagen–Dazs products. Typical of this testimony is the affidavit of Roy Bracken, president of Pioneer Distributing Company in Boise, Idaho, which states:

> The Haagen–Dazs products which Pioneer distributes include prepackaged products such as pints which are sold to supermarkets, convenience stores and other retail outlets, and bulk containers holding 1½ or 2½ gallons of ice cream, which are sold to restaurants and other food service accounts.

> When Pioneer distributes prepackaged and bulk products as described above, it purchases the product from The Haagen–Dazs Company ("HDC") and resells it to its own retail accounts. Pioneer purchases the product from HDC at prices set by HDC over which Pioneer has no control. Pioneer sells the product at prices set by Pioneer over which HDC

has no control. Prior to July 1983, Pioneer purchased the Haagen–Dazs products it distributed from Woodbridge Sweets Corporation ("WSC") at prices set by WSC and resold the products at prices set by Pioneer.

In addition to purchasing and distributing Haagen–Dazs products in the manner described above, since March 1983 Pioneer has also delivered certain Haagen–Dazs ice cream products to the franchised Haagen–Dazs shoppe in Boise. Such deliveries have been made pursuant to a consignment agreement with Haagen–Dazs Franchise, Inc. ("HDF") until July 1983, and thereafter with The Haagen–Dazs Shoppe Company, Inc. ("HDSC"). Under the consignment agreement, Pioneer has not purchased the ice cream products for the franchised shoppe. Instead, the franchisees have purchased the product directly from either HDF or HDSC. For its services in storing, handling and delivery, Pioneer has received delivery, warehouse and handling fees from HDF or HDSC. *At no time did Pioneer set or control the prices of products sold to the Haagen–Dazs franchised shoppes by HDF or HDSC.*

Bracken Aff. par. 2–4 (emphasis added); *see also* Edwards Aff. par. 5–7; Rogers Aff. par. 3–4.

It is clear from the above-cited affidavit testimony that plaintiff/franchisees and non-franchise retailers did not purchase Haagen–Dazs products from a common seller, *i.e.,* defendants. While plaintiffs purchased Haagen–Dazs ice cream directly from HDF or HDSC, non-franchise retailers purchased Haagen–Dazs products through a distributor with independent control over prices. Defendants cannot be held liable under the Robinson–Patman Act for price differences resulting from sales by two different sellers.

In response to defendants' argument that more than one seller was involved in the sales about which plaintiffs complain, plaintiffs baldly assert that HDC exercises complete control over distribution and pricing. Plaintiffs contend that HDC controls its distributors, and argues that the distribution system constitutes a single integrated enterprise. Thus plaintiffs contend that defendants represent a de facto single seller which may be held liable for price discrimination.

The Court finds that plaintiffs' unsupported assertions do not create a genuine issue of material fact as to whether defendants constitute a single seller for purposes of the Robinson–Patman Act. Plaintiffs cite no evidence in support of their claim that defendants effectively control distribution and pricing decisions of independent Haagen–Dazs distributors. Plaintiffs have submitted no affidavit or deposition testimony nor any documents tending to show defendants' supposed domination of distribution to non-franchise retailers. In light of plaintiffs' failure to demonstrate a factual basis for its claim that defendants were a "single seller," the Court must grant summary judgment in favor of defendants on plaintiffs' claim under the Robinson–Patman Act.

2. Evidence of Price Discrimination

██ Summary judgment is appropriate where a plaintiff fails to submit evidence showing that defendant sold a commodity to plaintiff's functional competitor for one price while contemporaneously selling a commodity of like grade and quantity to plaintiff for a higher price. *See Dealers Wholesale Supply, Inc. v. Pacific Steel and Supply Co.,* 1984–2 Trade Cases § 66,109, 1984 WL 775 (N.D.Cal.1984). In this case, plaintiffs have failed to support their allegations of price discrimination with evidence showing that defendants sold Haagen–Dazs ice cream to non-franchise retailers at prices lower than those charged to plaintiffs. Accordingly, even if the Court determined that plaintiffs and non-franchise retailers purchased ice cream from a common seller, plaintiffs' claim of price discrimination in violation of the Robinson–Patman Act must fail.

Plaintiffs argue that whether defendants have discriminated in price between plaintiffs and non-franchise retailers is a question of fact for the jury. In support of their argument, however, plaintiffs do not

submit a comparative analysis showing the respective prices paid by plaintiffs and non-franchise retailers for Haagen–Dazs products. Nor do plaintiffs submit invoices or other evidence of the price paid by non-franchise retailers to which the Court could compare prices paid by plaintiffs in determining if defendants practiced price discrimination.

Plaintiffs contend that price discrimination results from the fact that plaintiff franchisees must pay defendants franchise fees, royalties and promotion fees which increase the "price" plaintiffs pay for Haagen–Dazs products and which fees are not charged to non-franchise retailers. Even if the Court were to accept plaintiffs' argument that for purposes of the Robinson–Patman Act the "price" plaintiffs pay for Haagen–Dazs products includes costs attendant to the operation of a franchise, plaintiffs have produced no specific evidence showing that this price exceeds the price paid by non-franchise retailers for Haagen–Dazs products. The portions of the record relied on by plaintiffs as support for their allegation of price discrimination merely relate the various types of costs borne by plaintiffs as franchisees and do not specify the amount of such costs nor provide a breakdown of these costs per tub of ice cream purchased. *See, e.g.,* Ross Aff. II Exh. 64 at 4–5; Dwyer Dep. at 363–64. Such evidence is insufficient to support plaintiffs' claim of price discrimination. Accordingly, summary judgment in favor of defendants on Count II of plaintiffs' respective complaints is appropriate on this ground.

### 3. Effect on Competition

■ Plaintiffs' failure to submit evidence demonstrating the effect of defendants' alleged price discrimination on competition presents another barrier to plaintiffs' recovery under the Robinson–Patman Act. In order to set out a prima facie case under the Robinson–Patman Act, 15 U.S.C. § 13(a), a plaintiff must show that the alleged price discrimination produced a possibility of financial injury to competition. *Richard Short Oil Co. v. Texaco, Inc.,* 799 F.2d 415, 420 (8th Cir.1986). As noted by the Eighth Circuit in *Short Oil,*

> The [Robinson–Patman] Act refers not to the effect upon competitors, but to the effect upon competition in general. That is, analysis of the injury to competition focuses on whether there has been a substantial impairment to the vigor or health of the contest for business, regardless of which competitor wins or loses.

*Short Oil,* 799 F.2d at 420. This focus under the Robinson–Patman Act on the effect on competition versus the effect on individual competitors was further explained by another panel of the Eighth Circuit in *Henry v. Chloride, Inc.,* 809 F.2d 1334, 1341 (8th Cir.1987):

> [A]t the heart of [the] cases interpreting the Robinson–Patman Act] is the sense that " '[a] focus on detrimental effects *on competition,* rather than a concern with individual *competitors,* is fundamental to a reconciliation of the Robinson–Patman Act with overall antitrust policies.' " *O. Hommel Co. v. Ferro Corp.,* 659 F.2d 340, 347 (3d Cir.1981), *cert. denied,* 455 U.S. 1017 [102 S.Ct. 1711, 72 L.Ed.2d 134] (1982) (emphasis in original) *quoting* Rowe, *Price Discrimination* 130. Injury to a single competitor, even in conjunction with price discrimination, can represent "honest competition" as much as "illegal conduct," *D.E. Rogers Associates [v. Gardner-Denver Co.],* 718 F.2d [1431] at 1439 [(6th Cir.1983)], or even mismanagement or inefficiency by the injured competitor. *International Telephone & Telegraph Corp.,* 3 Trade Reg.Rep. at 23,095. We agree. The Supreme Court has made clear the primacy of general pro-competitive principles in interpreting and applying all of the antitrust laws. *Automatic Canteen Co. v. FTC,* 346 U.S. 61, 73–74 [73 S.Ct. 1017, 1024–1025, 97 L.Ed. 1454] (1953). To allow recovery to an individual competitor who has been injured by what might be legitimate competitive pricing would turn the Robinson–Patman Act into a font of tort law for battered businesses.

(Emphasis in original.) The Eighth Circuit is not alone in its requirement that a plaintiff seeking to establish a claim under the Robinson–Patman Act demonstrate injury to competition. As observed by the court in *Henry*, "[t]he courts of appeals that have considered this issue (as most of them have), have overwhelmingly held that '[t]he naked demonstration of injury to a specific competitor without more is not sufficient to show that a price discrimination "may" substantially lessen competition.'" *Henry*, 809 F.2d at 1340, *quoting Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 548 (9th Cir.1983), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984).

In this case, plaintiffs have submitted no evidence of injury to competition other than testimony regarding the individual harm allegedly suffered by plaintiff/franchisees as a result of defendants' conduct. Plaintiffs have not engaged in a market analysis examining economic factors which bear on the ability of market participants to compete. Nor have plaintiffs submitted a specific analysis of the effect of defendants' alleged discriminatory pricing on the overall health of plaintiffs' franchise businesses. While it is apparent that certain plaintiffs have suffered a downturn in business over the last several years, plaintiffs have failed to submit evidence relating this downturn to discriminatory pricing or other anti-competitive conduct by defendants. Accordingly, absent such evidence of injury to *competition*, summary judgment in favor of defendants on Count II of plaintiffs' respective complaints is appropriate.

### B. *Oregon Price Discrimination Act* [23]

■ In Count XIX of the *Carlock* complaint, plaintiffs John Fulton, Sharon Fulton, Frances Fulton and David Fulton [24] (the Oregon plaintiffs) allege that defendants engaged in price discrimination in violation of Oregon Revised Statutes § 646.040. [25] Oregon Revised Statutes §§ 646.010 to 646.180, the Anti–Price Discrimination Law, was modeled after the Robinson–Patman Act; in particular, section 646.040 is comparable to 15 U.S.C. § 13(a). *Redmond Ready–Mix, Inc. v. Coats*, 283 Or. 101, 582 P.2d 1340, 1346 (1978). As stated by the Oregon Supreme Court, "[u]nder such circumstances federal cases interpreting the federal statutes are persuasive ... in interpreting the Oregon statute." *Redmond*, 582 P.2d at 1346; *see also Top Service Body Shop, Inc. v. Allstate Insurance Co.*, 283 Or. 201, 582 P.2d 1365, 1375 n. 21 (1978).

In light of the authority afforded federal cases by Oregon courts in interpreting section 646.040, it is apparent that the preceding analysis of plaintiffs' Robinson–Patman Act claim applies to the Oregon plaintiffs' claim of price discrimination brought pursuant to Oregon law. So applied, the Oregon plaintiffs' claim under section 646.040 would fail due to the fact that more than one seller was involved in the allegedly discriminatory sales of which plaintiffs complain, and due to plaintiffs' failure to present evidence of price discrimination and injury to competition. In particular, plaintiffs' failure to demonstrate an effect on competition represents a fatal defect in plaintiffs' claim in light of the Oregon Supreme Court's finding that section 646.040 is concerned with injury to competition, not injury to a competitor. *Redmond*, 582 P.2d at 1348. Therefore, summary judgment will be granted in favor of defendants on Count XIX of the *Carlock* complaint.

**23.** The Court notes that plaintiffs have failed to present responding argument regarding their claims under state price discrimination statutes.

**24.** *See infra* at 854–56 for a discussion of the standing of John Fulton, Sharon Fulton, Frances Fulton and David Fulton.

**25.** Oregon Revised Statutes § 646.040 makes it unlawful for:

any person ... either directly or indirectly, to discriminate in price between different purchasers of commodities ... of like grade and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

### C. *Colorado Unfair Practices Act*

■ In Count XV of the *Carlock* complaint, plaintiffs Robert Goodman, Abby Goodman, Foothills Ice Cream Works Ltd., Jennifer Wein, Green Mountain Ice Cream Co., Inc., Barry Dumont, Connie Dumont, Jeffrey Dilson, Jacqueline Dilson and Caledonia Ice Cream Co. (the Colorado plaintiffs) allege that defendants have engaged in price discrimination in violation of Colo. Rev.Stat. § 6–2–103. Section 6–2–103 prohibits charging different prices for a product at different locations within Colorado with the intent to destroy competition. The Court finds that the Colorado plaintiffs' claim of price discrimination under this statute must fail because as discussed in the preceding section on plaintiffs' Robinson–Patman Act claim, plaintiffs have presented no evidence demonstrating that they actually were victims of price discrimination practiced by defendants. Further, a plaintiff proceeding under section 6–2–103 must demonstrate an intent on the part of the defendant to destroy competition. *Beneficial Finance Co. v. Sullivan,* 534 P.2d 1226, 1229 (Colo.App.1975). Here, plaintiffs have produced no evidence showing an intent on the part of defendants to destroy competition. Accordingly, the Court will grant summary judgment in favor of defendants on this claim.

### D. *Idaho Unfair Practices Law*

■ In Count XIV of the *Carlock* complaint, plaintiffs Frances T. Ellsworth, Roy Ellsworth, Howard Belodoff and Idaho Ices, Inc. (the Idaho plaintiffs) allege that defendants violated Idaho Code § 48–104 which prohibits the selling of "any article or product at less than its fair market value, or at a less price than it is accustomed to demand or receive therefor in any other place under like conditions" for the purpose of driving another person out of business. The Court finds that summary judgment in favor of defendants on this claim is appropriate because plaintiffs have failed to produce any evidence suggesting that defendants sold Haagen–Dazs ice cream for less than its fair market value or otherwise dumped Haagen–Dazs ice cream

onto the market in an attempt to drive plaintiffs out of business.

Interestingly, plaintiffs have not asserted a cause of action under Idaho's counterpart to the Robinson–Patman Act, Idaho Code § 48–202. Such a claim would fail, in any event, as discussed in previous sections, due to plaintiffs' failure to present evidence on requisite elements of a price discrimination claim.

### E. *California Unfair Practices Act*

■ In Count X of the *Carlock* complaint, plaintiffs Jerry Carlock, Gerald Sullivan, Sullock Corporation, Mark Reiff, Marjorie Goldfine, Sander Goldfine, Henry Goldfine, Mighty Good Ice Cream, Inc., Jerry Crawford, Mary Crawford, Dorothy Kranhold, Steven Kranhold, Lester Kranhold and John Emry (the California plaintiffs) allege that defendants engaged in price discrimination in violation of the California Unfair Practices Act. The specific statutory citation relied on by plaintiffs, California Business and Professions Code § 17200, does not deal with price discrimination. Rather, price discrimination is dealt with in the Unfair Practices Act at Cal.Bus. & Prof.Code § 17040 which provides:

> It is unlawful for any person engaged in the production, manufacture, distribution or sale of any article or product of general use or consumption, with intent to destroy the competition of any regular established dealer in such article or product, or to prevent the competition of any person who in good faith, intends and attempts to become such dealer, to create locality discriminations.

Cal.Bus. & Prof.Code § 17031 defines locality discrimination as

> a discrimination between different sections, communities or cities or portions thereof, or between different locations in such sections, communities, cities or portions thereof in this State, by selling or furnishing an article or product, at a lower price in one section, community or city, or any portion thereof, or in one location in such section, community, or

city or any portion thereof, than in another.

The price discrimination provisions of the Unfair Practices Act, as interpreted by the California Supreme Court, do not provide an avenue of recovery for plaintiffs in this case. In *Harris v. Capitol Records Distributing Corp.*, 64 Cal.2d 454, 50 Cal. Rptr. 539, 543–44, 413 P.2d 139, 143–44 (1966), the California Supreme Court ruled that section 17040 was intended to prevent practices which injure the *seller's* competitors—so-called primary level competition. The court held that a plaintiff cannot prevail on a claim under section 17040 based on practices which injure competition among purchasers. *Id.* The court noted that the California Legislature has declined to repeal sections 17040 and 17031 and incorporate the substance of the Robinson–Patman Act with its prohibition against price discrimination "between different purchasers." *Harris*, 50 Cal.Rptr. at 543 n. 5, 413 P.2d at 143 n. 5. In this case, plaintiffs have set forth no allegations regarding the effect of defendants' alleged price discrimination on competition among other sellers of ice cream. Plaintiffs allege only injury to competition among ice cream retailers. Accordingly, plaintiffs' claim of price discrimination under the California Unfair Practices Act cannot go forward, and summary judgment will be granted in favor of defendants on Count X of the *Carlock* complaint.[26]

## V. STATE CONSUMER FRAUD STATUTES

Plaintiffs have asserted claims under various state statutes which protect consumers from fraudulent practices. Defendants now move the Court for summary judgment on those claims, arguing that as a matter of law plaintiffs cannot recover under the language of the respective statutes as interpreted by the courts.

### A. *Minnesota Consumer Fraud Act*

In Count X of the *Dwyer* complaint, plaintiffs Thomas Dwyer, Tivoli Enterprises, Inc., Vanilla Chip Ice Cream Co., Aaron Pinkus and Marcia Pinkus (the Minnesota plaintiffs) allege that defendants have violated the Minnesota Consumer Fraud Act and, in particular, Minn.Stat. § 325F.69. Section 325F.69, subd. 1 provides:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided herein.

Private damage actions are permitted to remedy violations of section 325F.69. Minn.Stat. § 8.31, subd. 3a. Defendants now move the Court for summary judgment on Count X, arguing that plaintiffs have failed to state a claim for relief under section 325F.69 and have failed to produce evidence in support of their claim.

■ Defendants argue that plaintiffs have failed to allege that any of defendants' actions were undertaken (1) "with the intent that others rely thereon," or (2) "in connection with the sale of any merchandise." Minn.Stat. § 325F.69, subd. 1. With respect to defendants' first point, courts have held that the Consumer Fraud Act is broader than common law fraud. *LeSage v. Norwest Bank Calhoun–Isles, N.A.*, 409 N.W.2d 536, 539 (Minn.Ct.App. 1987), *cited in In re Professional Financial Management, Ltd.*, 703 F.Supp. 1388, 1397 (D.Minn.1989). A plaintiff need not prove intentional misrepresentation in order to prevail on a claim under Minn.Stat. § 325F.69. *See Yost v. Millhouse*, 373 N.W.2d 826, 830 (Minn.Ct.App.1985); *In re Professional Financial Management, Ltd.*, 703 F.Supp. at 1397. A cause of action under section 325F.69 is made out if plaintiff supplies proof of conduct equiva-

---

**26.** Even if plaintiffs could properly state a claim for price discrimination under the California Unfair Practices Act, summary judgment in favor of defendants on Count X of the *Carlock* complaint would be appropriate in light of plaintiffs' failure to present evidence of price discrimination and injury to competition.

lent to negligent misrepresentation. *In re Professional Financial Management, Ltd.*, 703 F.Supp. at 1397. Thus, it is not necessary that one who makes the misrepresentation knows that it is false. If an individual makes a statement which turns out to be false, and makes it of his own knowledge when in fact he does not know whether it is true or false, that is a misrepresentation. *Id.* In this case, the Court finds that plaintiffs have alleged sufficient facts to satisfy the intent element of Minn. Stat. § 325F.69.

[49] With respect to defendants' second point, Minn.Stat. § 325F.68, subd. 2 defines merchandise as "any objects, wares, goods commodities, intangibles, real estate, or services." Certainly Haagen–Dazs ice cream falls within this broad definition of merchandise. And plaintiffs have alleged misrepresentation in connection with the sale of that merchandise, *i.e.*, that defendants misrepresented the weight and air content of tubs of bulk ice cream sold to plaintiffs. The Court finds that such allegations fall within the language and coverage of Minn.Stat. § 325F.69. Accordingly, the Court finds that as to plaintiffs' claims of fraud in regard to the weight and air content of the bulk ice cream, plaintiffs have properly stated a claim for relief under the Minnesota Consumer Fraud Act.

[50] Defendants also contend that plaintiffs have failed to provide sufficient factual support for the allegation that defendants violated Minn.Stat. § 325F.69. Section 325F.69 sets forth a broad proscription against fraudulent conduct in the sale of merchandise. As the foregoing discussion of plaintiffs' common law fraud claims demonstrates, at least in regard to plaintiffs' allegations of fraud in connection with the weight and air content of bulk ice cream sold to plaintiffs, plaintiffs have submitted sufficient evidence to preclude an order of summary judgment. This evidence sufficiently supports plaintiffs' claim under the Minnesota Consumer Fraud Act. Accordingly, the Court will deny defendants' motion for summary judgment on Count X of the *Dwyer* complaint.

### B. *Idaho Consumer Protection Act*

In Count XII of the *Carlock* complaint, the Idaho plaintiffs allege that defendants have acted in violation of the Idaho Consumer Protection Act, Idaho Code § 48–608(1). Section 48–608(1) provides:

Any person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by this act, may treat any agreement incident thereto as voidable or, in the alternative, may bring an ... action ... to recover actual damages....

Defendants move the Court for summary judgment on Count XII on three grounds. Defendants contend that plaintiffs' allegations of wrongful conduct fail to state a claim for relief under Idaho Code § 48.608(1). Defendants further contend that plaintiffs' claims brought pursuant to section 48–608(1) are barred by the applicable statute of limitation. Finally, defendants contend that summary judgment in favor of defendants is appropriate because there are no facts in the record which support plaintiffs' claim under section 48–608(1).

#### 1. Failure to State a Claim

[51] Defendants contend that plaintiffs have failed to state a claim under the Idaho Consumer Protection Act because the allegations set forth by plaintiffs in support of their claim do not constitute an unfair or deceptive act or practice of the type actionable under the Act. The Court disagrees. Idaho Code § 48–603 enumerates those acts which violate the Idaho Consumer Protection Act. Among the acts declared unlawful under section 48–603 are:

(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; [and]

....

(17) Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer.

In support of their claim under Idaho law, the Idaho plaintiffs allege that defendants fraudulently concealed a change in the air content of the bulk ice cream. This allegation of fraudulent conduct relates to the quality or grade of the goods purchased by plaintiffs and is within the purview of sections 48–603(7) and (17). The Court finds that as to this allegation, plaintiffs have stated a claim for relief under the Idaho Consumer Protection Act.

Defendants further contend that plaintiffs have failed to state a claim for relief because plaintiffs are not "consumers" who may bring an action under the Idaho Consumer Protection Act. Defendants' argument is not supported by the language of the Act. Under Idaho Code § 48–608(1), "[a]ny *person* who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property" may seek relief. (Emphasis added.) Pursuant to Idaho Code § 48–602, "person" is defined as "natural persons, corporations, trust, partnerships, incorporated or unincorporated associations, and any other legal entity, or any agent or servant thereof." The Idaho Consumer Protection Act does not contain a separate definition of consumer, and section 48–608(1) is not limited by its terms to actions by consumers. The Court therefore finds that plaintiffs may proceed under the Idaho Consumer Protection Act.

### 2. Statute of Limitations

Defendants argue that plaintiffs' claim under the Idaho Consumer Protection Act is barred by the applicable statute of limitations. Idaho Code § 48–619 provides that "[n]o action may be brought under [the Idaho Consumer Protection Act] more than two (2) years after the cause of action accrues." This action was commenced June 9, 1987. Thus, any cause of action under the Idaho Consumer Protection Act which accrued prior to June 9, 1985 would be barred by Idaho Code § 48–619.

Idaho Code § 5–218 is the general statute of limitations for fraud claims brought pursuant to Idaho law. Section 5–218 sets forth a three-year statute of limitations to be applied in cases involving fraud, and provides that "[t]he cause of action in such case [shall] not ... be deemed to have accrued until the discovery by the aggrieved party, of the facts constituting the fraud." In light of the absence of guidance in the Idaho Consumer Protection Act regarding when a claim accrues for purposes of section 48–619, the Court will apply the general provision regarding fraud set forth in section 5–218. Thus, the date on which plaintiffs' cause of action accrued is determined by when plaintiffs discovered defendants' alleged fraudulent conduct.

Defendants argue that plaintiffs discovered the alleged fraudulent conduct by defendants prior to June 9, 1985 and thus argue that plaintiffs' cause of action accrued prior to that date, rendering plaintiffs' claim time-barred pursuant to Idaho Code § 48–619. Plaintiffs dispute defendants' contention, arguing that plaintiffs did not discover defendants' fraud until after June 9, 1985. The Court cannot determine on the record before it the date on which the Idaho plaintiffs discovered defendants' alleged fraudulent concealment of the increased air content of the bulk ice cream. Accordingly, at this time the Court will deny defendants' motion to dismiss plaintiffs' claim under the Idaho Consumer Protection Act. This matter may properly be resolved upon later submissions of the parties.[27]

### 3. Factual Support for Plaintiffs' Claim

Defendants contend that even if plaintiffs have stated a claim for relief under the Idaho Consumer Protection Act that is not time-barred, summary judgment should still be granted in favor of defendants because plaintiffs have introduced insufficient factual support for their claim. The Court finds defendants' contention to be without merit. As demonstrated by the foregoing analysis of plaintiffs' common law fraud claims, plaintiffs have produced sufficient evidence to withstand summary

---

**27.** The Court recognizes that this order does not resolve all issues with regard to the particular claims of individual plaintiffs that may be resolved prior to trial. The Court will consider entertaining future motions aimed at resolving these issues.

judgment with regard to their claim that defendants fraudulently concealed a change in the air content of the bulk ice cream. Accordingly, the Court declines to grant summary judgment in favor of defendants on Count XII of the *Carlock* complaint.

### C. *Washington Franchise Investment Protection Act*

In Count XX of the *Carlock* complaint, plaintiffs Janet Drago, Noel Drago, Christine Curtis, Timothy Curtis and Inside Scoop, Inc. (the Washington plaintiffs) assert a claim for damages under the Washington Franchise Investment Protection Act (WFIPA), and specifically Wash.Rev. Code Ann. § 19.100.180. Defendants now move the Court for summary judgment on Count XX, arguing that plaintiffs have failed to state a claim for relief under Washington law.

The WFIPA, which provides comprehensive regulation of franchising, is in two parts. The first part regulates the offering and sale of franchises, and includes detailed requirements for registration and disclosure. The second part, which includes Wash.Rev.Code Ann. § 19.100.180, is designed to resolve problems which arise out of the relationship between a franchisor and a franchisee. *Coast to Coast Stores (Central Organization), Inc. v. Gruschus,* 100 Wash.2d 147, 667 P.2d 619, 621 (1983) (en banc). Wash.Rev.Code Ann. § 19.100.180 sets forth a franchisee bill of rights which is intended to equalize the bargaining power of the parties to a franchise agreement. *Coast to Coast,* 667 P.2d at 621.

Wash.Rev.Code Ann. § 19.100.180 is itself in two parts. The first part, Wash. Rev.Code Ann. § 19.100.180(1), directs that "[t]he parties [to a franchise agreement] shall deal with each other in good faith." The second part provides a lengthy list of proscribed conduct. Wash.Rev.Code Ann. § 19.100.180(2) provides that "it shall be an unfair or deceptive act or practice or an unfair method of competition and therefor unlawful and a violation of this chapter for any person to ..." perform any of the ten

enumerated acts. The last on this list of proscribed acts is: "Terminate a franchise prior to the expiration of its term except for good cause." Wash.Rev.Code Ann. § 19.100.180(2)(j).

Defendants contend that the essence of plaintiffs' claim under the WFIPA is an allegation of wrongful termination. Defendants further contend that plaintiffs cannot recover under Wash.Rev.Code Ann. § 19.100.180(2)(j) for wrongful termination because their franchises have not been terminated. Defendants note that plaintiffs continue to hold and exercise their rights to use the Haagen–Dazs trademark, and to market Haagen–Dazs products, both of which are elements of the existence of a "franchise" as that term is defined in Wash.Rev.Code Ann. § 19.100.010(4).

In *Coast to Coast,* 667 P.2d at 623, the Washington Supreme Court held that for purposes of the WFIPA, "a franchise is terminated only when the agreement between the franchisee and franchisor is brought to an end, terminating the franchisee's right to use the franchisor's trade name, service mark, or the like." Based on this interpretation of the WFIPA, plaintiffs cannot recover under Wash.Rev.Code Ann. § 19.100.180(2)(j) for wrongful termination because plaintiffs' franchises have not been actually terminated. Constructive termination of a franchise is not actionable under Wash.Rev.Code Ann. § 19.100.180(2)(j). *See Coast to Coast,* 667 P.2d at 622–23; *see also Payless Car Rental System, Inc. v. Draayer,* 43 Wash.App. 240, 716 P.2d 929 (1986).

Plaintiffs do not limit their allegations of wrongful conduct under the WFIPA to improper termination. Plaintiffs allege that defendants made false representations regarding earnings, flavor selection and methods of distribution; failed to provide promised franchise support; and provided franchisees with adulterated product. Plaintiffs contend that these actions fall within the proscriptions of Wash.Rev.Code Ann. § 190.100.180(2). A close reading of Wash.Rev.Code Ann. § 190.100.180(2) reveals, however, that the acts complained of by plaintiffs are not among the acts pro-

scribed by that section.[28] Accordingly, plaintiffs have failed to state a claim for relief under the WFIPA and summary judgment will be granted in favor of defendants on Count XX of the *Carlock* complaint.

## VI. STANDING OF PLAINTIFF CORPORATIONS

A number of the plaintiff franchisees formed corporations to operate some or all of their shoppes. These corporations are named as plaintiffs in this action.[29] None of these corporations are parties to a written franchise agreement. Defendants argue that because these corporations are not parties to a franchise agreement, they may not assert claims for either breach of contract or breach of implied covenants of good faith and fair dealing. Further, defendants contend that because the corporations did not enter into a contract, they also may not maintain an action for fraudulent inducement.[30] Plaintiffs contend essentially that based on the course of dealing between defendants and the plaintiff corpo

**28.** Wash.Rev.Code Ann. § 190.100.180(2) provides in relevant part:

(2) For the purposes of this chapter and without limiting its general application, it shall be an unfair or deceptive act or practice or an unfair method of competition and therefore unlawful and a violation of this chapter for any person to:

(a) Restrict or inhibit the right of the franchisees to join an association of franchisees.

(b) Require a franchisee to purchase or lease goods or services of the franchisor or from approved sources of supply unless and to the extent that the franchisor satisfies the burden of proving that such restrictive purchasing agreements are reasonably necessary for a lawful purpose justified on business grounds, and do not substantially affect competition; *Provided,* That this provision shall not apply to the initial inventory of the franchise....

(c) Discriminate between franchisees in the charges offered or made for royalties, goods, services, equipment, rentals, advertising services, or in any other business dealing, unless and to the extent that the franchisor satisfies the burden of proving that any classification of or discrimination between franchisees is reasonable, is based on franchises granted at materially different times and such discrimination is reasonably related to such difference in time or on other proper and justifiable distinctions considering the purposes of this chapter, and is not arbitrary.

(d) Sell, rent, or offer to sell to a franchisee any product or service for more than a fair and reasonable price.

(e) Obtain money, goods, services, anything of value, or any other benefit from any other person with whom the franchisee does business on account of such business unless such benefit is disclosed to the franchisee.

(f) If the franchise provides that the franchisee has an exclusive territory, which exclusive territory shall be specified in the franchise agreement, for the franchisor or subfranchisor to compete with the franchisee in an exclusive territory or to grant competitive franchises in the exclusive territory area previously granted to another franchisee.

(g) Require franchisee to assent to a release, assignment, novation, or waiver which would relieve any person from liability imposed by this chapter.

(h) Impose on a franchisee by contract, rule, or regulation, whether written or oral, any standard of conduct unless the person so doing can sustain the burden of proving such to be reasonable and necessary.

(i) Refuse to renew a franchise without fairly compensating the franchisee for the fair market value, at the time of expiration of the franchise, of the franchisee's inventory, supplies, equipment, and furnishing purchased from the franchisor, and good will, exclusive of personalized materials which have no value to the franchisor, and inventory, supplies, equipment and furnishings not reasonably required in the conduct of the franchise business: *Provided,* That compensation need not be made to a franchisee for good will if (i) the franchisee has been given one year's notice of nonrenewal and (ii) the franchisor agrees in writing not to enforce any covenant which restrains the franchisee from competing with the franchisor: *Provided further,* That a franchisor may offset against amounts owed to a franchisee under this subsection any amounts owed by such franchisee to the franchisor.

(j) Terminate a franchise prior to the expiration of its term except for good cause....

**29.** The corporations involved in this action are: Tivoli Enterprises, Inc.; Vanilla Chip Ice Cream Co.; Sullock Corporation; Sacramento Mighty Good Ice Cream Co.; Caledonia Ice Cream Co.; Foothills Ice Cream Works, Ltd.; Green Mountain Ice Cream Co., Inc.; Idaho Ices, Inc.; The Inside Scoop, Inc.; and ICE, Inc.

**30.** Defendants also contend that the corporate plaintiffs cannot assert antitrust claims because these plaintiffs were not purchasers of Haagen–Dazs ice cream for purposes of antitrust law. The Court need not decide this issue because plaintiffs' claims of monopolization and price discrimination brought pursuant to federal and state statutes fail on the merits, as discussed *supra.*

rations, an implied in fact contract exists between defendants and the corporations on the same terms as the standard franchise agreement executed between defendants and the individual plaintiff franchisees. Plaintiffs thus argue that the corporations are proper plaintiffs.

As a general rule, one who is not a party to a contract has no standing to assert a claim for its breach. *Scaduto v. Orlando*, 340 F.2d 293, 300 (2d Cir.), *cert. denied*, 380 U.S. 978 (1965). Plaintiffs argue, however, that the plaintiff corporations should be treated as parties to franchise agreements with defendants, with standing equal to that of individual plaintiff franchisees. In support of their argument, plaintiffs note that defendants have consistently dealt with the plaintiff corporations as franchisees. Plaintiffs assert that defendants have sold ice cream to these corporations, accepted checks from these corporations, and in all other ways treated them as legitimate parties to a franchise agreement.

 Under certain circumstances, a contract may be implied from the conduct of the parties. *Gryc v. Lewis*, 410 N.W.2d 888, 891 (Minn.Ct.App.1987); *Michaels v. County of Tioga*, 61 Misc.2d 603, 306 N.Y. S.2d 579, 581 (Sup.Ct.1970). A contract cannot be implied in fact, however, where the facts surrounding the parties' relationship or the declarations of the party to be charged are inconsistent with the existence of a contract. *New York Telephone Co. v. Teichner*, 69 Misc.2d 135, 329 N.Y.S.2d 689, 691 (Dist.Ct.1972). Whether an implied in fact contract exists is determined by the objective manifestations of the parties. *Gryc*, 410 N.W.2d at 891. Whether a contract is to be implied in fact, and the existence of the terms of such a contract, are generally questions of fact to be determined by the trier of fact. *AFSCME Councils 6, 14, 65 and 96 AFL–CIO v. Sundquist*, 338 N.W.2d 560, 567 (Minn. 1983), *appeal dismissed*, 466 U.S. 933, 104 S.Ct. 1902, 80 L.Ed.2d 452 (1984).

 In their argument in support of summary judgment, defendants note that the standard franchise agreement specifically limits the rights conveyed through the agreement to the signatory of the contract. Paragraph 15.1 of the franchise agreement provides:

> Acquiring or having licenses, permits, utilities or insurance for the Haagen–Dazs Shoppe in the name of any person other than the within individual Franchisee or payment of the obligations of the Haagen–Dazs Shoppe by checks issued by any other person other than the within individual Franchisee or the grant or conveyance of any legal, equitable or beneficial right, title or interest in the Haagen–Dazs Shoppe or its equipment by Franchisee to any person, firm or corporation, other than the grant of a lien in the Shoppe equipment to secure payment of the original purchase price of such personalty, shall each constitute an irrebuttable presumption that Franchisee has materially and substantially breached the provisions of this Franchise.

Pentelovich Aff. Exh. F par. 15.1. Further, paragraph 19 of the franchise agreement prohibits assignment by the franchisee. *Id.* at par. 19. These statements from the franchise agreement may reasonably be construed as declarations of defendants suggesting that no implied agreement exists between the parties. As previously mentioned, however, the conduct of defendants in dealing with the plaintiff corporations as franchisees suggests that an implied in fact contract does exist. Under these circumstances, the question of whether an implied in fact contract exists between the plaintiff corporations and defendants cannot be determined on summary judgment. Rather, in accord with the general rule, the question of an implied contract is one for the jury.

Based on the foregoing, the Court will not rule as a matter of law that the plaintiff corporations are without standing to maintain the present action. Rather, the Court will allow the corporations to proceed to trial as proper party plaintiffs.

## VII. STANDING OF DAVID FULTON AND FRANCES FULTON

 Plaintiffs David Fulton and Frances Fulton are the parents of plaintiff John

Fulton. David Fulton and Frances Fulton took over operation of John Fulton and Sharon Fulton's shoppe in Lake Oswego, Oregon in or about October 1985 when John Fulton and Sharon Fulton declared bankruptcy and moved to San Diego. At the time David Fulton and Frances Fulton took over the shoppe, they executed a franchise agreement and returned it to Haagen–Dazs. Affidavit of David Fulton par. 3. Apparently, Haagen–Dazs refused to consent to the transfer of the franchise because John Fulton and Sharon Fulton refused to sign a general release in favor of Haagen–Dazs. Affidavit of Stephen Van Velkinburgh par. 4–5. Since the time David Fulton and Frances Fulton took over the Lake Oswego shoppe, however, they have acted and have been treated by defendants as franchisees. David Fulton and Frances Fulton have paid for and been shipped ice cream. David Fulton Aff. par. 5. They have paid defendants for advertising and royalties, and have attended franchisee meetings. *Id.*

Defendants contend that because David Fulton and Frances Fulton are not officially approved franchisees of record, they are without standing to assert claims for breach of contract, breach of implied covenant or fraud. Plaintiffs contend that in light of defendants' conduct toward David Fulton and Frances Fulton, defendants are estopped from denying that David Fulton and Frances Fulton are in fact franchisees. The Court finds that the same implied contract analysis set forth in the previous discussion of the standing of plaintiff corporations applies to the question of whether David Fulton and Frances Fulton are proper plaintiffs. That is, evidence exists relating to defendants' conduct toward David and Frances Fulton which suggests that an implied in fact franchise contract exists between the parties. While defendants contest such an interpretation of their actions, it is apparent that a factual question exists as to whether an implied agreement is in effect. Under such circumstances, the Court will not rule as a matter of law that David Fulton and Frances Fulton are without standing to advance their claims in this lawsuit.

Defendants argue in the alternative that David Fulton and Frances Fulton have failed to allege any facts entitling them to relief for misrepresentation or breach of contract. On the contrary, defendants contend that the deposition testimony of David Fulton and Frances Fulton demonstrates that those plaintiffs believe defendants have done nothing improper in connection with the Lake Oswego shoppe. *See* Deposition of David Fulton at 200–01, 208–09; Deposition of Frances Fulton at 98–100. Plaintiffs present no specific argument on this point.

The Court finds that while David Fulton and Frances Fulton did not exhibit explicit knowledge in their deposition testimony of wrongful acts committed by defendants, these plaintiffs should not be disqualified on the basis of that testimony from pursuing claims which are common to all plaintiffs. As discussed in previous sections on breach of contract and misrepresentation, plaintiffs have produced evidence sufficient to withstand defendants' motion for summary judgment supporting certain claims which are common to all plaintiffs. The Court will allow plaintiffs David Fulton and Frances Fulton to continue pursuing these common claims in conjunction with the other plaintiffs.

## VIII. STANDING OF JOHN FULTON AND SHARON FULTON

Plaintiffs John Fulton and Sharon Fulton filed a voluntary joint personal bankruptcy petition on October 15, 1985. Pentelovich Aff. Exh. X. Plaintiffs did not indicate the existence of any claim against defendants in schedules filed with the bankruptcy court, and the bankruptcy estate ultimately was closed by court order dated April 28, 1986. Defendants contend that any claims plaintiffs might have had against defendants were extinguished as a result of plaintiffs' bankruptcy. Defendants assert that all claims in existence at the time of the bankruptcy were transferred to the bankruptcy trustee, and that plaintiffs lost all right to pursue those claims. Defendants further contend that, because all plaintiffs' interest in the franchise agree-

ment passed to the estate at the time of plaintiffs' bankruptcy filing, plaintiffs cannot pursue any alleged post-petition claims which relate to plaintiffs' franchise operation.

■ At the time a bankruptcy petition is filed, the trustee in bankruptcy is vested with title to all the bankrupt's property. 11 U.S.C. § 541. A cause of action is a property right which passes to the trustee in bankruptcy, even if such cause of action is not included in schedules filed with the bankruptcy court. *See Hester v. Farmers Home Administration,* 49 B.R. 593, 599 (E.D.Mo.1985). Therefore, upon filing a petition for bankruptcy, a debtor loses standing to pursue any claims because those claims become part of the bankruptcy estate. *See Hester,* 49 B.R. at 599; *McGraw v. Jesionowski (In re Bell & Beckwith),* 64 B.R. 144, 147 (Bankr.N.D.Ohio 1986). Applying this rule to the present case requires a finding that plaintiffs John Fulton and Sharon Fulton are without standing to pursue claims against defendants which accrued to plaintiffs as of the filing of their bankruptcy petition.[31]

Plaintiffs contend that even if they may not pursue pre-petition claims, they are still entitled to assert claims for post-petition fraud, breach of contract, and violation of statute. The record indicates that just prior to filing for bankruptcy, John Fulton and Sharon Fulton transferred any interest they had in the Lake Oswego franchise to David Fulton and Frances Fulton. *See* Exhibits attached to David Fulton Affidavit. In light of that transfer, the proper parties to assert claims against defendants for acts committed after John Fulton and Sharon Fulton's bankruptcy filing would be David Fulton and Frances Fulton.

Based on the foregoing, the Court finds that John Fulton and Sharon Fulton are not proper plaintiffs in this action.

## IX. VALIDITY OF RELEASES

Plaintiffs Dwyer, Emry and Hines executed releases in favor of HDF and HDSC in connection with the transfer of certain Haagen–Dazs franchises. The transfers involved were:

(1) March 1984—Purchase of Haagen–Dazs shoppe located in San Francisco, CA by plaintiff Emry;

(2) September 1984—Sale of Haagen–Dazs shoppe located on Hennepin Avenue in Minneapolis, MN by plaintiff Dwyer;

(3) October 1984—Purchase of Haagen–Dazs shoppe located in Ridge Square in Minnetonka, MN by plaintiff Dwyer; and

(4) April 1985—Purchase of Haagen–Dazs shoppe located in Englewood, CO by plaintiff Hines.

*See* Pentelovich Aff. Exh. G, H, I; Eisenberg Aff. of March 29, 1989 Exh. F. In each case where plaintiffs Dwyer, Emry or Hines acted as purchaser of a franchise, plaintiffs executed a form entitled "Haagen–Dazs Shoppe Franchise Surrender and Reissue Agreement," which provided in part:

Seller and Purchaser mutually acknowledge that Haagen–Dazs Franchise, Inc. has not been party to any negotiations or agreements pertaining to the sale of the Haagen–Dazs Shoppe business to Purchaser, and that said corporation and its directors, officers, agents, servants or employees has not made any representations or warranties regarding such transaction. Seller and Purchaser also agree that they shall defend and hold harmless said corporation and its

---

**31.** Plaintiffs suggest that they were only barely aware of their claims against defendants when they filed their bankruptcy petition; plaintiffs intimate that this lack of knowledge somehow preserves plaintiffs' standing to assert pre-petition claims against defendants. The Court finds this argument to be without merit. Title 11 U.S.C. § 541 broadly states that, with a few enumerated exceptions, all property of a debtor passes to the bankruptcy estate. A claim about which a debtor has only vague knowledge is not among the enumerated exceptions, and plaintiffs cite no statutory or case authority in support of their argument. Under these circumstances and given the broad language of 11 U.S.C. § 541, the Court finds that plaintiffs' argument must fail.

officers, directors, stockholders, and employees, jointly and severally with respect to any and all liabilities, costs, expenses, claims, or causes of action pertaining to Seller's sale of the Haagen–Dazs Shoppe business to Purchaser with the same force and effect as though a general release as to such transaction was given to the corporation.

*See, e.g.,* Pentelovich Aff. Exh. H. In regard to plaintiff Dwyer's sale of the Hennepin Avenue franchise, Dwyer executed not only the franchise surrender and reissue agreement but also a general release purporting to release HDF and HDSC from all liability from claims relating to Dwyer's operation of that franchise.[32] Defendants now argue based on these releases that plaintiffs Dwyer, Emry and Hines are barred by these releases from pursuing claims against defendants, and plaintiffs seek summary judgment dismissing all claims by these plaintiffs.[33] Plaintiffs contest defendants' construction of the releases, and present objections to the validity of the releases.

## A. *Adequacy of Consideration*

 Courts generally engage in a presumption in favor of the validity of releases. *Schmitt–Norton Ford, Inc. v. Ford Motor Co.,* 524 F.Supp. 1099, 1102 (D.Minn. 1981), *aff'd,* 685 F.2d 438 (8th Cir.1982). To be valid, however, a release must be supported by consideration. *Id.* In this case, plaintiffs contend that the releases signed by plaintiffs Dwyer, Emry and Hines are invalid due to lack of consideration.

Questions regarding whether consideration was given at all, or whether a token amount is sufficient consideration for a release, are for the jury. *Schmitt–Norton Ford,* 524 F.Supp. at 1103, *citing Maynard v. Durham & Southern Railway Co.,* 365 U.S. 160, 162–63, 81 S.Ct. 561, 562–63, 5 L.Ed.2d 486 (1961). If more than a minimum threshold level of consideration is present, however, no genuine issue of material fact is raised and sufficient consideration may be found as a matter of law. *Schmitt–Norton Ford,* 524 F.Supp. at 1103. The Court finds that the releases in question here are supported by more than a minimum level of consideration, and as a matter of law are not invalid on that ground.

As to the releases executed by plaintiffs Dwyer, Emry and Hines in connection with their purchases of shoppes, the franchise surrender and reissue agreement provides that plaintiffs will release HDF and HDSC from claims relating to the purchase of the shoppe and will agree to complete a training program and fulfill other conditions, and in return HDSC will issue a new franchise agreement to plaintiffs as franchisees. Certainly this franchise agreement and the rights attendant thereto including the right to use the Haagen–Dazs

---

**32.** The general release executed by plaintiff Dwyer provided that plaintiff Dwyer, as releasor, released and discharged HDF and HDSC, as releasee,

the RELEASEE, RELEASEE's heirs, executors, administrators, successors and assigns from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims, and demands whatsoever, in law, admiralty or equity, which against the RELEASEE, the RELEASOR, RELEASOR'S heirs, executors, administrators, successors and assigns ever had, now have or hereafter can, shall or may, have for, upon, or by reason of any matter, cause or thing whatsoever from the beginning of the world to the day of the date of this RELEASE, pertaining to a certain business known as Haagen–Dazs Shoppe, # 147 located at 2906½ Hennepin Av-

enue South, Minneapolis, Minn. 55408 including but not limited to the Haagen–Dazs Shoppe Franchise, First Refusal Option, and Lease Assignment Option and all other agreement whatsoever governing the operation of that business between the parties named herein.

Pentelovich Aff. Exh. G.

**33.** The releases discussed above are limited by their terms to claims relating to a particular Haagen–Dazs franchise shoppe. Plaintiff Dwyer executed releases relating to his Hennepin Avenue and Ridge Square shoppes. Dwyer also operated, at certain times, shoppes in St. Anthony Main and downtown Minneapolis. Dwyer did not execute releases in connection with these latter shoppes, and accordingly any claims Dwyer asserts which arise from operation of those shoppes are not barred by a release.

trade name are things of value which constitute valid consideration for plaintiffs' releases.

As to the surrender and reissue agreement executed by Dwyer in connection with his sale of the Hennepin Avenue shoppe,[34] plaintiff Dwyer received the right to transfer his franchise to the purchaser in consideration for his release. The Court finds that the economic benefit which corresponds to such a sale provides adequate consideration for Dwyer's release.

The consideration for plaintiff Dwyer's general release of HDF and HDSC, also executed in the course of Dwyer's sale of the Hennepin Avenue shoppe, is clear. On the same day that Dwyer's attorney executed the general release of claims relating to the Hennepin Avenue shoppe in favor of HDF and HDSC, Paley executed a similar release on behalf of HDSC in favor of Dwyer. Pentelovich Aff. Exh. G. This release constitutes adequate consideration for the release executed by Dwyer.

Based upon the foregoing analysis, the Court finds that the releases executed by plaintiffs were supported by adequate consideration.

### B. *Fraud*

■ Plaintiffs contend that the releases at issue here are invalid because they were obtained by fraud. Misrepresentation or fraud may undermine the validity of a release. *Schmitt–Norton Ford*, 524 F.Supp. at 1103; *Sorensen v. Coast–to–Coast Stores (Central Organization), Inc.*, 353 N.W.2d 666, 670 (Minn.Ct.App.1984). In this case, however, plaintiffs have done no more than baldly assert fraud by defendants in procuring the releases. Plaintiffs do not specify exactly how defendants acted fraudulently, nor do plaintiffs cite portions of the record to support their claims of fraud. Plaintiffs refer to no affidavit or deposition testimony nor documents which suggest that fraud played a part in the execution of the releases. Absent some

evidence of fraud, the releases must be presumed valid.

### C. *Coercion*

■ A release may be found invalid if it was not freely and intentionally entered into by the releasor. *See Noble v. C.E. D.O., Inc.*, 374 N.W.2d 734, 744 (Minn.Ct. App.1985). In order to prove economic coercion negating a party's intent to enter into a release, the party must establish three elements: (1) that one side involuntarily accepted the terms of the other, (2) that circumstances permitted no other alternative, and (3) that those circumstances were the result of coercive acts of the opposite party. *Oskey Gasoline & Oil Co. v. Continental Oil Co.*, 534 F.2d 1281, 1286 (8th Cir.1976); *Schmitt–Norton Ford*, 524 F.Supp. at 1104; *Noble*, 374 N.W.2d at 744; *Sorensen*, 353 N.W.2d at 670. Whether the particular facts are sufficient to constitute a defense of economic coercion is a matter for the Court to determine. *Oskey Gasoline*, 534 F.2d at 1286. Here, plaintiffs have failed to present sufficient facts to allow the Court to determine if plaintiffs were induced to execute the releases through coercive conduct. Plaintiffs have provided the Court with no specific facts regarding the circumstances under which plaintiffs executed the releases. The Court is without information as to whether the plaintiffs faced no viable alternative to signing the release. Accordingly, the Court cannot find the releases invalid due to economic coercion.

### D. *Scope of the Releases*

■ Plaintiffs raise a question as to the scope of the releases at issue here. The Court finds that the language of the releases is straightforward and should be applied as follows. As to the surrender and reissue agreement signed by plaintiffs Dwyer, Emry and Hines in connection with the purchase of Haagen–Dazs shoppes, it is apparent that the release language contained in that form agreement is intended

---

**34.** Plaintiffs contend that the releases executed in connection with plaintiff Dwyer's sale of the Hennepin Avenue shoppe are ineffective because they were not signed by Dwyer himself.

This argument is without merit as the releases were signed by Keith R. Mohrlant acting as Dwyer's attorney-in-fact pursuant to a written power of attorney. *See* Pentelovich Aff. Exh. G.

to bar claims relating to the sale of the Haagen–Dazs business. *See* Pentelovich Aff. Exh. G, H, I; Eisenberg Aff. Exh. F. By signing the agreement, plaintiffs acknowledge that HDSC has not made any representations or warranties with respect to the transaction. *Id.* Thus, plaintiffs Dwyer, Emry and Hines are barred from pursuing claims of misrepresentation arising out of their purchases of shoppes for which they signed releases. Plaintiffs would not be barred, however, from pursuing breach of contract or misrepresentation claims based on conduct engaged in by defendants during the course of the parties' franchise relationship.

As to the general release signed by plaintiff Dwyer in connection with the sale of his Hennepin Avenue shoppe, the obviously broad scope of the release language suggests that all claims of Dwyer relating to the operation of his Hennepin Avenue shoppe are barred. Pentelovich Aff. Exh. G. The Court will give full effect to this language and will bar Dwyer from pursuing claims regarding his Hennepin Avenue shoppe.

Based on the foregoing, the Court will uphold the releases as valid, and bar claims brought by plaintiffs Dwyer, Emry and Hines which are covered by the language of the releases.

CONCLUSION

Accordingly, based on the foregoing, and upon all the files, records, proceedings and arguments of counsel,

IT IS ORDERED:

1. Defendants' motion to strike the March 22, 1989 Affidavit of Jeff Ross (Ross Aff. I) and the March 22, 1989 Affidavit of Mitchell Scott Paul is denied.

2. Defendants' motion to strike the April 28, 1989 Affidavit of Barry Sacks is granted.

3. Defendants' motion for summary judgment against plaintiffs' claims for breach of the contract and the implied covenants of good faith and fair dealing is granted with respect to all plaintiffs' claims except: (a) the claim by all the *Carlock* and *Dwyer* plaintiffs that HDF breached the franchise agreement by increasing the air content of the bulk ice cream sold to franchisees; and (b) the claim by all the *Carlock* and *Dwyer* plaintiffs that HDF and HDSC breached the franchise agreement by improperly calculating the adjustments to royalties and advertising contributions.

4. Plaintiffs' motion for partial summary judgment on their claim that HDF and HDSC charged plaintiffs excessive royalties and advertising contributions is denied.

5. Defendants' motion for summary judgment against plaintiffs' fraud claims is granted with respect to all of plaintiffs' claims except: (a) the claim by the Pinkuses that they were fraudulently induced to enter the franchise agreement by HDF's representations that it would provide assistance in site selection; (b) the claim by the Kranholds that they were fraudulently induced to enter the franchise agreement by HDSC's representations that it would provide assistance in site selection; (c) claims by the Curtises, the Goodmans, the Pinkuses and Dwyer that HDF and HDSC misrepresented the weight of the ice cream sold in bulk containers; (d) the claim by all the *Carlock* and *Dwyer* plaintiffs that HDF fraudulently concealed a change in the air content of the bulk ice cream; and (e) the claim by all plaintiffs concerning representations of advertising and marketing assistance by HDF and HDSC. The extent to which the surviving fraud claims extend to defendant Doris Mattus–Hurley was not argued to the Court and is not, therefore, decided in this Order.

6. Defendants' motion for summary judgment on claims in *Carlock* and *Dwyer* for violation of section 2 of the Sherman Act is granted.

7. Defendants' motion for summary judgment on the claims in *Carlock* and *Dwyer* for price discrimination in violation of the Robinson–Patman Act is granted.

8. Defendants' motion for summary judgment on the Oregon Price Discrimination Act claims asserted in *Carlock* is granted.

9. Defendants' motion for summary judgment on the Colorado Unfair Practices Act claims asserted in *Carlock* is granted.

10. Defendants' motion for summary judgment on the Idaho Unfair Practices Law claims asserted in *Carlock* is granted.

11. Defendants' motion for summary judgment on the California Unfair Practices Act claims asserted in *Carlock* is granted.

12. Defendants' motion for summary judgment on the Minnesota Consumer Fraud Act claims asserted in *Dwyer* is denied.

13. Defendants' motion for summary judgment on the Idaho Consumer Protection Act claims asserted in *Carlock* is denied.

14. Defendants' motion for summary judgment on the Washington Franchise Investment Act claims asserted in *Carlock* is granted.

15. Defendants' motion to dismiss the claims of the plaintiff corporations in *Carlock* and *Dwyer* on the grounds that the corporations lack standing to bring suit is denied.

16. Defendants' motion to dismiss the claims of David Fulton and Frances Fulton for lack of standing is denied.

17. Defendants' motion to dismiss the claims of John Fulton and Sharon Fulton is granted.

18. Defendants' motion to bar the claims of plaintiffs Thomas Dwyer, John Emry and Edwin Hines based upon the releases they have executed is partially granted. Dwyer, Emry and Hines are barred from pursuing claims of fraud arising out of their purchases of shoppes for which they signed releases. With one exception, however, the releases do not serve to bar Dwyer, Emry and Hines from pursuing breach of contract or fraud claims based on conduct engaged in by defendants during the course of the parties' franchise relationship. The exception is the general release signed by Dwyer in connection with the sale of his Hennepin Avenue shoppe. The broad scope of the language in that release bars Dwyer from pursuing any claims regarding his Hennepin Avenue shoppe.